## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JIAJIA LUO, Individually and on Behalf of All Others Similarly Situated,<br><br>           Plaintiff,<br><br>  vs.<br><br>SOGOU INC., SOHU, INC., TENCENT HOLDINGS LIMITED, XIAOCHUAN WANG, CHARLES (CHAOYANG) ZHANG, YUXIN REN, JOANNA (YANFENG) LU, BIN GAO, JOSEPH CHEN, JANICE LEE, and JAMES (XIUFENG) DENG,<br><br>           Defendants | Case No.<br><br>CLASS ACTION<br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Jiajia Luo, individually and on behalf of all the other persons similarly situated, by plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Sogou Inc. ("Sogou" or the "Company"), as well as conference call transcripts and media and analyst reports about the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### SUMMARY OF THE ACTION

1.  This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired Sogou American Depository Shares ("ADSs") pursuant and/or traceable to Sogou's false and misleading Registration Statement and Prospectus issued in connection with the Company's initial public offering on November 9, 2017 (the "IPO" or the

"Offering"), seeking to recover compensable damages caused by defendants' Securities Act of 1933 (the "Securities Act") violations (the "Class").

2.      Sogou, an Internet search company, was incorporated in the Cayman Islands in December 2005 by Sohu, Inc. ("Sohu"). Sogou is a subsidiary of Sohu, and is based in Beijing, the People's Republic of China.

3.      As of September 2017, Sogou was China's fourth largest Internet company based on MAU. By mobile queries, the Company's Sogou Search engine is the second largest search engine in China.

4.      Prior to February 2006, Sogou's search and search-related businesses were operated by various entities owned or controlled by Sohu. In February 2006, Sohu undertook a reorganization of its search and search-related businesses, whereby most of the business was transferred to Sogou. As part of the reorganization, Sohu established Sogou (BVI) Limited, or Sogou BVI, Beijing Sogou Technology Development Co., Ltd., or Sogou Technology, and Sogou Hong Kong Limited, or Sogou HK.

5.      Sogou Search is powered by artificial intelligence ("AI") and provides certain services that are unique from other search engines. One example is its cross-language search service, which eliminates the Chinese-English language barrier by enabling users to locate English content on the Internet by querying searches in Chinese and then reading content for which Sogou provides a Chinese translation.

6.      Sogou filed a draft Registration Statement on Form DRS with the SEC on August 14, 2017, and filed a Registration Statement on Form F-1 with the SEC on October 13, 2017. The SEC declared the Registration Statement effective on November 8, 2017, after Sogou made several amendments to the Registration Statement per comments received from the SEC. The Registration Statement was utilized in the Offering, and each of the Individual Defendants signed the Registration Statement.

7.     On November 9, 2017, Sogou filed its Prospectus with the SEC on Form 424B4.

8.     On November 9, 2017 Sogou declared its IPO of 45,000,000 ADSs at a price of US$13 per ADS. Each ADS represents one Class A Ordinary Share, par value of $0.001 per share. Sogou announced that its ADSs were approved to be listed on New York Stock Exchange LLC ("NYSE") under the ticker symbol "SOGO."

9.     On November 30, 2017, Sogou announced that the underwriters of the Company's IPO had exercised their over-allotment (or "greenshoe") option to purchase an additional 5,643,856 ADSs, each representing one Class A Ordinary Share of the Company. Pursuant to terms of the over-allotment option, the underwriters purchased the additional ADSs from the Company for the IPO price of US$13.00 per ADS, less an underwriting discount and commission of US$0.65 per ADS, or a net price of US$12.35 per ADS.

10.     Total proceeds to the Company from ADSs sold in the IPO, including the 45,000,000 ADSs sold initially and the 5,643,856 ADSs sold pursuant to the over-allotment option, were approximately US$625,450,000, after deducting underwriting discounts and commissions but before deducting offering expenses payable by the Company.

11.     Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies.  Specifically, defendants made false and/or misleading statements and/or failed to disclose that: (i) Chinese regulators were analyzing Sogou for regulatory action because of an increase Sogou merchants' sales of counterfeit goods; (ii) Chinese regulators were analyzing Sogou for regulatory action because Sogou's existing software, advertising procedures, personnel, and audit procedures were insufficient to safeguard against compliance violations with governing Chinese regulations, and would need to be updated, enhanced, and strengthened, thus resulting in increased expenses; (iii) Sogou's cost of revenues were skyrocketing primarily because of significant increases in Traffic Acquisition Cost, which is a primary driver of Sogou's cost of revenues,

as Sogou was dealing with significant price inflation from increased competition; (iv) Sogou was going to alter its strategy concerning smart hardware and push the Company's AI capabilities to increase product competitiveness; (v) as a result of altering its smart hardware strategy, Sogou had already decided to phase out non-AI-enabled hardware products, such as legacy models of Teemo Smart Watch, and transition to use products integrating AI technologies, which Sogou hoped would reduce its hardware revenues in the second half of 2018; and (vi) as a result of the foregoing, Sogou's public statements were materially false and misleading at all relevant times.

12.   In June and July 2018, Chinese media sources reported that Chinese authorities had ordered Sogou to remove illegal content from its search engine.

13.   On July 30, 2018, Sogou announced its financial and operating results for the second quarter of 2018.  The Company revised guidance for its third quarter 2018 financial results, citing an investigation by Chinese regulatory authorities and the implementation of "remedial measures", which included a ten-day suspension of part of its advertising business.

14.   Following this announcement, the price of Sogou ADSs fell $0.78, or 7.55%, to close at $9.55 on July 30, 2018.

15.   On October 25, 2018, Sogou announced its financial and operating results for the third quarter of 2018, advising investors that revenues had fallen short of guidance by $5.24 million and disclosing disappointing guidance for 2019.

16.   Following this news, the price of Sogou ADSs fell $0.25, or 4.35%, over the following three trading sessions, closing at $5.50 on October 30, 2018.

17.   As a result of Defendants' false and/or misleading statements, Sogou securities traded at inflated prices.  However, after disclosure of Defendants' false and/or misleading statements, Sogou's ADSs suffered a precipitous decline in market value, thereby causing significant losses and damages to Plaintiff and other Class members.

4

## JURISDICTION AND VENUE

18.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o).

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v).

20.     Venue is proper in this Judicial District pursuant to 15 U.S.C. § 77v. Sogou securities are traded on the NYSE, located within this Judicial District.

21.     In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

22.     Plaintiff purchased or otherwise acquired Sogou ADSs as described in the attached certification and was damaged by the revelation of the alleged corrective disclosure.

23.     Defendant Sogou is incorporated in the Cayman Islands, and its shares trade on the NYSE under the ticker symbol "SOGO."  The Company's corporate headquarters are located at Level 15, Sohu.com Internet Plaza, No. 1 Unit Zhongguancun East Road, Haidian District, Beijing 100084, People's Republic of China.

24.     Defendant Sohu is a Chinese Internet company and is a controlling shareholder of Sogou. Its offices are located at Level 15, Sohu.com Internet Plaza, No. 1 Unit Zhongguancun, Haidian District, Beijing, China, 100084. Sohu's shares trade on the NASDAQ Stock Exchange under the ticker "SOHU."

25.     Sogou is founded and controlled by Sohu. The Prospectus states that "Because more than 50% of the voting power in the election of directors of our company will be held by Sohu immediately

following this offering, we will qualify as a controlled company under the [NYSE] Listed Company Manual."

26.     Defendant Tencent Holdings Limited ("Tencent") is a Chinese multinational investment holding conglomerate founded in 1998, whose subsidiaries specialize in various Internet-related services and products, entertainment, artificial intelligence, and technology both in China and globally. Tencent is one of the largest if not the largest gaming and social media companies. Tencent is a controlling shareholder of Sogou. Tencent is headquartered at Tencent Building, Kejizhongyi Avenue Hi-tech Park Nanshan District, Shenzhen, China 518057.

27.     Defendant Xiaochuan Wang ("Wang") is, and throughout the relevant period, was a Director and Chief Executive Officer ("CEO") of Sogou. Upon information and belief, Wang is a citizen and resident of China.

28.     Defendant James (Xiufeng) Deng ("Deng") is the Company's Chief Financial Officer ("CFO"). Deng has been responsible for overseeing the Company's financial and accounting functions and prepared parts of the Offering Documents. Upon information and belief, Deng is a citizen and resident of China.

29.     Defendant Charles (Chaoyang) Zhang ("Zhang") is the Chairman of the Board ("Chairman") of Sogou. Zhang is the founder of Sohu and has been its Chairman and CEO since August 1996. Upon information and belief, Zhang is a citizen and resident of China.

30.     Defendant Yuxin Ren ("Ren") is a Director of Sogou. Upon information and belief, Ren is a citizen and resident of China.

31.     Defendant Joanna (Yanfeng) Lu ("Lu") is a Director of Sogou. Upon information and belief, Lu is a citizen and resident of China.

32.     Defendant Bin Gao ("Gao") is identified in the Prospectus as a nominee for Director of Sogou. Upon information and belief, Gao is a citizen and resident of China.

6

33.     Defendant Joseph Chen ("Chen") is identified in the Prospectus as a nominee for Director of Sogou. Upon information and belief, Chen is a citizen and resident of China.

34.     Defendant Janice Lee ("Lee") is identified in the Prospectus as a nominee for Director of Sogou. Upon information and belief, Lee is a citizen and resident of China.

35.     The defendants named in ¶¶ 27-34 are sometimes referred to herein as the "Individual Defendants."

36.     The Prospectus states that "[u]pon the effectiveness of the registration statement on Form F-1 of which this prospectus is a part, our Board of Directors will consist of Dr. Charles Zhang, Xiaochuan Wang, Yuxin Ren, Joanna Lu, Bin Gao, Joseph Chen, and Janice Lee."

37.     The Individual Defendants possessed the power and authority to control the contents of the Company's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

38.     Sogou, an Internet search company, was incorporated in the Cayman Islands in December 2005 by Sohu. Sogou is a subsidiary of Sohu, and is based in Beijing, the People's Republic of China.

7

39.     As of September 2017, Sogou was China's fourth largest Internet company based on MAU. By mobile queries, the Company's Sogou Search engine is the second largest search engine in China.

40.     Prior to February 2006, Sogou's search and search-related businesses were operated by various entities owned or controlled by Sohu. In February 2006, Sohu undertook a reorganization of its search and search-related businesses, whereby most of the business was transferred to Sogou. As part of the reorganization, Sohu established Sogou (BVI) Limited, or Sogou BVI, Beijing Sogou Technology Development Co., Ltd., or Sogou Technology, and Sogou Hong Kong Limited, or Sogou HK.

41.     Sogou Search is powered by AI and provides certain services that are unique from other search engines. One example is its cross-language search service, which eliminates the Chinese-English language barrier by enabling users to locate English content on the Internet by querying searches in Chinese and then reading content for which Sogou provides a Chinese translation.

42.     Sogou filed a draft Registration Statement on Form DRS with the SEC on August 14, 2017, and filed a Registration Statement on Form F-1 with the SEC on October 13, 2017. The SEC declared the Registration Statement effective on November 8, 2017, after Sogou made several amendments to the Registration Statement per comments received from the SEC. The Registration Statement was utilized in the Offering, and each of the Individual Defendants signed the Registration Statement.

43.     On November 9, 2017, Sogou filed its Prospectus with the SEC on Form 424B4.

44.     On November 9, 2017 Sogou declared its IPO of 45,000,000 ADSs at a price of US$13 per ADS. Each ADS represents one Class A Ordinary Share, par value of $0.001 per share. Sogou announced that its ADSs were approved to be listed on the NYSE under the ticker symbol "SOGO."

45.     On November 30, 2017, Sogou announced that the underwriters of the Company's IPO had exercised their over-allotment option to purchase an additional 5,643,856 ADSs, each representing

one Class A Ordinary Share of the Company. Pursuant to terms of the over-allotment option, the underwriters purchased the additional ADSs from the Company for the IPO price of US$13.00 per ADS, less an underwriting discount and commission of US$0.65 per ADS, or a net price of US$12.35 per ADS.

46.   Total proceeds to the Company from ADSs sold in the IPO, including the 45,000,000 ADSs sold initially and the 5,643,856 ADSs sold pursuant to the over-allotment option, were approximately US$625,450,000, after deducting underwriting discounts and commissions but before deducting offering expenses payable by the Company.

### The Alleged False and Misleading Statements[1]

47.   The Class Period begins on November 9, 2017, when Sogou filed its Prospectus with the SEC on Form 424B4. The Offering Documents stated, in relevant part:

We are an innovator in search and a leader in China's Internet industry. Our Sogou Search is the second largest search engine in China by mobile queries and we are the fourth largest Internet company in China based on MAU in September 2017, according to iResearch. Our industry-leading Sogou Input Method, *the robust ecosystem we have built and shared with Tencent and other strategic partners, and significant breakthroughs in AI uniquely position us to capture opportunities in China's search and Internet industry*.

Sogou Search had a 17.8% market share in China based on mobile queries in September 2017, as compared to 15.2% in March 2017 and 16.9% in June 2017, according to iResearch. Meanwhile, our mobile search MAU increased from 473 million in March 2017, to 483 million in June 2017, and further to 511 million in September 2017. *We have grown significantly, with total search page views having grown by 28.0% and mobile search page views having grown by 71.9% on an annualized basis from September 2014 to September 2017. Powered by AI, Sogou Search offers innovative products and services*. For example, our cross-language search service eliminates the Chinese-English language barrier, enabling users to discover English content on the Internet by querying in Chinese and reading content that we have translated into Chinese.

Chinese language input software is a must-have for users to type in Chinese. Sogou Input Method is the largest Chinese language input software by both mobile and PC MAUs in September 2017, according to iResearch, and is the first cloud-based Chinese language input software. Sogou Search continually captures Chinese expressions and phrases on the Internet, which enables

---

[1] Emphasis added throughout, unless otherwise noted.

Sogou Input Method to build a comprehensive and up-to-date vocabulary library. This allows us to improve the efficiency and accuracy of predictive text. In September 2017, Sogou Input Method had 307 million mobile DAU and 87 million PC DAU. It was the number two PC software in China by DAU and the number three mobile application in China by DAU in September 2017, according to iResearch. Sogou Input Method interfaces with virtually all applications that involve Chinese language input, generating massive and high-quality data that is critical to our big data capabilities. Sogou Input Method has the ability to anticipate users' search intentions in real-time and allows users to search directly with Sogou Search through its embedded search function, generating a significant portion of our organic search traffic.

We have built and shared a robust ecosystem with Tencent and other strategic partners. We deliver differentiated content to our users through services such as search access to the vast content from Tencent's Weixin Official Accounts. We have also broadened our user acquisition channels by collaborating with our strategic partners and third parties. Sogou Search is the default general search engine in Tencent's Mobile QQ Browser and qq.com. We are exploring potential opportunities to deepen our collaboration with Tencent. In October 2017, Tencent began testing, on a trial basis and for purposes of assessment, the integration of Sogou Search into Weixin/WeChat, whereby its users can use Sogou Search as a general search function from within Weixin/WeChat to access information outside Weixin/WeChat. We intend to discuss commercial arrangements with Tencent after completion of product testing and optimization.

***We are at the forefront of AI development with a clear roadmap. Focusing on natural interaction and knowledge computing, we have made significant breakthroughs in voice and image technologies, machine translation, and question answering or Q&A, which have been successfully integrated into our products and services.*** In addition to the implementation of machine translation in cross-language search services, we provide our users with a more natural search experience through AI-based voice and image technologies. Q&A technology enables us to provide direct answers in response to user queries, instead of displaying a list of Web links. ***Our proven AI capabilities will facilitate our launch of more disruptive products and services, such as virtual personal assistants, or VPAs, to serve users anytime, anywhere***.

***We have recorded substantial revenue growth, with an increase from US$386.4 million in 2014 to US$591.8 million in 2015 and US$660.4 million in 2016 and an increase from US$488.8 million for the nine months ended September 30, 2016 to US$630.6 million for the nine months ended September 30, 2017.*** We generate revenues primarily from search and search-related advertising services, which represented 90.4% and 87.9%, respectively, of our total revenues in the year ended December 31, 2016 and for the nine months ended September 30, 2017.

48.     In addition, the Offering Documents stressed the growing online search market in China,

stating in relevant part:

***China has a large and fast-growing online search market***. According to iResearch, China's total online search industry has grown to RMB76.5 billion (US$11.5 billion) in 2016. ***Going forward, the industry is expected to continue its rapid growth to RMB204.3 billion (US$30.7 billion) in 2021 representing a CAGR of 21.7% from 2016 to 2021. The industry growth is***

*supported by a massive but under-monetized user base*. According to iResearch, the annual revenue per search user in China was RMB127.1 (US$19.1) in 2016, compared to US$152.8 in the U.S., according to IDC. The shift of advertising budgets from offline to online and growth in key verticals, such as education, e-commerce, online games, financial services, and healthcare, will continue to drive monetization of online search in China.

*Online search is one of the most significant applications of AI. The core capabilities required to develop online search, including large-scale data processing, computing power, and advanced algorithms, are also stepping stones for the development of AI*. Search engines are able to efficiently process a massive amount of continuously updated data, and leverage advanced algorithms to determine targeted responses to user queries. These capabilities are also required for the development of AI and, therefore, online search companies are best positioned to develop and commercialize new AI products and services.

*AI will enable further search breakthroughs*. For example, Q&A technology enables search engines to provide direct and targeted answers to user queries. Other AI technologies, such as voice recognition, will enable a more intuitive and natural search experience based on conversation. The predictive and interactive capabilities enabled by AI and big data will provide further monetization opportunities for search engines, such as personalized newsfeeds and credit analytics for Internet finance. *AI is also a key enabler for smart hardware, which provides consumers with new gateways to the Internet and expands the use cases for search beyond PC and mobile devices to home, in-vehicle, and other environments*.

49.    Sogou's Prospectus further stated, in relevant part:

The increase in our other revenues from US$24.2 million for the three months ended June 30, 2017 to US$31.8 million for the three months ended September 30, 2017, representing a quarter-on-quarter increase of 31.4%, *was primarily attributable to an increase in revenues from sales of smart hardware products and IVAS*.

50.    The Prospectus also stated under its "*AI is a key enabler for smart hardware*" section,

in relevant part:

New Internet-enabled smart hardware, *such as wearables and smart appliances, is gaining popularity among consumers*. According to iResearch, China's smart hardware market is expected to grow to RMB275.1 billion (US$41.3 billion) in 2021, at a CAGR of 37.9% from 2016 to 2021. Smart hardware provides consumers with new gateways to the Internet.

51.    Sogou's Prospectus also stressed:

*We are at the forefront of AI development*. Search is one of the first practical applications of AI. *As a leader in China's search market, we have attracted a large pool of talent and developed algorithms and know-how in AI*. . . . We have applied our AI capabilities to a wide variety of projects and services. *Our voice and image recognition technologies have been integrated into Sogou Search, Sogou Input Method, and smart hardware developed in-house*

11

*and by third parties. We are among the earliest in China to develop a natural language conversation system*.

52.     In addition, Sogou's Prospectus described its Smart Hardware as follows:

*In 2014, we launched Teemo Watch, our self-developed smart watch for children that rapidly became one of the leading domestic brands for smart watches, according to IDC. Also according to IDC, Teemo Watch's sales ranked in the top five for smart wearables in China by shipping volume in the first quarter of 2017.*

In July 2017, we launched Teemo Hero Watch, our latest generation of 4G smart watch for children. Teemo Hero Watch offers a dual high-definition camera, which supports two-way HD video calls and HD Video sharing. It also integrates our Q&A technology and supports various other AI-powered applications.

*We frequently upgrade Teemo Watch features, and offer unique content-based services to differentiate our product from those of competitors. Our value-added content service model has evolved from story-pushing in our early days to now offering Teemo news, bedtime stories, "know-ahead-of-time," headlines, FM radio, photos, cloud-based video storage services, and other value-added services.*

53.     Likewise, the Prospectus noted several Chinese regulations that governed e-commerce companies, including Sogou, while utterly failing to disclose how Chinese regulators were already investigating Sogou for potential regulatory action:

In May 2010, SAIC adopted the Interim Measures for the Administration of Online Commodities Trading and Relevant Services, which took effect in July 2010. Under these measures, enterprises or other operators which engage in online commodities trading and other services and have been registered with SAIC or its local branches must make the information stated in their business license available to the public or provide a link to their business license on their website. *Online distributors must adopt measures to ensure the security of online transactions, protect online shoppers' rights and prevent the sale of counterfeit goods*. Information on products and transactions released by online distributors must be authentic, accurate, complete and sufficient.

In January 2014, SAIC adopted the Administrative Measures for Online Trading, or the Online Trading Measures, which terminated the above interim measures and took effect in March 2014. Under the Online Trading Measures, e-commerce platform operators shall examine and register the identity information of the merchants applying for having access to their platforms, archive such information which shall be kept verified and updated regularly. It is further provided that e-commerce platform operators shall make publicly available the link to or the information contained in the business licenses of such merchants (in the case of business entities) or a label confirming the verified identity of the merchants (in the case of individuals). A consumer is entitled to return the commodities within seven days from the date after receipt of the commodities without giving a reason, except for the following commodities: customized

commodities, fresh and perishable commodities, audio-visual products downloaded online or unpackaged by consumers and computer software and other digital commodities, and newspapers and journals that have been delivered. The online commodity operators shall, within seven days upon receipt of the returned commodities, provide full refunds to consumers for relevant commodities. In addition, operators shall not, by using contractual terms or by other manners, set out the provisions that are not fair or reasonable to consumers such as those that exclude or restrain consumers' rights, relieve or exempt operators' responsibilities, and increase the consumers' responsibilities, and shall not, by using contractual terms and by technical means, conduct transactions in a forcible manner.

54.     The statements referenced in ¶¶ 47-53 were materially false and misleading because the Offering Documents failed to disclose that: : (i) Chinese regulators were analyzing Sogou for regulatory action because of an increase Sogou merchants' sales of counterfeit goods; (ii) Chinese regulators were analyzing Sogou for regulatory action because Sogou's existing software, advertising procedures, personnel, and audit procedures were insufficient to safeguard against compliance violations with governing Chinese regulations, and would need to be updated, enhanced, and strengthened, thus resulting in increased expenses; (iii) Sogou's cost of revenues were skyrocketing primarily because of significant increases in Traffic Acquisition Cost, which is a primary driver of Sogou's cost of revenues, as Sogou was dealing with significant price inflation from increased competition; (iv) Sogou was going to alter its strategy concerning smart hardware and push the Company's AI capabilities to increase product competitiveness; (v) as a result of altering its smart hardware strategy, Sogou had already decided to phase out non-AI-enabled hardware products, such as legacy models of Teemo Smart Watch, and transition to use products integrating AI technologies, which Sogou hoped would reduce its hardware revenues in the second half of 2018; and (vi) as a result of the foregoing, Sogou's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

55.     On June 7, 2018, Chinese, non-U.S.-based, news sources reported that Chinese authorities had ordered Sogou to take down illegal content. *See* Li Yan, *Douyin, Sogou Told to Eliminate*

13

*Illegal Ads that Insult Heroic Deeds and Spirits*, ECNS.CN (June 7, 2018, 1:23 PM). The article revealed, in relevant part:

> Douyin, a Chinese popular short video app under Toutiao, and Chinese search engine Sogou were ordered on Wednesday to immediately take down illegal advertisements and carry out serious rectification. The Beijing Office of the Central Cyberspace Affairs Commission and the Beijing Administration for Industry and Commerce talked with the two companies on Wednesday. In the case of Douyin, the discussions involved publishing illegal advertisements on Sogou that discriminated against and insulted 'heroic deeds and spirits.'

Notably, the article pointed out how Chinese authorities accused Sogou of not "fulfill[ing] its responsibility to examine the advertisements posted on its website." *Id.*

56.    On July 1, 2018, additional disclosures concerning Sogou's conduct was reported. Several governmental entities, supervised by the PRC's State Administration of Market Regulation, called for Sogou's punishment for running content insulting national heroes and martyrs. According to *ChinaDaily.com*:

> Cyberspace regulators have required Douyin, a popular Chinese short video app under ByteDance, and Chinese search engine Sogou to carry out rectifications for their illegal advertisements that insulted martyrs. Instructed by the Cyberspace Administration of China, the Cyberspace Administration of Beijing and the city's Administration of Industry and Commerce had held face-to-face talks on Saturday with five companies [including Sogou], demanding them to immediately launch a rectification campaign and clean any content that insults heroes and martyrs, according to a release from the Cyberspace Administration of Beijing on Sunday. The move follows Douyin's advertisement on the Sogou search engine, which insulted Qiu Shaoyun, a war hero in the Korean War (1950-53) who let himself burn alive while he laid perfectly still so his platoon wouldn't be exposed . . . . The five companies [including Sogou] have been ordered to have a thorough self-examination on related content; conduct internal training on policies and regulations, socialist core values and revolutionary history; and improve their internal content review mechanism to prevent such violations. Names and images of heroes and martyrs such as Qiu must not be used in commercial advertisements, according to the release.

*See* Wang Keju, *Douyin Must Rectify Illegal Ads Insulting Chinese Martyrs*, CHINADAILY.COM (July 1, 2018, 7:41 PM).

57.    Also on July 1, 2018, the *South China Morning Post* reported:

> On Sunday afternoon, the watchdog said it had instructed the firms, which include the New York-listed search engine Sogou, to remove all commercials that mention Qiu and that all of them had 'voluntarily suspended [their] commercial services' . . . . The online controversy started

on June 5[, 2018] when an advertisement for Douyin appeared on Sogou that invited people to view 'jokes about Qiu Shaoyun getting burned'. The following day, the cyberspace administration issued a statement saying it had spoken to the two companies and ordered them to delete all related content.

See Jun Mai, *Chinese Video App Douyin Counts the Cost of Insulting Korean War Hero as Advertising Halted*, S. CHINA MORNING POST (July 1, 2018, 9:29 PM; updated July 1, 2018, 11:15 PM).

58.    On July 30, 2018, Sogou issued a press release announcing its Q2 2018 financial results. The press release disclosed two adverse events for the Company and, consequently, a revised downward guidance for its Q3 2018 financial results:

> ***Chinese regulatory authorities, including the Beijing Office of the Cyberspace Administration of China and the Beijing Administration for Industry and Commerce, initiated an investigation of Sogou after certain advertisements involving content that the authorities believed insulted a national hero were displayed on its platform.*** The advertisements were developed and reviewed by Douyin, a Chinese short-form video platform, and displayed on Sogou Search in June 2018. Following the investigation, the regulatory authorities instructed Sogou to amend its advertising practices. Sogou fully cooperated with the authorities in their investigation and the Company has taken steps to revise its advertising policies and audit procedures to ensure compliance with relevant regulations. ***In connection with implementing such remedial measures, Sogou suspended part of its advertising business for ten days commencing July 1, 2018. This is expected to result in a one-time reduction in revenues in the third quarter of 2018***.

> ***Sogou recently adjusted its smart hardware strategy*** to better leverage the Company's AI capabilities to improve product competitiveness. The adjustment followed the recent launch of two translation devices that were well received in the market due to Sogou's industry-leading translation technologies. As a result of the change in strategy, ***Sogou will phase out hardware products that are not AI-enabled***, such as some legacy models of Teemo Smart Watch, and transition to products that integrate the Company's leading AI technologies. ***Sogou expects that this will result in a reduction in hardware revenues in the second half of 2018***.

> **Business Outlook**

> ***For the third quarter of 2018, Sogou expects total revenues to range from $275 million to $285 million***, representing a 7% to 11% increase year-over-year. ***The guidance for the third quarter takes into account the one-time impact of the regulatory investigation, lower hardware Sales following the adjustment of the smart hardware strategy, and the depreciation of the RMB***.

59.    On this news, Sogou ADS shares fell from $10.33 on Friday, July 27, 2018, to $9.55 on Monday, July 30, 2018, and to $8.36 by August 15, 2018.

60.     On July 30, 2018, *Briefing.com* released an article attributing Sogou's share price drop to its poor earnings and decreased guidance for Q3 2018, which were directly related to the Company's remedial 10-day suspension, as well as its transition to new smart hardware. *See Sogou Trades Lower on Q2 Results; Q3 Revenue Guidance Well Below Expectations (SOGO)*, BRIEFING.COM (July 30, 2018, 9:49 ET). According to the article:

> The Q2 results were decent but not great; *of greater issue for the stock's performance today is the issued Q3 revenue guidance of $275-285 mln, which is well below market expectations*.
>
> *Why the poor guidance? It seems that Chinese regulatory authorities initiated an investigation of Sogou* after certain ads involving content that the authorities believed insulted a martyred national hero were displayed on its platform. The ads were developed and reviewed by Douyin, a popular Chinese short-form video sharing platform, and displayed on Sogou Search in June 2018. Sogou, as instructed by authorities, has taken steps to revise its advertising policies and audit procedures to ensure compliance. As a result of these revisions, *Sogou suspended part of its ad business for ten days beginning on July 1. This is expected to result in a one-time reduction in revenue in Q3*.
>
> *Also, in the interest of product competitiveness, Sogou has decided to phase out hardware products that are not AI-enabled*, such as some legacy models of Teemo Smart Watch, and to transition to products that integrate the company's AI technologies. *Sogou expects to see this strategic change result in a reduction in hardware revenue in 2H18. So the combination of these two events seem[s] to have impacted near-term revenue outlook*.

*Id.*

61.     On July 19, 2018, Sogou hosted a conference call with analysts and investors to discuss its Q2 2018 financial results. During that call, in response to a question from an analyst, Sogou admitted that issues surrounding the suspension of its ad business were negatively impacting the Company:

> **Q:** First question is regarding the recent PR incident on infringing or counterfeit products that management just mentioned. So can management share with us some thoughts on whether you view these impact as temporary one or rather long-lasting risk, as though we are taking a lot of efforts here, is this hard to solve all this kind of problem at one-time? That's my first question.
>
> **A:** [Colin Huang of Sogou]: Okay. So the first question, the combat against the counterfeit goods . . . . *The recent development and media attention had a little—honestly, had a little effect on the business itself*, but it does help us reflect and revisit many of our policies. We deeply understand that regardless the existing problems the industry has. It doesn't give us any excuse for not facing the problem directly and fighting against the problem wholeheartedly.

16

62.     Analysts on the July 19, 2018, call were skeptical of Sogou's assurances that the negative effects of the Company's suspension would be confined to Q3 2018. In response to a question regarding these doubts, Sogou admitted that Q2 2018 revenues were negatively impacted by Sogou's transition to smart hardware with superior AI capabilities:

> **Q:** [Alicia Yap]: I have a follow-up questions regarding the 10-day suspension's impact with 3Q guidance. So can you elaborate a little bit on the impact? ***It seems like the 3Q guidance are suggesting more serious impact than the 10-day suspension. So wanted to know how much of that coming from exactly the 10 days impact and how much of that is actually coming from the ongoing cleanup on the monitoring of those ad services***. So any detailed elaborations would be helpful.

> **A:** [Joe Zhou]: Okay, I will take this question. ***So first, let me give you more details on Q2 revenue***. That was such a very good basis for you to understanding Q3 revenue guidance. So for Q2, excluding 10 percentage points exchange rate impact total revenues in RMB increased by 33% year-over-year. Among that search-related revenues grew 35% year-over-year and the hardware revenues grew 19% year-over-year. For search-related revenue, the increase of 35% year-over-year were driven by, first, midsingle-digit growth in search traffic and 23% improvement on monetization. ***So for other revenues, it grew by 19%. The modest growth was primarily due to slower-than-expected Teemo sales as we already started to transition to hardware products that are better connected with AI capabilities. So that's for Q2***.

> ***For Q3***, excluding 2 percentage points exchange rate impact, if we use the midrange of our guidance that implies total revenues in RMB terms to grow 11% year-over-year. So among that, search-related revenues were increased by mid-teens and ***other revenues were decreased 25% to 30%***. So for search-related revenues to grow by mid-teens year-over-year, that's driven by, first single-digit growth in traffic and about 10% improvement on monetization. So, comparing to 23% year-over-year growth on the monetization improvement in Q2, ***the speed slowdown in Q3 [is] due to the 10-day suspension as a result of the Yin [ph] incident***.

> ***So other revenues are expected to decrease by 25% to 30% costs toward the end of Q2. We started to accelerate the adjustment of our smart hardware strategy by transitioning to products that are better connected with AI capabilities. Therefore, we are phasing out hardware products that are now AI-enabled such as certain legacy models of the Teemo Smart Watch***.

63.     Following these disclosures, Sogou's stock closed at $11.29 per share on July 19, 2018, and fell to $9.21 per share by July 31, 2018, thus declining over 19% in July 2018.

64.     On October 25, 2018, Sogou announced its Q3 2018 results, reporting that revenues missed guidance by $5.24 million. Sogou also announced a disappointing guidance for 2019.

65.     On November 5, 2018, on a conference call with analysts and investors to discuss the Company's Q3 2018 results and guidance going forward, Sogou disclosed that its upgraded smart hardware was continuing to have a negative impact on the Company's guidance for 2019:

> [Joe Zhou]: And finally, turning to guidance. For the first quarter of 2018, we expect the total revenues to be in the range of $292 million to $307 million, representing a 5% to 11% increase year-over-year or 11% to 17% increase year-over-year in RMB terms. ***The guidance takes into account a year-over-year decrease in other revenues due to the upgrade of our smart hardware strategy***, some macro uncertainties and regulatory headwind for certain sectors.

66.     On the same call, Jessie Zheng responded to a question from an analyst concerning the Company's transition to smart hardware and its effect on 2019 results:

> [Jessie Zheng]: "***On smart hardware***, I think our strategy has been that we need to leverage those technologies in voice, computer Vision, machine translation and Q&A, along the roadmap of natural interaction and knowledge computing, and integrate such AI technology closely with smart hardware to help strengthen Sogou's competitiveness and differentiation. ***In the first half and more recently, we launched a series of translation devices that help us showcase our AI capabilities*** and build a stronger brand in the market. And in the future, we look to launch some products that are of more strategic implications, that are designed to serve as a better gateway for user interaction.

67.     On the same call, Sogou announced that the Company's sales to Tencent, one of its largest customers, had decreased, while there was still no timetable for any WeChat search business monetization.

68.     Following these disclosures, Sogou's share price continued to fall, reaching a mere $5.50 by October 30, 2018, suffering over a 57% decrease in less than a year from its IPO date.

69.     As a result of Defendants' false and/or misleading statements, Sogou securities traded at inflated prices.  However, after disclosure of Defendants' false and/or misleading statements, Sogou's shares suffered a precipitous decline in market value, thereby causing significant losses and damages to Plaintiff and other Class members.

## CLASS ACTION ALLEGATIONS

70.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class (as defined *supra* at ¶ 1).  Excluded from the Class are defendants and their family members, directors and officers of Sogou and their families and affiliates, directors and officers of Sohu and their families and affiliates, and directors and officers of Tencent and their families and affiliates.

71.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Sogou has millions shares of stock outstanding, owned by hundreds or thousands of persons.

72.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a)     Whether the Securities Act was violated by defendants;

(b)     Whether defendants omitted and/or misrepresented material facts;

(c)     Whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     Whether the price of Sogou ADSs were artificially inflated; and

(f)     The extent of damage sustained by Class members and the appropriate measure of damages.

73.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

74.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

75.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I
## Violation of Section 11 of
## The Securities Act Against All Defendants

76.     Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

77.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against the Individual Defendants.

78.     The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

79.     Sogou is the registrant for the IPO. Individual Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

80.     As issuer of the shares, Sogou is strictly liable to Plaintiff and the Class for the misstatements and omissions.

81.     None of the Individual Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

82.     By reasons of the conduct herein alleged, each Individual Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

83.     Plaintiff acquired Sogou securities pursuant and/or traceable to the Registration Statement for the IPO.

84.     Plaintiff and the Class have sustained damages. The value of Sogou securities has declined substantially subsequent to and due to the Individual Defendants' violations.

## COUNT II
### Violation of Section 15 of
### The Securities Act Against the Individual Defendants

85.     Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

86.     This count is asserted against the Individual Defendants and is based upon Section 15 of the Securities Act.

87.     Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Sogou within the meaning of Section 15 of the Securities Act. Individual Defendants had the power and influence and exercised the same to cause Sogou to engage in the acts described herein.

88.     Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

89.     By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.	Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.	Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.	Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

DATED: January 9, 2019

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
Jonathan D. Lindenfeld
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
	ahood@pomlaw.com
	jlindenfeld@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.  I, _____ Jiajia Luo _____, make this

declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section

21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities

Litigation Reform Act of 1995.

2. I have reviewed a Complaint against Sogou Inc. ("Sogou" or the "Company"), and authorize the

filing of a comparable complaint on my behalf.

3. I did not purchase or acquire Sogou securities at the direction of plaintiffs counsel, or in order to

participate in any private action arising under the Securities Act or Exchange Act.

4. I am willing to serve as a representative party on behalf of a Class of investors who purchased or

acquired Sogou securities during the class period, including providing testimony at deposition and trial, if

necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5. To the best of my current knowledge, the attached sheet lists all of my transactions in Sogou

securities during the Class Period as specified in the Complaint.

6. During the three-year period preceding the date on which this Certification is signed, I have not

sought to serve as a representative party on behalf of a class under the federal securities laws.

7. I agree not to accept any payment for serving as a representative party on behalf of the class as set

forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses

directly relating to the representation of the class as ordered or approved by the Court.

8.   I declare under penalty of perjury that the foregoing is true and correct.


**Executed** ___1/08/2019___
                 **(Date)**


_____
**(Signature)**

_____
**(Type or Print Name)**

**Sogou Inc. (SOGO)**                                                    **Luo, Jiajia**

### List of Purchases and Sales

| Date | Purchase or Sale | Number of Shares/Unit | Price Per Share/Unit |
|------|------------------|----------------------|----------------------|
| 6/18/2018 | Purchase | 200 | $15.4685 |