**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| JIAJIA LUO, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>    v.<br><br>SOGOU INC., SOHU.COM INC., TENCENT HOLDINGS LIMITED, XIAOCHUAN WANG, CHARLES (CHAOYANG) ZHANG, YUXIN REN, JOANNA (YANFENG) LU, BIN GAO, JOSEPH CHEN, JANICE LEE, JAMES (XIUFENG) DENG, CHI PING MARTIN LAU, DONALD J. PUGLISI, J. P. MORGAN SECURITIES LLC, CREDIT SUISSE SECURITIES (USA) LLC, GOLDMAN SACHS (ASIA) L.L.C., and CHINA INTERNATIONAL CAPITAL CORPORATION HONG KONG SECURITIES LTD.,<br><br>    Defendants. | CASE No.: 1:19-cv-00230-JPO |

**DEFENDANT SOGOU INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS**
**<u>MOTION TO DISMISS THE SECOND AMENDED COMPLAINT</u>**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND .................................................................................................... 3

    A.   Sogou's Business ............................................................................................... 3

    B.   Sogou's IPO & Disclosures ............................................................................... 4

    C.   Smart Hardware ................................................................................................. 7

ARGUMENT ............................................................................................................................. 9

I.     THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 11 ...................... 10

    A.   Plaintiffs Fail to State a Section 11 Claim as to Sogou's Disclosures Regarding its
         Compliance Procedures .................................................................................... 11

        1. Plaintiffs fail to allege facts showing that Sogou's Internet content procedures were
           inadequate at the time of the IPO ............................................................ 11

        2. Sogou's extensive disclosures concerning its Internet content procedures render
           Plaintiffs' Section 11 claim invalid as a matter of law ................................. 13

    B.   Plaintiffs Fail to Allege Facts Showing that Sogou Omitted Material Information
         about its Smart Hardware .................................................................................. 15

        1. Plaintiffs fail to allege facts showing that Sogou omitted information about
           transitioning its smart hardware products at the time of the IPO ................... 16

        2. Plaintiffs fail to allege facts showing that Sogou "wrongly implied" that its smart-
           hardware was already AI-enabled ............................................................ 18

II.    PLAINTIFFS' OTHER ALLEGATIONS DO NOT SUPPORT THEIR SECTION 11
      CLAIMS .................................................................................................................. 19

CONCLUSION ......................................................................................................................... 22

## TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*
556 U.S. 662 (2009) ........................................................................................................ 9

*Bell Atlantic v. Twombly*
550 U.S. 544 (2007) ........................................................................................................ 9

*Charter Twp. of Clinton Police & Fire Ret. Sys. v. KKR Fin. Holdings LLC*,
No. 08 CIV. 7062 PAC, 2010 WL 4642554 (S.D.N.Y. Nov. 17, 2010) ................................... 13

*Denny v. Barber*
576 F.2d 465  (2d Cir. 1978) ........................................................................................... 11

*Halperin v. eBanker USA.com, Inc.*
295 F.3d 352 (2d Cir. 2002) ............................................................................................ 15

*In re CIT Grp., Inc. Sec. Litig.*
349 F. Supp. 2d 685 (S.D.N.Y. 2004) ................................................................................ 17

*In re Convergent Tech Sec. Litig.*
948 F.2d 507 (9th Cir. 1991) ........................................................................................... 19

*In re IAC/InterActiveCorp Sec. Litig.*,
695 F. Supp. 2d 109 (S.D.N.Y. 2010) ........................................................................... 9, 19

*In re Morgan Stanley Info. Fund Sec. Litig.*,
592 F.3d 347 (2d Cir. 2010) ........................................................................................ 3, 10

*In re ProShares Tr. Sec. Litig.*,
889 F. Supp. 2d 644, 653 (S.D.N.Y. 2012),
*aff'd*, 728 F.3d 96 (2d Cir. 2013) ......................................................................... 14, 15, 19

*In re TVIX Sec. Litig.*,
25 F. Supp. 3d 444 (S.D.N.Y. 2014),
*aff'd sub nom. Elite Aviation LLC v. Credit Suisse AG* 588 F. App'x 37 (2d Cir. 2014)... 15, 18

*In re Ultrafem Inc. Sec. Litig.*,
91 F. Supp. 2d 678 (S.D.N.Y. 2000) ................................................................................. 10

*In re Wachovia Equity Sec. Litig.*,
753 F. Supp. 2d 326 (S.D.N.Y. 2011) ............................................................................... 15

*Lin v. Interactive Brokers Grp., Inc.*
574 F. Supp. 2d 408 (S.D.N.Y. 2008) ............................................................................... 11

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
  761 F.3d 245 (2d Cir. 2014).................................................................................................. 13

*Panther Partners, Inc. v. Ikanos Comm., Inc.*,
  538 F. Supp. 2d 662 (S.D.N.Y. 2008),
  *aff'd*, 347 F. App'x 617 (2d Cir. 2009)........................................................................... 12, 14

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)............................................................................................ 10, 21

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc.*
  75 F.3d 801 (2d Cir. 1996).................................................................................................... 17

*Scott v. Gen. Motors Co.*
  46 F. Supp. 3d 387 (S.D.N.Y. 2014),
  *aff'd*, 605 F. App'x 52 (2d Cir. 2015)................................................................. 9, 10, 17, 18

*Singh v. Schikan*
  106 F. Supp. 3d 439 (S.D.N.Y. 2015)............................................................................ 10, 12

*Vaccaro v. New Source Energy Partners L.P.*,
  No. 15-CV-8954 (KMW), 2016 WL 7373799 (S.D.N.Y. Dec. 19, 2016) .............................. 21

## Statutes and Rules

15 U.S.C. § 77k................................................................................................................................ 1

15 U.S.C. § 77o.............................................................................................................................. 21

Fed R. Civ. P. 9(b) ........................................................................................................................ 10

Fed. R. Civ. P. 12(b)(6)................................................................................................................... 1

## PRELIMINARY STATEMENT

The Court should dismiss the Second Amended Complaint[1] ("Complaint" or "Compl.") under Fed. R. Civ. P. 12(b)(6) because Plaintiffs[2] have failed to state a claim under Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k ("Securities Act" or "'33 Act").

Plaintiffs allege that Sogou Inc. ("Sogou") omitted two pieces of information from its November 6, 2017 Registration Statement ("Registration Statement") filed in connection with its Initial Public Offering ("IPO"): (1) that Sogou's procedures to comply with Chinese censorship laws were purportedly inadequate; and (2) that, at the time of the IPO, Sogou allegedly failed to disclose that it had made the decision to transition to smart hardware products that had greater artificial intelligence ("AI") capabilities and to phase out certain non-AI enabled smart watch models. Plaintiffs also claim that Sogou "wrongly implied" that its smart hardware had AI capabilities. None of those alleged misstatements or omissions is actionable as a matter of law.

Plaintiffs' Section 11 claim as to Sogou's alleged inadequate compliance procedures is deficient for two reasons. First, Plaintiffs fail to allege any facts showing how or why Sogou's compliance procedures were inadequate **at the time of the IPO**. Instead, Plaintiffs rely solely on Sogou's decision **over seven months later** to modify its content monitoring practices in response to a one-time alleged violation of the Law on the Protection for Heroes and Martyrs (the "Heroes and Martyrs Act"), which was not even enacted until **five months after the IPO.**

---

[1] The Second Amended Complaint has incorrectly numbered paragraphs. Paragraphs 1 through 93, on pages 2 through 37, are correct. However, the paragraph following Paragraph 93 on page 37 is numbered "71," and the numbering restarts from there. As a result, there are duplicate-numbered paragraphs: two paragraphs numbered 75, two numbered 90, and so on. When this Motion cites to a paragraph in the first 93 paragraphs of the Complaint, it will cite like this: (Compl. ¶ 90). When citing to a duplicate-numbered paragraph from pages 37 to 41, it will cite as follows: (Compl. ¶ 90 (Second)).

[2] The Combined Investor Group, consisting of Lizhen Zhang, Juean Xu, Yuehua Ding, Maggie Xu, Mark S. Frater, and Ketan Patel, was appointed Lead Plaintiff in this action on April 2, 2019. *See* Order Appointing Lead Plaintiff and Approving Selection of Co-Lead Counsel, Docket No. 20, 1:19-cv-00230-JPO (Apr. 2, 2019).

1

The fact that Sogou changed its procedures to address compliance with a later-enacted law in response to a post-IPO violation plainly does not demonstrate the inadequacy of the procedures at the time of the IPO.  *See infra*, Section I.A.1.

Second, the Registration Statement contains extensive warnings that Sogou could have difficulty complying with Chinese censorship laws like the subsequently adopted Heroes and Martyrs Act and might suffer penalties as a result of non-compliance.  This clearly disclosed risk is exactly what occurred seven months after the IPO.  The law is clear that where a registration statement warns of the precise risk that later materializes, a Section 11 claim fails as a matter of law.  *See infra*, Section I.A.2.

Plaintiffs' Section 11 claim as to Sogou's smart hardware likewise is deficient for three reasons.  First, the facts alleged in the Complaint contradict Plaintiffs' assertion that Sogou failed to disclose it was transitioning to smart hardware that better-leveraged AI.  *See infra*, Section I.B.1.

Second, Plaintiffs allege no facts showing that **at the time of the IPO** Sogou had plans to phase out certain smart watch models.  Rather, the only fact alleged in the Complaint concerning the phaseout is that in mid-2018 the Company announced it had then decided to phase out some older model smart watches that were not AI-enabled as a result of the market acceptance of new AI products launched in the first and second quarters of 2018—**again well after the IPO**.  There is nothing in the Complaint to support the inference that Sogou had made this decision at the time of the IPO.  *See infra*, Section I.B.1.

Third, Plaintiffs' assertion that Sogou "wrongly implied" that its smart hardware products were already AI-enabled makes no sense.  Sogou expressly stated in the Registration Statement that some, but not all, smart hardware products were AI-enabled, and Plaintiffs do not allege a

single fact showing otherwise.  Accordingly, there was no "wrong implication"; the Registration Statement made a statement and Plaintiffs fail to allege a fact showing it was untrue.  *See infra*, Section I.B.2.

Given the absence of any facts contemporaneous with the IPO to support Plaintiffs' Section 11 claims against Sogou, the Complaint must be dismissed.

## FACTUAL BACKGROUND[3]

### A.    Sogou's Business

Sogou provides Internet search and search-related services in the People's Republic of China ("PRC" or "China").  *See* Affidavit of Joshua M. Looney filed in Support of Sogou's Motion to Dismiss ("Looney Aff."), ¶ 3, Ex. A (Sogou Inc., Reg. Statement (Form F-1/A) with Preliminary Prospectus attached (Nov. 6, 2017) at 7–8).[4]  Sogou has unique Chinese-language input software, cross-language Internet search services, and AI capabilities, which it believes distinguish it from other Internet search engines in China.  *See id.*  The vast majority of Sogou's revenue comes from search-related advertising.  *See id.* at 8 (search-related advertising contributed 87.9% ($554.3 million) of Sogou's revenue in the nine months prior to the IPO and 90.4% in 2016 ($597 million)).  Sogou's other businesses, which comprise the rest of its revenue, consist of Internet value-added services (primarily the operation of Web games and mobile games) and other products and services, including smart hardware products.  *See id.* at

---

[3] The facts contained in this section are taken from the Complaint and the documents cited therein, including the Registration Statement and Preliminary Prospectus, which are attached to Looney Aff. as Exhibit A.  *See* Looney Aff. at ¶ 3.  The documents are integral to the Complaint and are a proper subject for judicial notice and may be considered by the Court in determining the merits of Sogou's Motion to Dismiss.  *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 354 n.5 (2d Cir. 2010) ("[Courts] may take judicial notice of the full contents of the SEC's filings relat[ed] to this enforcement action because plaintiffs rely upon portions of them in their pleadings and, in any event, these proceedings are a matter of public record.").

[4] All references to "Ex." refer to exhibits attached to the Affidavit of Joshua M. Looney filed in Support of Sogou's Motion to Dismiss.  The Registration Statement and Preliminary Prospectus are attached as one exhibit, Exhibit A.  All citations to Exhibit A will cite to the pagination in the lower right-hand corner of the page, rather than the separate pagination of the Registration Statement or the Preliminary Prospectus.

19, 95 ("Other revenues" comprised $63.2 million in 2016 and $76.2 million for the nine months ended September 30, 2017).

The Teemo Watch is one of the smart hardware products that Sogou sells. *See id.* at 123–24.[5]

### B.      Sogou's IPO & Disclosures

Sogou conducted an IPO on November 9, 2017 pursuant to the Registration Statement and a prospectus filed with the Securities and Exchange Commission ("SEC").[6]  Compl. ¶ 6–7. Sogou disclosed thirty-six pages of risk factors in the Registration Statement. *See* Ex. A at 21–57.  One major risk it disclosed was the possibility that Chinese authorities would shut down Sogou's search engine for violating Internet content regulations or otherwise penalize Sogou: "If content accessed through our search services includes information that PRC governmental authorities find illegal or inappropriate, we may be required to curtail or even shut down our search services, and we may be subject to other penalties," which include "monetary damages," and "ceasing certain aspects of our business, which could have an adverse effect on our business and results of operations." *Id.* at 29.

The Company was further explicit that the PRC's Internet content and advertising regulations—existing at the time of the IPO or in the future—could directly impact its business: "If we are found to be in violation of current or future PRC laws and regulations regarding

---

[5] Sogou also began selling the Sogou Travel Translator and the Sogou Smart Recording Translator in 2018. *See* Ex. B (Press Release, Sogou Inc., Sogou Announces Second Quarter 2018 Results (July 30, 2018)) at 3.

[6] On October 13, 2017, Sogou filed a registration statement with the SEC on Form F-1.  Compl. ¶ 6.  The SEC declared an amended registration statement effective on November 8, and Sogou filed its prospectus on November 9, the day it conducted the IPO.  Compl. ¶ 6–7. The Company listed American Depository Shares, or ADSs, on the New York Stock Exchange under "SOGO." Compl. ¶ 7.  Including the portion of the underwriters' over-allotment option that was exercised, Sogou sold a total of 50,643,856 million ADSs in the offering.  Compl. ¶ 7–8.

Internet-related services and telecom-related activities, we could be subject to penalties or restrictions on our business activities." *Id.* at 38.

Sogou was especially clear about this risk in light of the fact that specific PRC regulations had **already** negatively affected Sogou's business:

> **PRC regulations relating to sponsored search have had, and may continue to have, an adverse effect on our results of operations.**
>
> . . . . In order to comply with [Internet content] regulations [issued in 2016], we have established more stringent standards for selecting advertisers for our pay-for-click services and have turned down certain existing advertisers, and have lowered the percentage that pay-for-click search results represent of results on our search pages, which had an adverse impact on our search and search-related revenues and overall results of operations for 2016 and, along with the tax on advertising, are likely to continue to have such an impact.
>
> *Id.* at 36 (emphasis in original).

Moreover, Sogou stressed that "PRC laws and regulations relating to the liability of providers of online products and services for activities of their users are undeveloped, and their current and future reach are unclear." *Id.* at 29.  Sogou cautioned investors that it "**may have difficulty determining the type of content that may result in liability for us** and, if we are wrong, we may be prevented from operating our Internet platforms." *Id.* at 42 (emphasis added). Indeed, at the time of the IPO, Sogou also warned investors of the very risk that materialized in July 2018 in connection with the one-time violation of the Heroes and Martyrs Act: "We cannot assure you that the PRC governmental authorities will not issue new laws or regulations specifically regulating sponsored search services, which could further impact our revenues." *Id.* at 36.

On April 27, 2018, the PRC government adopted the Heroes and Martyrs Act, which took effect on May 1, 2018—**over five months after the IPO**—to protect the "names, portraits, fame,

5

or hono[r] of heroes and martyrs" from being "insult[ed] or defam[ed] . . . in a public place or on the internet[.]"  Ex. C (the Heroes and Martyrs Act), Art. 22.  In or about June 2018, a third-party video platform company, Douyin, which was accessible via Sogou's search results keyed off of certain queries, ran advertisements that offered "jokes" about the Chinese hero Qiu Shaoyun, who is said to have burned to death from incendiary bombing in the Korean War (the "Douyin Incident").  *See* Compl. ¶ 59–65; *see also* Ex. E (Q2 2018 Sogou Inc Earnings Conference Call – Final, 7/30/18 FD Wire 10:30:00) at 3.  This led to an investigation of Douyin and Sogou in June 2018 by Chinese authorities.  *See* Compl. ¶ 59–60.  In responding to the investigation, Sogou suspended part of its advertising business for ten days in July 2018.  *See* Compl. ¶ 14; Ex. B at 4.

Sogou announced that the suspension was "expected to result in a one-time reduction in revenues in the third quarter of 2018."  Compl. ¶ 68; Ex. E at 3.  Sogou's management further stated in a conference call with investors on July 30, 2018 that its "search-related advertising has completely recovered, and its revenue growth will return to normal in Q4."  Compl. ¶ 70; *see* Ex. E at 6.  On the call, Sogou elaborated on new measures put in place for compliance with the new Heroes and Martyrs Act, comparing them with its prior measures:

> [B]efore that incident, we had a stringent review mechanism that includes multiple steps.  So once an ad is submitted to Sogou, the system will automatically fill the keywords that are blacklisted.  After the ad is uploaded to Sogou's database, the system will do another round of auto inspection and we will perform manual inspection on [a sample] basis.  So after the incident, we have implemented a range of measures to prevent this from happening again.  So we have established a dedicated team to monitor relevant new regulations and any changes of regulations as well as ensure timely implementation of such new regulations or changes accordingly.  And we strengthened our auditing procedures by leverag[ing] AI to upgrade [our] automated system and expand[ing] our manual inspection team to expand the scope of manual inspection.

> Compl. ¶ 70 (emphasis omitted); *see also* Ex. E at 6.

6

Although the Complaint asserts that Sogou was required to have these new measures in place at the time of the IPO,[7] it does not identify any PRC law or regulation that mandated the implementation of these specific procedures at the time of the IPO, or allege any reason why Sogou's already "stringent review mechanism" in place prior to the Douyin Incident was somehow then "inadequate." Moreover, the Heroes and Martyrs Act—which as stated above did not exist at the time of the IPO—does not require these compliance measures. *See* Ex. C.

### C.    Smart Hardware[8]

Sogou launched the Teemo Watch in 2014. *See* Ex. A at 123. In July 2017, Sogou launched a later generation of its smart watch, the Teemo Hero Watch. *See id.* at 124. The Hero watch used AI-enabled technology, such as Sogou's question-and-answer technology. *See id.*; *see also id.* ("We frequently upgrade Teemo Watch features, and offer unique content-based services to differentiate our product from those of competitors.").

In its IPO disclosures, Sogou stated that it had begun integrating its AI capabilities into smart hardware: "We have applied our AI capabilities to a wide variety of products and services. Our voice and image recognition technologies have been integrated into Sogou Search, Sogou Input Method, and smart hardware developed in-house and by third parties." *Id.* at 113; *see also*

---

[7] Compl. ¶ 58 ("[A]t the time of the IPO, . . . Sogou was required to [have these measures in place.]".

[8] Smart hardware is, and was at the time of the IPO, a small part of Sogou's business. In the Registration Statement, revenue from smart hardware was included in "Other Revenues" along with Internet value-added services like Web and mobile games, and other products and services. *See* Ex. A at 95. All of "Other Revenues" accounted for about 12% of Sogou's total revenues for the nine months ending September 2017, *see id.* at 19 (about $76 million out of $630.5 million total), and smart hardware, as only one component of "Other Revenues," would have been an even smaller percentage. The legacy models of Sogou's Teemo Smart Watch would not have been the entirety of Sogou's smart hardware: at the time of the IPO, Sogou had recently launched an updated, AI-enabled model, the Teemo Hero Watch. *See id.* at 124. Indeed, when certain legacy models of the Teemo Smart Watch were discontinued in 2018, the "Other Revenues" from 2017 to 2018 dropped $5.8 million, or less than 1% of Sogou's total revenues in 2018. *Compare* Ex. H (Press Release, Sogou Inc., Sogou Announces Fourth Quarter and Full Year 2017 Results (Jan. 29, 2018)) at 4 *with* Ex. F (Press Release, Sogou Inc., Sogou Announces Fourth Quarter and Full Year 2018 Results (February 1, 2019)) at 5.

Compl. ¶ 76.  Sogou also stated its intention to produce more AI-related products.  *See* Compl. ¶¶ 76–77 ("We have a clear roadmap for AI, focusing on natural interaction and knowledge computing. . . . We have applied our AI capabilities to a wide variety of products and services. . . . AI is a key enabler for smart hardware.") (emphasis omitted); *see also* Ex. A at 115–16 ("**We intend to grow our business and improve our results of operations by . . . . [c]ontinu[ing] to pursue innovations in AI technologies. . . . We also plan to broaden the application of our AI technologies**.") (emphasis added).  There are, therefore, no grounds for Plaintiffs' assertion that Sogou "failed to disclose that, at the time of the IPO, Sogou had determined to adjust its smart hardware strategy by transitioning to products that are better connected with AI capabilities."  Compl. ¶ 12 (internal quotations omitted).

After the IPO, Sogou launched AI-enabled translation devices in March and May 2018.  *See* Ex. E at 2; *see also* Compl. ¶ 79.  As Sogou stated during a conference call with investors on July 30, 2018, the success of those two devices encouraged Sogou to focus on hardware better able to take advantage of Sogou's AI-enabled technology:

> The [two translation] products have been well received in the market and created a strong brand recognition among customers.  **Encouraged by this development towards end of the second quarter**, we accelerated an adjustment of our smart hardware strategy**.  Now we are . . . transitioning to products that better leverage our AI technologies** . . . to improve products' competitiveness and . . . plan to scale the business as quick as possible.  We already have a few more products in the pipeline that we intend to launch before the end of this year.
>
> Ex. E at 2; *see also* Compl. ¶ 79.

Thus, contrary to Plaintiffs' assertion that Sogou had decided before the IPO to phase out smart hardware products that were not AI-enabled (Compl. ¶ 78), the underlying facts alleged in the Complaint state the opposite: that this decision was made after the IPO based on the success

of its two translation devices released in 2018.  *See* Compl. ¶ 79 ("The [smart hardware strategy] adjustment **followed the recent launch of two translation devices** that were well-received in the market. . . . **As a result of the change in strategy,** Sogou will phase out hardware products that are not AI-enabled, such as some legacy models of Teemo Smart Watch, and transition to products that integrate the Company's leading AI technologies.") (quoting Sogou's **2018 2Q Earnings Release**) (emphasis omitted; emphasis added); *see also* Ex. B at 4.

Furthermore, contrary to Plaintiffs' allegation that Sogou "wrongly implied" that its smart hardware was already AI-enabled in the Registration Statement, Sogou was clear that one line of its smart watches was AI-enabled and the other was not.  *Compare* Compl. ¶ 75 ("[The] Teemo Hero Watch . . . integrates [Sogou's] Q&A technology and supports various other AI-powered applications.") (quoting the Offering Documents) *with id.* at ¶ 80 (quoting Sogou as stating during a conference call in 2018 that "we are phasing out hardware products that are no[t] AI-enabled such as **certain** legacy models of the Teemo Smart Watch.") (emphasis added).  Plaintiffs allege no facts to support a claim that this was false—impliedly or otherwise.

## ARGUMENT

The Complaint cannot survive this Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6) because it does not plead "enough facts to state a claim to relief that is plausible on its face." *Scott v. Gen. Motors Co.*, 46 F. Supp. 3d 387, 393 (S.D.N.Y. 2014), *aff'd*, 605 F. App'x 52 (2d Cir. 2015) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)) (internal quotations omitted).  Merely concluding that Sogou's Registration Statement violated Section 11 does not make it so.  *See id.* ("A pleading that offers 'labels and conclusions' or a formulaic recitation of elements of a cause of action will not do.") (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  The Court should therefore dismiss the Complaint.  *See In re IAC/InterActiveCorp Sec. Litig.*, 695 F. Supp. 2d 109, 117–21 (S.D.N.Y. 2010) (dismissing

Section 11 claims of material omissions for failing to meet *Twombly*'s requirement of factual pleading).[9]

## I.      THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 11

Plaintiffs' Section 11 claim fails because they allege no facts showing that at the time of the IPO Sogou had inadequate compliance procedures or had made the decision to transition to smart hardware products with greater AI capabilities and to phase out non-AI Teemo Watches. *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358–59 (2d Cir. 2010) (affirming dismissal; "To state a claim under section 11, the plaintiff must allege that . . . the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'") (quoting 15 U.S.C. § 77k(a)); *see also Singh v. Schikan*, 106 F. Supp. 3d 439, 446 (S.D.N.Y. 2015) ("When pleading an actionable omission, plaintiffs must, at a minimum, plead facts to demonstrate that **allegedly omitted facts both existed, and were known or knowable, at the time of the offering**.") (citation and internal quotation marks omitted; emphasis added).

Instead, Plaintiffs base their alleged omissions on hindsight in response to two events that occurred after the IPO—*i.e.* the Douyin Incident and the decision to phase out non-AI Teemo Watches.  Section 11 claims based on hindsight are not actionable.  *See Scott*, 46 F. Supp. 3d at

---

[9] Because Plaintiffs' claims sound in fraud, they must also satisfy the heightened pleading requirements of Fed R. Civ. P. 9(b).  *See Rombach v. Chang*, 355 F.3d 164, 170–72 (2d Cir. 2004) (applying Rule 9(b)'s particularity pleading standard to a Section 11 claim sounding in fraud even though the plaintiff purported to state only a negligence claim).  The Complaint is replete with explicit claims of fraud: (i) "[T]he Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading" (Compl. ¶ 30); (ii) "Defendants were aware . . . [that] these adverse, undisclosed facts would, and ultimately did, have an unfavorable impact on Sogou's sales, revenues, and income from continuing operations" (Compl. ¶ 32); and (iii) "[w]hether defendants knew or recklessly disregarded that their statements were false and misleading" predominates Plaintiffs' claims (Compl. ¶ 77(d) (Second)).  Plaintiffs cannot avoid Rule 9(b) with their generic disclaimer of "any allegation of fraud, recklessness or intentional misconduct."  Compl. ¶¶ 81 (Second), 90 (Second).  *See In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 2d 678, 691 (S.D.N.Y. 2000) (applying Rule 9(b) to a Section 11 claim despite the plaintiffs' "boilerplate disclaimer" of fraud).

396 (dismissing Section 11 claim that improperly attempted to show false statements based on subsequent events; a plaintiff "may not state a claim for Section 11 liability based on mere hindsight"); *see also Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978) (Friendly, J.) (affirming dismissal of securities fraud claims because "the complaint . . . alleg[ed] fraud by hindsight").

### A. Plaintiffs Fail to State a Section 11 Claim as to Sogou's Disclosures Regarding its Compliance Procedures

The sole basis for Plaintiffs' allegation that Sogou failed to disclose that its compliance procedures were "inadequate" is that Sogou implemented modified procedures in July 2018 following the Douyin Incident. Compl. ¶¶ 11, 58–66. Plaintiffs allege that these procedures were "required" by PRC law at the time of the IPO. *Id.* at ¶ 58. But neither the post-IPO events nor the non-existent PRC law support Plaintiffs' claims.

Moreover, Plaintiffs wholly ignore Sogou's extensive disclosures that it may not be able to comply with existing and future PRC laws, which could result in an adverse impact on its business. *See* Compl. ¶¶ 56–57; *see also* Ex. A at 42 ("We may have difficulty determining the type of content that may result in liability for us and, if we are wrong, we may be prevented from operating our Internet platforms.").

#### 1. Plaintiffs fail to allege facts showing that Sogou's Internet content procedures were inadequate at the time of the IPO

There is no actionable omission regarding Sogou's compliance procedures because Plaintiffs have failed to plead that such procedures were inadequate at the time of the IPO. *See Lin v. Interactive Brokers Grp., Inc.*, 574 F. Supp. 2d 408, 421 (S.D.N.Y. 2008) ("To be actionable under Section 11, the registration statement must contain an untruth or material omission **when such part became effective**.") (quoting 15 U.S.C. § 77k(a)) (emphasis added). Plaintiffs merely allege their conclusion that Sogou's compliance procedures were inadequate.

But they fail to identify any "known or knowable" facts supporting the alleged inadequacy of those procedures. *Singh*, 106 F. Supp. 3d at 446.

The court's decision in *Panther Partners, Inc. v. Ikanos Comm., Inc.* is apposite here. 538 F. Supp. 2d 662 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 617 (2d Cir. 2009).  There, Panther Partners had claimed that Ikanos failed to disclose that its quality assurance program was inadequate to prevent microchip defects during its September 2005 IPO.  *See id.* at 671.  As evidence, the plaintiff identified a quality-control problem that occurred after the IPO in January 2006, when some of the Ikanos' microchips began failing.  *Id.* at 671–72.

The *Panther Partners* court dismissed the Section 11 claim because, among other things, Panther Partners had failed to (i) "enumerate exactly how and why Ikanos's quality control program" was deficient, or (ii) allege any facts which were known or knowable and therefore should have been disclosed at the time of the IPO.  *Id.* at 671–72 (holding that Panther Partners "[was] engaging in retrospective pleading [by] . . . question[ing] the accuracy of the offering statement in light of the much-later materialization of a quality control problem."); *id.* at 672 ("It is obvious, of course, that a defect problem which does not emerge until January 2006 (at the earliest) cannot be disclosed in September 2005."); *see also Singh*, 106 F. Supp. 3d at 447–49 (dismissing a Section 11 claim that a pharmaceutical defendant did not disclose that an ongoing drug study would fail after the IPO because plaintiffs "made no allegations suggesting that defendants could have known that the study would in fact produce worse results [than a prior study].").

Like in *Panther Partners*, Plaintiffs here have failed to allege any facts showing "how [or] why" Sogou's compliance procedures were inadequate.  They offer no basis for their assertion that Sogou was "required" to have the additional procedures it adopted after the Douyin

incident in place at the time of the IPO.[10]  Indeed, they do not identify any law or regulation existing at the time of the IPO or otherwise that required Sogou to implement these additional procedures.  *Cf. Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 251 (2d Cir. 2014) (vacating dismissal of a Section 11 claim where the defendants had failed to disclose that their environmental waste treatment procedures were inadequate to comply with regulations that, unlike here, existed at the time of the IPO, and had already resulted in violations).  Even the post-IPO enacted Heroes and Martyrs Act—which forms the sole basis for Plaintiffs' claims—does not require the additional procedures adopted by Sogou.  *See* Ex. C.

All Plaintiffs have done is list Sogou's post-IPO improvements and claimed that Sogou was somehow required to have these procedures in place at the time of the IPO.  *Compare* Compl. ¶ 58 *with* Compl. ¶¶ 69–70.  Sogou's procedures are not rendered inadequate solely based on a "much-later materialization" of a compliance issue—*i.e.* the subsequent Douyin Incident.  Because such "retrospective pleading" is impermissible, Plaintiffs' Section 11 claim as to Sogou's compliance procedures should be dismissed.  *See Charter Twp. of Clinton Police & Fire Ret. Sys. v. KKR Fin. Holdings LLC*, No. 08 CIV. 7062 PAC, 2010 WL 4642554, at *16 (S.D.N.Y. Nov. 17, 2010) (dismissing Section 11 claims in part because plaintiffs' claims were based on hindsight derived from the subprime mortgage crisis, and plaintiffs had failed to allege facts showing defendant's awareness of inability to refinance when its registration statement became effective).

    2.    <u>Sogou's extensive disclosures concerning its Internet content procedures render Plaintiffs' Section 11 claim invalid as a matter of law</u>

Sogou warned investors of the risk that the Company might be unable to comply with Chinese Internet-content regulations—which is the exact risk that later materialized.  The law is

---

[10] *See supra*, Factual Background, Section B.

13

clear that Plaintiffs cannot base their Section 11 claim on that materialized risk. *See In re ProShares Tr. Sec. Litig.*, 889 F. Supp. 2d 644, 653 (S.D.N.Y. 2012), *aff'd*, 728 F.3d 96 (2d Cir. 2013) ("When a registration statement warns of the exact risk that later materialized, a Section 11 claim will not lie as a matter of law."); *Panther Partners*, 538 F. Supp. 2d at 672 ("An accurate statement coupled with the precise disclosure of a risk later realized cannot adequately form the basis for a securities claim.").

Sogou fully disclosed the risk posed by existing and possible future PRC Internet content laws that could negatively impact Sogou's business:

- "We cannot assure you that the PRC governmental authorities will not issue new laws or regulations specifically regulating sponsored search services, which could further impact our revenues." Ex. A at 36.

- "PRC laws and regulations relating to the liability of providers of online products and services for activities of their users are undeveloped, and their current and future reach are unclear." *Id.* at 29.

- "We may have difficulty determining the type of content that may result in liability for us and, if we are wrong, we may be prevented from operating our Internet platforms." *Id.* at 42.

Courts regularly dismiss Section 11 claims that are thinly-disguised assertions that a risk fully disclosed in the offering documents later occurred. *Panther Partners*, 538 F. Supp. 2d at 672 ("Panther's allegation that Ikanos failed to disclose that it lacked an adequate in-house quality assurance program flies in the face of the disclosure actually made: Ikanos's disclosure covers the exact risk later realized, namely, the potential manifestation of a quality control problem at the site of its subcontractor's overseas production plant."); *In re ProShares*, 889 F. Supp. 2d 644, 654 (dismissing Section 11 claim that registration statement omitted risk that exchange-traded funds "could lose substantial value in a relatively brief period" because, among other things, the registration statement clearly stated that the funds' "objectives were daily only"

14

and that their value could "diverge significantly" when "held for longer than one day"); *In re TVIX Sec. Litig.*, 25 F. Supp. 3d 444, 452 (S.D.N.Y. 2014), *aff'd sub nom. Elite Aviation LLC v. Credit Suisse AG* 588 F. App'x 37 (2d Cir. 2014) (dismissing Section 11 claim that registration statement omitted computations and details of the long-term risk for holding onto short-term exchange-traded notes because, among other things, there was a clear disclosure that the "daily rebalancing [of the notes] would impair performance if there was any volatility").

A reasonably prudent investor would have understood the PRC regulatory risks from Sogou's disclosures at the time of the IPO—the exact risks that, in fact, came to fruition more than half a year later. *See In re ProShares*, 889 F. Supp. 2d 644, 654 (dismissing Section 11 claim; "[t]he plain language of the registration statements addressed the relevant risk directly, and a reasonably prudent investor would have understood that [risk]," which materialized after the IPO) (citing *Halperin v. eBanker USA.com, Inc.* 295 F.3d 352, 360–61 (2d Cir. 2002)) (internal quotations omitted).[11]

**B.    Plaintiffs Fail to Allege Facts Showing that Sogou Omitted Material Information about its Smart Hardware**

Plaintiffs rely on two arguments to allege a Section 11 claim with respect to Sogou's smart hardware disclosures. First, Plaintiffs claim Sogou failed to disclose at the time of the IPO that it had decided to transition to smart hardware with better-connected AI capabilities and to phase out certain non-AI enabled models of the Teemo Watch. Second, Plaintiffs claim that Sogou "wrongly implied" that its smart hardware was AI-enabled. Both assertions fail as a matter of law to show any omission or misstatement by Sogou regarding its smart hardware.

---

[11] Plaintiffs allege that Dr. Liyun Ru, Sogou's former Chief Operating Officer, resigned "in the midst of Sogou's troubles with its controls over advertising content." Compl. ¶ 72. Yet they do not connect Dr. Ru's resignation in any way with the Douyin Incident. This allegation is irrelevant to this claim and cannot save it from dismissal. *Cf. In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 366 (S.D.N.Y. 2011) ("[T]he resignations of Individual Defendants—without factual allegations linking the resignations to the alleged fraud—[are not] sufficient to raise the inferences required to establish fraud.").

1.    <u>Plaintiffs fail to allege facts showing that Sogou omitted information about transitioning its smart hardware products at the time of the IPO</u>

Plaintiffs claim that Sogou failed to disclose it intended to transition to more smart hardware products that had greater AI capabilities.

As a threshold matter, the Complaint contradicts this claim by quoting disclosures that that Sogou was **already** developing AI-enabled products.  Indeed, Sogou clearly disclosed in its Registration Statement that it "intend[ed] to grow our business and improve our results of operations by . . . . [c]ontinu[ing] to pursue innovations in AI technologies. . . . [and] broaden[ing] the application of our AI technologies."). Ex. A. at 115–16; *see also* Compl. ¶¶ 76–77 ("We have a clear roadmap for AI, focusing on natural interaction and knowledge computing. . . . We have applied our AI capabilities to a wide variety of products and services. . . . AI is a key enabler for smart hardware.") (emphasis omitted).  Plaintiffs' allegation that Sogou failed to disclose this intention thus fails.

Furthermore, Plaintiffs allege no facts showing that Sogou had made the decision to phase out certain non-AI enabled smart watch models by the time of the IPO.  The Complaint alleges only a single fact regarding the timing of this decision: it quotes a press release stating that Sogou **"recently"** made the decision after the market acceptance of two new AI-enabled language translation products in 2018.  *See* Compl. ¶ 79 (quoting a Sogou press release from **July 30, 2018**) (emphasis added); *see also* Ex. B. at 4.  The only fact alleged by Plaintiffs, therefore, is that Sogou made this decision in or around mid-2018.

There are no other facts alleged as to the timing of this decision, let alone any facts showing Sogou had decided at the time of the IPO to phase out certain legacy smart hardware products.  Accordingly, accepting the Complaint's allegations as true—namely, that Sogou's decision was made in mid-2018, long after the IPO—there was no omission by Sogou and

16

therefore no actionable claim under Section 11. *See In re CIT Grp., Inc. Sec. Litig.* 349 F. Supp. 2d 685, 690–91 (S.D.N.Y. 2004) ("That defendants later decided to revise the amount of loan loss reserves that it deemed adequate provides absolutely no reasonable basis for concluding that defendants did not think reserves were adequate at the time the registration statement and prospectus became effective."); *Scott*, 46 F. Supp. 3d at 394 ("[T]he relevant inquiry [for Section 11 claims] is not whether the statement later turned out to be correct, but rather whether the defendant knew or had reason to know, at the time the offering documents were filed, that the statement was untrue.") (citation and internal quotation marks omitted); *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc.* 75 F.3d 801, 811 (2d Cir. 1996) (Statements of the company's goal to narrow the price difference between premium and discount cigarette brands "simply reflected company policy at the time; they were not promises to maintain that policy in the future, and thus were not rendered misleading by the company's subsequent consideration of an alternative plan.").

The decision in *Scott v. General Motors Company* is highly relevant. 46 F. Supp. 3d 387 (S.D.N.Y. 2010). In *Scott*, General Motors ("GM") had high dealership inventory levels before a public offering. *Id.* at 389–90. The company stated in its registration statement that it would "improv[e] inventory management." *Id.* at 391. But GM's dealership inventory levels continued to increase after the offering. *Id.* at 392–93. Scott brought a Section 11 claim, alleging, among other things, that GM had not intended to improve its inventory management at the time of the offering given its post-offering dealership inventory increase. *See id.* at 396. The court dismissed this claim: "Lead Plaintiff proffers **no non-conclusory factual allegations** showing that GM did not intend to improve inventory management at the time the Registration Statement went effective. . . . Instead, the Amended Complaint relies on backward-looking logic to argue

17

that the statements were false, claiming that GM must have intended to manage its inventory poorly because, after the IPO, its inventory continued to increase." *Id.* (emphasis added).

Like *Scott*, Plaintiffs rely on hindsight in an attempt to manufacture a Section 11 claim. Also like *Scott*, the pleaded facts—that Sogou made the decision in mid-2018 to drop certain non-AI enabled hardware such as the older Teemo Watch models—fail to provide a basis for the claim that Sogou must have intended to do so before the IPO. Furthermore, it is hardly surprising that a company like Sogou would phase out older model technology products, particularly where it expressly disclosed its strategy to "pursue innovations" with respect to AI. *See* Ex. A. at 115.

Accordingly, Plaintiffs' claim as to Sogou's smart hardware disclosures should also be dismissed. *See In re TVIX Sec. Litig.*, 25 F. Supp. 3d at 450 ("Plaintiffs are not allowed to plead Section 11 claims with the benefit of 20/20 hindsight because Section 11 claims cannot be based on a backward-looking assessment of the registration statement.") (citation and internal quotations omitted).

2.    Plaintiffs fail to allege facts showing that Sogou "wrongly implied" that its smart-hardware was already AI-enabled

Plaintiffs also assert that Sogou "wrongly implied" in the Registration Statement that its smart hardware was already AI-enabled. Compl. ¶ 78. This claim is both demonstrably false and unsupported by any alleged fact.

Sogou could not have "wrongly implied" that its smart hardware had AI capabilities because it said so expressly with respect to one of the Teemo Watch models: "[The] Teemo Hero Watch . . . integrates [Sogou's] Q&A technology and supports various other AI-powered applications." Compl. ¶ 75 (quoting the Offering Documents); *see also* Compl. ¶ 87 ("Sogou

18

will phase out hardware products that are not AI-enabled, such as **some** legacy models of Teemo Smart Watch[.]") (quoting Ex. B at 4) (original emphasis removed; other emphasis added).

The only way this statement could be actionable is if it were false.  It is not.  Plaintiffs fail to allege a single fact showing that all of Sogou's smart hardware products lacked AI capability before the IPO.  *See In re IAC/InterActiveCorp.*, 695 F. Supp. 2d 109, 112–13, 120 (S.D.N.Y. 2010) (dismissing Section 11 claim because plaintiffs did not allege any "concrete facts" supporting their claim that the defendant failed to disclose "that widespread dissatisfaction was doing damage to [its] business" at the time the registration statement was filed).  For these reasons, Plaintiffs' claim regarding Sogou's allegedly "implied" inference about smart hardware must be dismissed.  *See In re ProShares Tr. Sec. Litig.*, 889 F. Supp. 2d at 654–55 (rejecting Section 11 claim that defendants had "impliedly encouraged investors to hold [funds] for periods of longer than one day" when plaintiffs could "point to no such language in the registration statements that specifically contemplates an investment strategy of holding for longer than one day"); *In re Convergent Tech Sec. Litig.*, 948 F.2d 507, 514 (9th Cir. 1991) (rejecting plaintiffs' contention that accurate statements about the past "misled investors by implying that [the company] expected the upward first quarter trend to continue").

## II.   PLAINTIFFS' OTHER ALLEGATIONS DO NOT SUPPORT THEIR SECTION 11 CLAIMS

For the reasons discussed above, Plaintiffs' baseless allegations fail to state a claim under Section 11.  However, the additional allegations on which Plaintiffs rely do not save their claims from dismissal.  Many of those allegations are demonstrably false.

First, Plaintiffs quote from a conference call with an individual named Colin Huang describing his company's "combat against . . . counterfeit goods" to support Plaintiffs' allegation that "Sogou admitted that issues surrounding the suspension of its ad business were negatively

impacting the Company."  Compl. ¶ 90–91.  Colin Huang, however, who Plaintiffs allege is "of Sogou" (Compl. ¶ 90), is not related to Sogou at all, and is apparently the CEO of the Chinese company Pinduoduo.  *See* Ex. I at ¶¶ 45, 83 (Consolidated Amended Class Action Complaint for Violations of the Securities Act of 1933, *In re Pinduoduo Securities Litigation,* 18-CIV-04256 (Cal. Super. Ct., San Mateo Cnty., Dec. 14, 2018)).  On information and belief, Plaintiffs cut this quotation from a different securities class action complaint[12] and pasted it into the Complaint, then falsely represented that Mr. Huang was speaking on behalf of Sogou about "counterfeit goods," an issue entirely unrelated to any of Plaintiffs' claims against Sogou.

Second, Plaintiffs allege that Sogou "advis[ed] investors that revenues had fallen short of guidance" for the third quarter of 2018.  Compl. ¶ 16.  This too is demonstrably false.  Sogou's revenue for the third quarter 2018 fell squarely within the Company's guidance in the previous quarter.  *Compare* Ex. B at 4 (describing the expectation that Sogou's total revenues would range from $275 million to $285 million during the third quarter 2018) *with* Ex. G at 4 ("Total revenues were $276.6 million [for the third quarter 2018.]").

Third, Plaintiffs claim that Sogou "revised guidance for its third quarter 2018 financial results" on July 30, 2018.  Compl. ¶ 14.  Again, this is false.  July 30, 2018 is the day that Sogou **first announced** its third quarter guidance—there was no prior guidance to revise.  *See* Ex. B. at

---

[12] *See* Ex. I at ¶ 83, Consolidated Amended Class Action Complaint for Violations of the Securities Act of 1933, *In re Pinduoduo Securities Litigation*, 18-CIV-04256 (Cal. Super. Ct., San Mateo Cnty., Dec. 14, 2018) ("Moreover, Pinduoduo hosted a conference call with analysts on August 30, 2018 to discuss its Q2 2018 financial results.  During that call, in response to a question from an analyst, Pinduoduo admitted that the impact from the counterfeit goods problem was affecting its financial results:

> **Q**: First question is regarding the recent PR incident on infringing or counterfeit products that management just mentioned.  So can management share with us some thoughts on whether you view these impact as temporary one or rather long-lasting risk, as though we are taking a lot of efforts here, is this hard to solve all this kind of problem at one-time?  That's my first question.
> A: [Colin Huang of Pinduoduo]: Okay.  So the first question, the combat against the counterfeit goods. . . **The recent development and media attention had a little — honestly, had a little effect on the business itself,** but it does help us reflect and revisit many of our policies.  We deeply understand that regardless the existing problems the industry has.  It doesn't give us any excuse for not facing the problem directly and fighting against the problem wholeheartedly.") (emphasis in original).

20

4.  Nor did Sogou revise that guidance at any point afterwards.  *See, e.g.*, Ex. G. at 4 (describing the third quarter 2018 results).

Fourth, Plaintiffs assert that Sogou's ADSs dropped in price following the company's "early November 2018" announcements: "Following this news, the price of Sogou ADSs fell $0.25, or 4.35%, over the following three trading sessions, closing at $5.50 on October 30, 2018."  Compl. ¶¶ 16–17.  This is obviously incorrect for two reasons.  First, Plaintiffs distort the chronology: the disclosures in November 2018 cannot have been responsible for the earlier price drop on October 30, 2018.  Second, the market price of Sogou ADSs actually **increased** by about 15.5% on November 5, 2018, the day the announcement was made, from the market price on October 30, 2018.  *See* Ex. J (*Sogou Inc. (SOGO): Historical Prices: Oct. 30, 2018 – Nov. 05, 2018*, YAHOO FINANCE[13] (accessed Sept. 17, 2019) (showing Sogou's closing price on November 5, 2018 was $6.35, almost 15.5% higher than the closing price of $5.50 on October 30, 2018).[14]

These patently false allegations further demonstrate the frivolous nature of Plaintiffs' claims.[15]

---

[13] Accessed at https://finance.yahoo.com/quote/SOGO/history?period1=1540872000&period2=1541394000&interval=1d&filter=history&frequency=1d.

[14] Courts are "entitled to take judicial notice of well publicized stock prices" on a motion to dismiss.  *Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 37 n.1 (2d Cir. 2012).

[15] Count II, "Violation of Section 15 of the Securities Act Against the Individual Defendants," is not pled against Sogou. *See* Compl. ¶¶ 90–94 (Second). Therefore, Count II cannot affect dismissal of the Complaint against the Company.  However, a claim under Section 15 (15 U.S.C. § 77o) for control person liability requires an underlying violation of federal securities laws. *See Rombach v. Chang*, 355 F.3d 164, 177–78 (2d Cir. 2004).  Given the plaintiffs' failure to plead a primary violation under Section 11, their Section 15 claim must also be dismissed. *See, e.g.*, *Vaccaro v. New Source Energy Partners L.P.*, No. 15-CV-8954 (KMW), 2016 WL 7373799, at *9 (S.D.N.Y. Dec. 19, 2016) (dismissing Section 15 claim after finding plaintiffs had failed to state Sections 11 or 12(a) claims) (citing *Rombach*, 355 F.3d at 177–78).

21

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court dismiss the

Second Amended Complaint with prejudice in its entirety.

Dated:  September 17, 2019          **GOULSTON & STORRS PC**

         /s/ Nicholas Cutaia

         Nicholas Cutaia
         885 Third Avenue, 18th Floor
         New York, New York 10022
         Tel: (212) 878-6900
         Fax: (212) 878-6911
         Email: ncutaia@goulstonstorrs.com

         Richard J. Rosensweig (admitted *pro hac vice*)
         Joshua M. Looney (admitted *pro hac vice*)
         400 Atlantic Avenue
         Boston, Massachusetts 02110
         Tel: (617) 482-1776
         Fax: (617) 574-4112
         Email: rrosensweig@goulstonstorrs.com
         Email: jlooney@goulstonstorrs.com

         *Counsel for Defendant Sogou Inc.*