# EXHIBIT I

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)
Yury A. Kolesnikov (SBN 271173)
7817 Ivanhoe Avenue, Suite 102
La Jolla, California  92037
Telephone:  (858) 914-2001
Facsimile:   (858) 914-2002

WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
Betsy C. Manifold (SBN 182450)
Rachele R. Byrd (SBN 190634)
Marisa C. Livesay (SBN 223247)
Brittany N. DeJong (SBN 258766)
750 B Street, Suite 2770
San Diego, CA 92101
Telephone:  (619) 239-4599
Facsimile:   (619) 234-4599

*Co-Lead Counsel for Plaintiffs*

[Additional Counsel Appear On Signature Page]

Electronically
**FILED**
by Superior Court of California, County of San Mateo
ON     12/14/2018
By_____/s/ Crystal Swords_____
Deputy Clerk

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SAN MATEO**

| | |
|---|---|
| IN RE PINDUODUO SECURITIES LITIGATION | ) ) ) |
| _____ | ) |
| | ) |
| This Document Relates to All Actions | ) ) ) ) ) ) ) ) ) ) ) |
| _____ | ) |

Lead Case No. 18-CIV-04256

CLASS ACTION

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933**

DEMAND FOR JURY TRIAL

JUDGE: Marie S. Weiner
Assigned for all purposes to Dept. 2

Plaintiffs Roger Webb, Harold A. Schlessinger, and Tuo Zhang ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' consolidated amended class action complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Pinduoduo Inc. ("Pinduoduo" or the "Company"), and information readily obtainable on the Internet. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons other than Defendants who purchased Pinduoduo American Depository Shares ("ADSs") pursuant and/or traceable to Pinduoduo's initial public stock offering on or about July 26, 2018 (the "Offering"), seeking to  pursue remedies under the Securities Act of 1933 (the "Securities Act").

2.      On a day in mid-July 2018, investment bankers from Goldman Sachs and Credit Suisse hosted a meeting with investors in New York to sell the IPO of Pinduoduo, a fast-growing and very young Chinese e-commerce company that some think could be the next JD.com or even Alibaba.  Shortly afterwards, the stock priced at the top of its IPO range and leapt 45% within a few days.

3.      But it wasn't long before the hype began to wear off.  After peaking at a massive valuation of $35 billion, or 125 times its 2017 sales, shares of Pinduoduo began a steady decline towards the IPO price of $19.  Thereafter, the stock declined below the IPO price, making it a "broken IPO" in Wall Street jargon.

4.      The nail in the coffin was news that Chinese regulators announced an

investigation into the sale of counterfeit goods and items infringing on copyrights that have been sold on Pinduoduo's platform. Pinduoduo deals mainly in very cheap items sold between third parties, fertile ground for fake goods to be exchanged.

5. These recent events have made it clear that Pinduoduo, its officers and directors, and the investment banks that brought the Company public made false and misleading statements in the Company's Prospectus and Registration Statement. The present action seeks recovery from such Defendants of the damages caused to Plaintiffs and other investors who bought Pinduoduo stock pursuant to the false and misleading Prospectus.

**JURISDICTION AND VENUE**

6. The claims alleged herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l (a)(2) and 77(o). This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, and 15 U.S.C. § 77v, which explicitly states that "[e]xcept as provided in section 16(c), no case arising under this title and brought in any State court of competent jurisdiction shall be removed to any court of the United States." Section 16(c) of the Securities Act refers to "covered class actions," which are defined as lawsuits brought as class actions or brought on behalf of more than 50 persons asserting claims under state or common law. This is an action asserting federal law claims. Thus, it does not fall within the definition of a "covered class action" under Section 16(c) and therefore is not removable to federal court under the Securities Litigation Uniform Standards Act of 1998. *See Cyan, Inc. v. Beaver County Employees Ret. Fund*, 138 S. Ct. 1061 (2018).

7. Each Defendant has sufficient contacts with California, or otherwise purposefully avails itself of benefits from California or has property in California so as to render the exercise of jurisdiction over each by California courts consistent with traditional notions of fair play and substantial justice. Defendants sold Pinduoduo ADSs to California residents and citizens, including Plaintiffs.

8. The amount in controversy exceeds the jurisdictional minimum of this Court,

and the total amount of damages sought exceeds $25,000.

9.    Venue is proper in this Court pursuant to Code of Civil Procedure section 395(a) because two of the Plaintiffs are citizens and residents of California and Defendant Sequoia Capital resides in this State and in the County of San Mateo.

**PARTIES**

10.    Plaintiff Roger Webb purchased Pinduoduo ADSs in California pursuant and/or traceable to the Offering, and was damaged thereby.  Plaintiff is a citizen and resident of California.

11.    Plaintiff Tuo Zhang purchased Pinduoduo ADSs pursuant and/or traceable to the Offering, and was damaged thereby.  Plaintiff is a citizen and resident of California.

12.    Plaintiff Harold A. Schlessinger purchased Pinduoduo ADSs pursuant and/or traceable to the Offering, and was damaged thereby.

13.    Defendant Pinduoduo Inc. is a Cayman Island corporation which operates an e-commerce platform that provides buyers with value-for-money merchandise and interactive shopping experiences.  Third-party vendors also sell products through Pinduoduo's platform.  Pinduoduo has its headquarters at No. 533 Loushanguan Road, 28th Floor, Changning District, Shanghai, 200051.  Pinduoduo's ADSs trade on the NASDAQ stock exchange under the ticker "PDD."

14.    Defendant Qi Lu ("Lu") has been an independent director and the chairman of Pinduoduo's compensation committee since July 2018.  Currently, he is the vice chairman of the board of directors of Baidu, Inc.  Prior to joining Baidu, Lu served as Microsoft's global executive vice president and led Applications and Services Group.  Lu joined Microsoft in 2009 as president of its Online Services Division.  Earlier in his career, Lu joined Yahoo! in 1998, later becoming senior vice president in charge of search and advertising technologies and subsequently executive vice president in 2007.  Lu holds bachelor's and master's degrees in computer science from Fudan University in Shanghai and a Ph.D. in computer science from Carnegie Mellon University.  Upon information and belief, Lu is a citizen and resident of China.

Consolidated Amended Class Action Complaint for Violations of the Securities Act of 1933

15.    Defendant Lei Chen ("Chen") is a founding member of the Company and has been a director of the Company since February 2017.  Chen has also been the chief technology officer of Pinduoduo since 2016.  Prior to joining the Company, Mr. Chen served as chief technology officer of Xinyoudi Studio since 2011.  Mr. Chen's prior working experience includes internships with Google, Yahoo Inc., and IBM in the United States.  Upon information and belief, Chen is a citizen and resident of China.

16.    Defendant Zhenwei Zheng ("Zheng") is a founding member of the Company and has been a director of the Company since April 2018.  Zheng has also served as the senior vice president of product development for the Company since 2016.  Prior to joining Pinduoduo, Mr. Zheng served as the chief executive officer of Xinyoudi Studio starting in 2011.  Prior to that, he held various positions at Baidu from 2008 to 2010.  Upon information and belief, Zheng is a citizen and resident of China.

17.    Defendant George Yong-Boon Yeo ("Yong-Boon Yeo") has served as a director of Pinduoduo since July 2018.  He currently serves as the chairman of the board of directors of Kerry Logistics Network (HKEx: 00636), a director of Kerry Holdings Limited, and an independent non-executive director of AIA Group Limited (HKEx: 01299).  Prior to that, Yeo served 23 years in the government of Singapore, and was Minister for Information and the Arts, Health, Trade & Industry, and Foreign Affairs of Singapore.  Yeo graduated with an MBA from the Harvard Business School in 1985.  Upon information and belief, Yong-Boon Yeo is a citizen and resident of China.

18.    Defendant Junyun Xiao ("Xiao") is a founding member of the Company and has been a director of the Company since April 2018 and senior vice president of operation since 2016.  Prior to joining Pinduoduo, Mr. Xiao served as operation director of Xinyoudi Studio starting in 2011.  Prior to that, he was a member of the founding team of Ouku.com and served as operation manager from 2007 to 2010.  Upon information and belief, Xiao is a citizen and resident of China.

19.    Defendant Zheng Huang ("Huang") is the founder of Pinduoduo and has been the Company's Chairman of the Board of Directors and Chief Executive Officer at all

relevant times, including during the Company's IPO.  Prior to founding Pinduoduo, Mr. Huang founded Xinyoudi Studio in 2011 to develop and operate online games.  Prior to that, Mr. Huang founded Ouku.com, a company that operated an online B2C platform for consumer electronics and home appliances, which was subsequently sold in 2010.  Mr. Huang started his career at Google's headquarters in California in 2004 as a software engineer and project manager.  Mr. Huang subsequently relocated to China and was part of the team that established Google China.  Upon information and belief, Huang is a citizen and resident of China.

20.    Defendant Tian Xu ("Xu") has been the Company's Vice President of Finance since June 2018.  Xu has been responsible for overseeing the Company's financial and accounting functions and prepared parts of the Offering Documents.  Prior to joining Pinduoduo, Mr. Xu served as a finance director at Baidu (NASDAQ: BIDU) since 2016.  Prior to that, he served as a finance director at Alibaba (NYSE: BABA) from 2014 to 2016.  From 2004 to 2012, Mr. Xu served as a finance controller at ABB Group, a leading technology company.  Prior to that, he served as an auditor in the auditing group of KPMG Huazhen from 2003 to 2004.  Mr. Xu received his bachelor's degree from Central University of Finance and Economics in 2000, his master's degree from Renmin University of China in 2003, and his master's degree in business administration from the Massachusetts Institute of Technology in 2013.  Upon information and belief, Xu is a citizen and resident of China.

21.    Defendant Haifeng Lin ("Lin") has been a director of the Company since June 2017.  Mr. Lin has also served as general manager of the merger and acquisitions department of Tencent Technology (Shenzhen) Company Limited, an affiliate of Tencent Holdings Limited (HKEx: 00700), since November 2010, and has been an executive director of Huayi Tencent Entertainment Company Limited (HKEx: 00419) since February 2016.  From July 2003 to November 2010, Mr. Lin served as a director of Microsoft China.  Prior to that, Mr. Lin worked at Nokia China from 1999 to 2001.  Mr. Lin received his bachelor's degree in engineering from Zhejiang University in June 1997 and his master's

Consolidated Amended Class Action Complaint for Violations of the Securities Act of 1933

degree in business administration from the Wharton School of the University of Pennsylvania in June 2003.  Upon information and belief, Lin is a citizen and resident of China.

22.     Defendant Zhen Zhang ("Zhang") has been a director of the Company since November 2015.  Mr. Zhang is one of the founders of Gaorong Capital and has served as its partner since 2014.  Mr. Zhang focuses on investments in the technology, media and telecommunications sector and has experience in helping early to growth stage companies develop their business.  Prior to founding Gaorong Capital, Mr. Zhang worked at IDG Capital Partners from 2002 to 2013 and was a partner and a member of the investment committee at IDG Capital Partners.  Upon information and belief, Zhang is a citizen and resident of China.

23.     Defendant Nanpeng Shen ("Shen") has been a director of the Company since April 2018.  Shen is Global Managing Partner of Defendant Sequoia Capital and the founding and managing partner of Sequoia Capital China.  Sequoia Capital China is a division of Defendant Sequoia Capital.  Entities associated with Defendant Sequoia Capital—some wholly owned by Shen—invested in Pinduoduo, and Sequoia Capital appointed Shen to the Pinduoduo Board of Directors.  Shen signed or authorized the signing and/or issuance of the Registration Statement in connection with the IPO.  Shen is also a co-founder of Ctrip.com International, Ltd. (Nasdaq: CTRP) and Homeinns Hotel Group.  Shen currently serves as an independent director of Ctrip and Momo Inc. (Nasdaq: Momo).  He also serves on the board of directors of PPDAI Group Inc. (NYSE: PPDF) and Noah Holdings Limited (NYSE: NOAH).  Mr. Shen received his bachelor's degree from Shanghai Jiao Tong University and his master's degree from Yale University.  Upon information and belief, Shen is a citizen and resident of China.

24.     Defendant Jianming Yu ("Yu") has been a director of the Company since March 2018.  Yu currently serves as a director of Zai Lab Ltd. (Nasdaq: ZLAB).  Mr. Yu received his bachelor's degree in biology from Tsinghua University in 1994, his doctoral degree in biology from Harvard University in 1998, and his master's degree in business

administration from the Kellogg School of Management at Northwestern University in 2000. Upon information and belief, Yu is a citizen and resident of China.

25. Defendants Lu, Chen, Zheng, Yong-Boon Yeo, Xiao, Huang, Xu, Lin, Zhang, Shen, and Yu are collectively referred to hereinafter as the "Individual Defendants."

26. Defendant China International Capital Corporation Hong Kong Securities Limited ("CICC") was an underwriter of the Company's Offering, served as a financial advisor, and assisted in the preparation and dissemination of Pinduoduo's false and misleading Offering Documents. Defendant CICC is headquartered at 29th Floor, One International Finance Center, 1 Harbor View Street, Central, Hong Kong, China.

27. Defendant China Renaissance Securities (Hong Kong) Limited ("China Renaissance") was an underwriter of the Company's Offering, served as a financial advisor and assisted in the preparation and dissemination of Pinduoduo's false and misleading Offering Documents. Defendant China Renaissance is headquartered at Unit 901-3, 9th Floor, Agricultural Bank of China Tower, 50 Connaught Road Central, Central, Hong Kong, China.

28. Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") is a Delaware limited liability company which is headquartered at 11 Madison Avenue, New York, New York. Credit Suisse was an underwriter of the Company's Offering, served as a financial advisor, and assisted in the preparation and dissemination of Pinduoduo's false and misleading Offering Documents (defined below).

29. Defendant Goldman Sachs (Asia) L.L.C. ("Goldman Sachs") was an underwriter of the Company's Offering, served as a financial advisor, and assisted in the preparation and dissemination of Pinduoduo's false and misleading Offering Documents. Goldman Sachs is headquartered at Cheung Kong Center, 68th Floor, 2 Queen's Road, Central, Hong Kong.

30. Credit Suisse, Goldman Sachs, CICC, and China Renaissance are referred to herein as the "Underwriter Defendants."

31. Defendant Sequoia Capital is a venture capital firm headquartered in Menlo

Consolidated Amended Class Action Complaint for Violations of the Securities Act of 1933

Park, California, and funds associated with Sequoia Capital own shares of Pinduoduo.  SCC Growth IV Holdco A, Ltd. ("SCC Growth"), incorporated in the Cayman Islands, holds more than half of the Pinduoduo shares held by Sequoia Capital funds.   SCC Growth is wholly owned by Sequoia Capital China Growth Fund IV, L.P. ("SCC Growth Fund"). The general partner of SCC Growth Fund is SC China Growth IV Management, L.P., whose general partner is SC China Holding Limited. SC China Holding Limited is wholly owned by SNP China Enterprises Limited, which in turn is wholly owned by Defendant Shen.  The remaining Pinduoduo shares held by Sequoia Capital funds are held by SC GGFII Holdco, Ltd. which is owned by Sequoia Capital Global Growth Fund II, L.P. and Sequoia Capital Global Growth II Principals Fund, L.P., whose general partner is SC Global Growth II Management, L.P. The general partner of SC Global Growth II Management, L.P. is SC US (TTGP), Ltd.  According to the Prospectus, the Sequoia Capital entities owned 7.4% of the outstanding Pinduoduo shares prior to the offering.  According to the 8th Amended and Restated Memorandum of Association of Walnut Street Group Holding Limited, now known as Pinduoduo, dated March 5, 2018, Sequoia Capital was allowed to appoint one director to the Board of Directors so long as it continued to hold shares.  In April 2018, Defendant Sequoia Capital appointed Defendant Shen to the Pinduoduo Board of Directors. Defendant Sequoia Capital is vicariously liable for the actions of Defendant Shen alleged herein, who was acting within the course and scope of his employment with Defendant Sequoia Capital when he signed or authorized the signing and/or issuance of the Registration Statement in connection with the IPO.

32.    Pinduoduo, the Individual Defendants, the Underwriter Defendants and Defendant Sequoia Capital are collectively referred to herein as "Defendants."

33.    Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement and Prospectus (the "Offering Documents").  The Underwriter Defendants' failure to conduct adequate due diligence investigations was a substantial factor leading to the harm complained of herein.

34.    In addition, the Underwriter Defendants met with potential investors and

- 8 -

Consolidated Amended Class Action Complaint for Violations of the Securities Act of 1933

presented highly favorable but materially incorrect and/or materially misleading information about the Company, its business, products, plans, and financial prospects, and/ or omitted to disclose material information required to be disclosed under the federal securities laws and applicable regulations promulgated thereunder.

35.    Representatives of the Underwriter Defendants also assisted the Company and the Individual Defendants in planning the Offering.  They also purported to conduct an adequate and reasonable investigation into the business, operations, products, and plans of the Company, an undertaking known as a "due diligence" investigation.  During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning the Company's business, financial condition, products, plans, and prospects.

36.    In addition to having access to internal corporate documents, the Underwriter Defendants and/or their agents, including their counsel, had access to the Company's lawyers, management, directors, and top executives to determine: (1) the strategy to best accomplish the Offering; (2) the terms of the Offering, including the price at which the Company's ADSs would be sold; (3) the language to be used in the Offering Documents; (4) what disclosures about the Company would be made in the Offering Documents; and (5) what responses would be made to the SEC in connection with its review of the Offering Documents.  As a result of those constant contacts and communications between the Underwriter Defendants' representatives and the Company's management and top executives, at a minimum, the Underwriter Defendants should have known of the Company's undisclosed existing problems and plans, and the material misstatements and omissions contained in the Offering Documents as detailed herein.

37.    The Underwriter Defendants caused the Offering Documents to be filed with the SEC and to be declared effective in connection with offers and sales of the Company's shares pursuant and/or traceable to the Offering and relevant offering materials, including to Plaintiffs and the Class.

Consolidated Amended Class Action Complaint for Violations of the Securities Act of 1933

**CLASS ACTION ALLEGATIONS**

38.    Plaintiffs  bring this action as a class action pursuant to section 382 of the California Code of Civil Procedure on behalf of a class consisting of all persons or entities who acquired the ADSs of Pinduoduo pursuant and/or traceable to the false and misleading Offering Documents issued in connection with the IPO (the "Class").  Excluded from the Class are Defendants and their families, the officers, directors and affiliates of the Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

39.    The members of the Class are so numerous that joinder of all members is impracticable.  The ADS shares are actively traded on the NASDAQ, a developed and global electronic market.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class.  In the IPO, at least 85,600,000 ADSs were sold at $19.00 per share to thousands of investors.  Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

40.    Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

41.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation, including litigation in San Mateo Superior Court.

42.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the Securities Act was violated by Defendants' acts as alleged

herein;

(b)    whether statements made by Defendants to the investing public in connection with the IPO and in the Offering Documents misrepresented material facts about the business, operations and prospects of Pinduoduo; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

43.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  In the IPO, at least 85,600,000 ADSs were sold at $19.00 per share to thousands of investors.

44.    Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impracticable for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**SUBSTANTIVE ALLEGATIONS**

**I.    Background on Pinduoduo**

45.    Pinduoduo's CEO, Colin Huang, has stated that he wants his company to resemble a combination of "Costco and Disney" that enables customers to receive value for their money by offering economical deals partnered with entertainment.  Value for money is generated either by selling private label brands or highly discounted branded items.

46.    Some analysts have described Pinduoduo as a more aggressive version of Groupon and a dollar store.  It uses group buying mechanics and social networking via WeChat to meet the minimum group size mandated by the merchant within a 24-hour time period from initiation, leading to all participants enjoying a better deal.  The customer is able to get a better price on already cheap products, and the merchant is able to generate more sales.  If the minimum group size is not generated, the merchant cancels the order and group members are refunded their payment.

47.    Founded in late 2015, Pinduoduo, whose name loosely translates to mean "buy more together," exists as a mobile app and a mini-program on messaging app WeChat

Consolidated Amended Class Action Complaint for Violations of the Securities Act of 1933

that offers users generous discounts if they and at least one of their WeChat friends decide to purchase an item together.

48.    Many of Pinduoduo's items are offered at less than 10 yuan after discounts, making it especially appealing to users from less-developed areas where incomes are lower. These users tend to view e-commerce shopping with friends as a form of cheap and fun entertainment in a country where smartphone users total 717 million.

49.    Its social+ group buying business model has proven so popular that Alibaba, which owns the Post and JD.com, have launched similar versions on their online marketplaces.  For the year ended March 31, 2018, Pinduoduo sold merchandise with a total value of 198.7 billion yuan.

50.    Pinduoduo founder Colin Huang became China's 12th richest person with the soaring US trading debut.  The former Google engineer's US$13.8 billion fortune after the IPO places him among the world's 100 richest people, according to the Bloomberg Billionaires Index.  Huang retains a 46.8 percent stake after the IPO, before any exercise of an over-allotment option.

51.    Defendant Huang, the CEO of Pinduoduo Inc., received at least $1 billion of stock without any performance hurdles as part of Pinduoduo's IPO.  As reported by Bloomberg:

> The concept of an IPO bonus that's not tied to future performance metrics is unusual because a public offering is already a way of compensating CEOs and their lieutenants. Founders like the heads of Pinduoduo, Xiaomi and JD already hold substantial stakes and would become billionaires even without the extra payout. That raises concerns that such rich paydays are coming at the expense of future shareholders, and could push startups to take on public investors even if they're not ready.

> "Generally we regard any pay package that doesn't align pay with performance not in the best interest of shareholders," said Michael Cheng, vice president of ESG Research at MSCI Inc. "Share awards that don't come with performance metrics defeat the whole purpose of equity retention policies, which are meant as incentives to executives to create value for the company and all shareholders."

> Colin Huang, the head of Pinduoduo, may soon have an $8.3 billion fortune, based on his holdings in the e-commerce operator and the IPO bonus. That

- 12 -

would make him among the 25 richest people in China, according to the Bloomberg Billionaires Index.

\* \* \*

The $8.3 billion fortune is based on the low end of the pricing range. The top end would mean a net worth of $9.9 billion, making him the 16th-richest person in China, ahead of Richard Liu, the founder of China's No. 2 e-commerce operator JD.com.

*See* Shelly Banjo & David Ramli, *CEOs Are Starting to Bank Billion-Dollar Bonuses With IPOs*, BLOOMBERG (July 23, 2018), https://www.bloomberg.com/news/articles/2018-07-23/china-ceos-start-to-get-1-billion-ipo-bonuses-to-go-public (last visited Dec. 14, 2018).

## II.    Materially False and Misleading Statements in the Prospectus

52.    On May 7, 2018, Pinduoduo filed a draft Registration Statement on Form DRS with the SEC.  On June 29, 2018, Pinduoduo filed a Registration Statement on Form F-1 with the SEC.  Following several amendments made in response to comments received by the SEC, the SEC declared the Registration Statement effective on July 25, 2018.  The Registration Statement was utilized in the Offering.

53.    Each of the Individual Defendants signed the Registration Statement.

54.    On July 26, 2018, Pinduoduo filed its Prospectus with the SEC on Form 424B4.

55.    The Registration Statement and Prospectus are referred to herein as the "Offering Documents."

56.    On July 26, 2018, Pinduoduo announced the pricing of its initial public offering of 85,600,000 American Depositary Shares ("ADSs") (equivalent of 342,400,000 Class A ordinary shares) at a price of US$19 per ADS for a total offering size of US$1.63 billion, assuming the underwriters do not exercise their option to purchase additional ADSs. The Company announced that its ADSs, each representing four Class A ordinary shares of the Company, had been approved for listing on the NASDAQ Global Select Market and were expected to begin trading on July 26, 2018 under the symbol "PDD".

57.    The Company also announced that the underwriters had been granted a 30-

- 13 -

Consolidated Amended Class Action Complaint for Violations of the Securities Act of 1933

day option to purchase up to an additional 12,840,000 ADSs from the Company (equivalent of 51,360,000 Class A ordinary shares), which would contribute to additional gross proceeds of US$244 million. This opinion is referred to by investment bankers as the "greenshoe" option.

58. The number of ordinary shares outstanding immediately after the offering (assuming the full vesting and exercise of 581,972,860 options granted and outstanding as of the offering) will be 5,013,118,240 ordinary shares on a fully diluted basis (or 5,064,478,240 ordinary shares if the underwriters exercise the over-allotment option in full).

59. On July 26, 2018, Pinduoduo ADSs began trading on NASDAQ, under the ticker "PDD". The stock opened at $26.50 per share and closed at $26.70 per share on July 26, 2018.

60. The Offering Documents were negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with the rules and regulations governing their preparation as the Offering Documents failed to disclose that: (1) Pinduoduo was not taking adequate steps to prevent counterfeit products from being sold on its platform or to remove counterfeit products from its platform; (2) Pinduoduo, rather than trying to eliminate the selling of counterfeit products from its platform, was actually encouraging the use of trademarks and aiding the selling of counterfeit products on its platform; (3) Pinduoduo was experiencing higher customer churn; (4) the full extent of the conflicts of interest posed to the Company by its reliance on a steady stream of traffic from one of the Company's principal shareholders — Tencent's WeChat; and (5) as a result, Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

61. The Offering Documents stated: "Our large and highly active buyer base has helped attract merchants to our platform, and *the scale of our sales volume has*

*encouraged merchants to offer even more competitive pricing and customized products and services to buyers, thus forming a virtuous cycle. In the twelve-month period ended June 30, 2018, we had 1.7 million active merchants on our platform, offering a broad range of product categories*." *See, e.g.,* Pinduoduo Inc., PROSPECTUS at 4, 80, 108 (July 26, 2018) (emphasis added).

62.    The Offering Documents also stated: *"Our number of active buyers, annual spending per active buyer and average monthly active users have been increasing.  The increases have primarily been driven by the growing popularity and recognition of our brand and platform*, the consumer preferences for our innovative shopping experience, wide selection and attractive prices of merchandise offered on our platform, and the positive impact of our promotional and marketing campaigns." *See, e.g., id.* at 81 (emphasis added).

63.    These statements were false and misleading because the Offering Documents did not disclose that Pinduoduo was not taking adequate steps to prevent counterfeit products from being sold on its platform or to remove counterfeit products from its platform, and thus that far from representing a "virtuous cycle," Pinduoduo's rapid growth was achieved in significant part by the increased sales of counterfeit goods on its platform.

64.    The materiality of any sale of counterfeit goods on Pinduoduo's platform was acknowledged by the Offering Documents, which stated:

> Public perception that counterfeit, unauthorized, illegal, or infringing products are sold on our platform or that we or merchants on our platform do not provide satisfactory consumer services, even if factually incorrect or based on isolated incidents, could damage our reputation, diminish the value of our brand, undermine the trust and credibility we have established and have a negative impact on our ability to attract new buyers or retain our current buyers. If we are unable to maintain our reputation, enhance our brand recognition or increase positive awareness of our platform, products and services, it may be difficult to maintain and grow our buyer base, and our business and growth prospects may be materially and adversely affected.

*      *      *

Consolidated Amended Class Action Complaint for Violations of the Securities Act of 1933

***We may incur liability for counterfeit, unauthorized, illegal, or infringing products sold or misleading information available on our platforms.***

\* \* \*

***In the event that counterfeit, illegal, unauthorized or infringing products are sold on our platform or infringing or misleading content is posted on our user interface, we could face claims or be imposed penalties. Counterfeit products sold on our platform may damage our reputation and cause buyers to refrain from making future purchases from us, which would materially and adversely affect our business operations and financial results***.

*See, e.g., id.* at 18, 22, 23 (emphasis added).

65.    The Offering Documents also conceded the materiality of any information regarding the sale of counterfeit goods on Pinduoduo's platform by the following statement in the Prospectus:

> The Tort Liability Law of the PRC, which was enacted by the Standing Committee of the NPC in December 2009 and took effect in July 2010, also provides that if an online service provider is aware that an online user is committing infringing activities, such as selling counterfeit products, through its internet services and fails to take necessary measures, it shall be jointly liable with the said online user for such infringement. If the online service provider receives any notice from the infringed party on any infringing activities, the online service provider shall take necessary measures, including deleting, blocking and unlinking the infringing content, in a timely manner. Otherwise, it will be jointly liable with the relevant online user for the extended damages.

*See, e.g., id.* at 128.

66.    However, while admitting the potential for significant fines and material effects on its financial results from failure to prevent the sale of counterfeit goods on its platform, Pinduoduo stated in the Offering Documents that it had "adopted strict measures to protect us against these potential liabilities," as follows:

> Under our current marketplace model, all products offered on our platform are supplied by merchants, who are separately responsible for sourcing the products that are sold on our platform.  In the twelve-month period ended June 30, 2018, we had 1.7 million active merchants on our platform, offering a broad range of product categories.  We have been and may continue to be subject to allegations and lawsuits claiming that products listed or sold through our platform by third-party merchants are counterfeit, unauthorized,

Consolidated Amended Class Action Complaint for Violations of the Securities Act of 1933

illegal, or otherwise infringe third-party copyrights, trademarks and patents or other intellectual property rights, or that content posted on our user interface contains misleading information on description of products and comparable prices. ***Although we have adopted strict measures to protect us against these potential liabilities, including proactively verifying the authenticity and authorization of products sold on our platform through working with brands and conducting offline investigations, immediately taking down any counterfeit or illegal products or misleading information found on our platform, and freezing the accounts of merchants in violation of the platform policies, these measures  may not always be successful or timely.*** For example, in January 2018, we were required by the relevant government authorities to strengthen supervision on the qualifications of the distributors of publications on our platform and to respond effectively to claims of copyright infringement. ***We have taken a number of measures in accordance with such requirements including the implementation of a comprehensive system in reviewing and tracking the qualification status of the relevant merchants.*** We may implement further measures in an effort to eliminate infringing products on our platforms, including taking legal actions against merchants of counterfeit or infringing products, which may cause us to spend substantial additional resources or result in reduced revenues.  In addition, these measures may not appeal to consumers, merchants or other participants on our platforms.  A merchant whose account is suspended or terminated by us, regardless of our compliance with the applicable laws, rules and regulations, may have disputes with us and commence action against us for damages, make public complaints or engage in publicity campaigns against us.  We may incur significant costs to defend against these activities, which could harm our business.

*See, e.g.*, *id.* at 22-23 (emphasis added).

67.     The aforementioned statements in the Offering Documents to the effect that Pinduoduo had "***adopted strict measures to protect us against these potential liabilities***" and had "***immediately tak[en] down any counterfeit or illegal products or misleading information found on our platform, and freezing the accounts of merchants in violation of the platform policies***" (emphasis added) were false and misleading because, in fact, at the time of the IPO, the extent of counterfeit goods being sold on Pinduoduo's platform was substantial and Pinduoduo had not done enough to counter the sale of such counterfeit goods.  Moreover, the statements were false and misleading because Pinduoduo, rather than trying to eliminate the sale of counterfeit products from its platform, was actually encouraging the use of trademarks and aiding the

Consolidated Amended Class Action Complaint for Violations of the Securities Act of 1933

selling of counterfeit products on its platform.

68.     Similarly, the Prospectus stated that Pinduoduo was subject to regulations adopted in China which were applicable to e-commerce companies such as Pinduoduo, but failed to disclose that the Chinese regulators were already analyzing Pinduoduo for potential regulatory action :

> In May 2010, SAIC adopted the Interim Measures for the Administration of Online Commodities Trading and Relevant Services, which took effect in July 2010. Under these measures, enterprises or other operators which engage in online commodities trading and other services and have been registered with SAIC or its local branches must make the information stated in their business license available to the public or provide a link to their business license on their website. ***Online distributors must adopt measures to ensure the security of online transactions, protect online shoppers' rights and prevent the sale of counterfeit goods.*** Information on products and transactions released by online distributors must be authentic, accurate, complete and sufficient.

> In January 2014, SAIC adopted the Administrative Measures for Online Trading, or the Online Trading Measures, which terminated the above interim measures and took effect in March 2014. Under the Online Trading Measures, e-commerce platform operators shall examine and register the identity information of the merchants applying for having access to their platforms, archive such information which shall be kept verified and updated regularly.  It is further provided that e-commerce platform operators shall make publicly available the link to or the information contained in the business licenses of such merchants (in the case of business entities) or a label confirming the verified identity of the merchants (in the case of individuals).  A consumer is entitled to return the commodities within seven days from the date after receipt of the commodities without giving a reason, except for the following commodities: customized commodities, fresh and perishable commodities, audio-visual products downloaded online or unpackaged by consumers and computer software and other digital commodities, and newspapers and journals that have been delivered. The online commodity operators shall, within seven days upon receipt of the returned commodities, provide full refunds to consumers for relevant commodities. In addition, operators shall not, by using contractual terms or by other manners, set out the provisions that are not fair or reasonable to consumers such as those that exclude or restrain consumers' rights, relieve or exempt operators' responsibilities, and increase the consumers' responsibilities, and shall not, by using contractual terms and by technical means, conduct transactions in a forcible manner.

*See, e.g., id.* at 125 (emphasis added).

69.     These statements were false and misleading because the Prospectus failed to

Consolidated Amended Class Action Complaint for Violations of the Securities Act of 1933

disclose that Chinese regulators were already looking at Pinduoduo for additional regulatory action due to increased sales of counterfeit goods by Pinduoduo merchants.

70.    The Offering Documents also contained material omissions, including:

(a)    The failure to disclose the extent of customer churn;

(b)    The full extent of risks and conflicts of interest posed to the Company by its reliance a steady stream of traffic from one of the Company's principal shareholders — Tencent's WeChat;

(c)    Pinduoduo's platform actually encourages counterfeits as there is a function called "Pinduoduo loading assistant" which allows a seller on Pinduoduo's platform to type in a product he/she is looking to sell and then copy the authentic seller's website content including pictures and trademarks; and

(d)    the fact that Pinduoduo had received the most complaints about counterfeit goods among all comparable e-commerce sites in China in 2016.

71.    In addition, Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(a)(3)(ii) ("Item 303"), required the Offering Documents to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on the net sales or revenues or income from continuing operations."  The regulation also requires the Offering Documents to disclose events that the registrant knew would "cause a material change in the relationship between costs and revenues." *Id.*  The fact that Pinduoduo was experiencing an increased incidence of counterfeit goods on its platform, had been ineffectual in stopping the sale of such goods, and that it faced increased regulatory action for failing to stem the tide of counterfeit goods sales on its platform—as well as the impact such trend would have on its financial results and expenses, which would lead to lower growth, revenue, and profit margins—were required to be disclosed pursuant to Item 303, because these facts posed events and uncertainties that would (and did) have an unfavorable impact on Pinduoduo's revenues and income from operations.

72.    While the Registration Statement generally warned of numerous risks that

Consolidated Amended Class Action Complaint for Violations of the Securities Act of 1933

could affect the Company, it failed to disclose that these risks had already materialized at the time of the IPO. The Registration Statement also failed to disclose the full extent of customer churn at Pinduoduo and failed to disclose that Pinduoduo's platform actually encourages counterfeits as there is a function called "Pinduoduo loading assistant" which allows a seller on Pinduoduo's platform to type in a product he/she is looking to sell and then copy the authentic seller's website content including pictures and trademarks.

73. Under the Securities Act, Defendants were required to disclose these material facts in the Registration Statement because they were known events or uncertainties that at the time of the IPO had caused or were reasonably likely to cause Pinduoduo's disclosed financial information to be not indicative of future operating results and likely to materially and adversely affect Pinduoduo's future results and prospects. Further, Defendants were required to disclose the risk factors that made the offering risky or speculative and to ensure the risk factor adequately described the actual risk and the likely material adverse effects on the Company's financial results and operations.

74. Accordingly, Defendants' conduct with respect to the Registration Statement violated the Securities Act.

75. Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

(a) The Underwriter Defendants are investment banking houses that specialize, *inter alia*, in underwriting public offerings of securities. The Underwriter Defendants served as the underwriters of the IPO and shared millions of dollars in fees collectively. The Underwriter Defendants determined that in return for their share of the IPO proceeds, they were willing to merchandize Pinduoduo stock in the IPO.

(b) The Underwriter Defendants also demanded and obtained an agreement from the Company that the Company would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws. They also made certain that the Company had purchased millions of dollars in directors' and officers' liability insurance.

Consolidated Amended Class Action Complaint for Violations of the Securities Act of 1933

(c)    Representatives of the Underwriter Defendants also assisted Pinduoduo and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Pinduoduo, an undertaking known as a "due diligence" investigation.  The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO.  During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Pinduoduo's operations and financial prospects.

(d)    In addition to availing themselves of virtually unbridled access to material corporate documents, agents of the Underwriter Defendants met with Pinduoduo's lawyers, management, and top executives and engaged in "drafting sessions" between at least May 2018 and July 2018.  During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Pinduoduo common stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about the Company would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement.  As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Pinduoduo's management and top executives, the Underwriter Defendants knew of, or in the exercise of reasonable care, should have known of, Pinduoduo's existing problems as detailed herein.

(e)    The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with the offers and sales of securities registered thereby, including those to Plaintiffs and the other members of the Class.

### III.    Events Following the IPO

76.    On July 31, 2018, news reports disclosed that the PRC's State Administration of Market Regulation had called for the Shanghai Municipal Administration of Industry

Consolidated Amended Class Action Complaint for Violations of the Securities Act of 1933

and Commerce to investigate the sale of counterfeit products on Pinduoduo's platform.

77.    The next day, on August 1, 2018, China's State Administration for Market Regulation released an announcement on its official website stating that it is investigating the claims about rampant counterfeit goods being sold on Pinduoduo's platform.

78.    On this news, the price of the Company's ADS stock declined from $22.59 on July 31, 2018 to $20.31 on August 1, 2018.

79.    Over the next two weeks, as additional news stories were published regarding Pinduoduo's counterfeit goods problem, the price of the Company's ADS stock declined further, to $17.70 on August 15, 2018.

80.    On August 2, 2018, the China Daily ran an article entitled "Pinduoduo Faces Regulators Over Counterfeit Goods." The article noted in part that:

> Central and Shanghai market regulators have launched investigations into complaints, led by Shenzhen-based television manufacturer Skyworth Group, that counterfeits are sold on Pinduoduo Inc.'s online discount platform.
>
> ***The State Administration for Market Regulation released an announcement on its official website on Wednesday, which said that they are paying significant attention to the many reports of infringement and counterfeit products sold on Pinduoduo's e-commerce site.***
>
> Whether it is the online platform itself or the business owners selling such products on the platform, any party that has violated the law will face legal punishment, the authorities said.
>
> ***The Shanghai Municipal Administration for Industry & Commerce said on Wednesday it had grilled Pinduoduo's manager the previous day.***
>
> The central government's regulator said it has asked the company to launch an internal review and enact any necessary corrections immediately. The problems reported by media, consumers and trademark owners should be rectified, it said.
>
> Pinduoduo said in an announcement released later on Wednesday that it will cooperate with market regulators, further cracking down on infringement and counterfeit products sold on the platform.
>
> "Pinduoduo has never produced a single counterfeit product and has been making all efforts to crack down on such goods. ***We have done a lot, but our actions remain far below people's expectations. Apart from***

- 22 -

> *retrospection and self-examination, we will work harder to improve our ability to fight against counterfeits," the company said in a statement.*
>
> *Skyworth was the first company to urge Pinduoduo to stop displaying and allowing sales of counterfeit products, but is by no means alone in its allegations.* Information provided by the China E-Commerce Research Center shows that Pinduoduo received the most complaints among all such websites in China in 2016.
>
> *But, Pinduoduo said on Wednesday that it removed more than 10.7 million problematic products last year and blocked 40 million links related to infringing products.* The company has a blacklist to permanently block companies found selling fake products on the platform, it said.

Shi Jing, *Pinduoduo faces regulators over counterfeit goods*, CHINADAILY.COM (Aug. 2, 2018), http://www.chinadaily.com.cn/a/201808/02/WS5b6241d1a31031a351e918c6.html (last visited Dec. 14, 2018) (emphasis added).

81.    On August 4, 2018, the China Daily published an article entitled "Pinduoduo Told to Fix Fake Goods Issue."  The article stated:

> China's market regulator said on Friday that online discounter Pinduoduo should strengthen platform management and regulate business activities of third-party vendors to maintain fair competition.
>
> Regulators met with the e-commerce site's officials amid reports of counterfeiting.
>
> The State Administration for Market Regulation said on its website that it required Pinduoduo to bolster the management and review of commodities and online traders, actively cooperate with regulators' investigations and obey the law to maintain healthy, rapid and sustainable development.
>
> The company will thoroughly rectify and reform its conduct, cooperate with regulators and not shirk its responsibilities, Huang Zheng, Pinduoduo CEO, was quoted as saying in the statement.
>
> The authority said this week it was paying close attention to media reports of infringement and counterfeit goods sold on Pinduoduo. It required the Shanghai Administration for Industry and Commerce as well as other regulators to launch targeted investigations.
>
> Pinduoduo said it is committed to fighting fake products and has already taken down more than 10 million products over counterfeiting concerns as well as blocked over 40 million links to goods suspected of piracy.

Consolidated Amended Class Action Complaint for Violations of the Securities Act of 1933

When it debuted on the Nasdaq Stock Market on July 26, its shares rocketed by more than 40 percent on the first trading day.

Founded in 2015, Pinduoduo is now the third-largest e-commerce platform in China, behind Alibaba Group and JD, and it has more than 300 million users.

***Pinduoduo's share price slumped below its initial public offering price this week following reports of counterfeit commodities and the authority's investigation. The company lost $5 billion in market capitalization in the following five trading days.***

"Pinduoduo should ramp up efforts to inspect third-party vendors' qualifications, raise the entry threshold and screen out fake goods by virtue of artificial intelligence, big data algorithms and consumers' evaluations," said Wang Huie, a senior analyst at Beijing-based internet consultancy Analysis.

Dong Yizhi, a researcher at China's E-Commerce Research Center, said fighting counterfeiting is a long process, but online platforms should spend the considerable money and technological methods necessary to fight intellectual property infringement and the sale of copycat products.

Fan Feifei, *Pinduoduo told to fix fake goods issue*, CHINADAILY.COM (Aug. 4, 2018), http://www.chinadaily.com.cn/a/201808/04/WS5b64f471a3100d951b8c8937.html (last visited Dec. 14, 2018) (emphasis added).

82. As these facts demonstrate, Pinduoduo's share price slumped below its initial public offering price in the week following reports of counterfeit commodities and the Chinese authority's investigation. ***The company lost $5 billion in market capitalization in five trading days alone***.

83. Moreover, Pinduoduo hosted a conference call with analysts on August 30, 2018 to discuss its Q2 2018 financial results. During that call, in response to a question from an analyst, Pinduoduo admitted that the impact from the counterfeit goods problem was affecting its financial results:

**Q:** First question is regarding the recent PR incident on infringing or counterfeit products that management just mentioned. So can management share with us some thoughts on whether you view these impact as temporary one or rather long-lasting risk, as though we are taking a lot of efforts here, is this hard to solve all this kind of problem at one-time? That's my first question.
**A:** [Colin Huang of Pinduoduo]: Okay. So the first question, the combat against the counterfeit goods. . . ***The recent development and media***

- 24 -

Consolidated Amended Class Action Complaint for Violations of the Securities Act of 1933

*attention had a little – honestly, had a little effect on the business itself*, but it does help us reflect and revisit many of our policies. We deeply understand that regardless the existing problems the industry has.  It doesn't give us any excuse for not facing the problem directly and fighting against the problem wholeheartedly."

(Emphasis added).

## FIRST CAUSE OF ACTION

### For Violation of § 11 of the Securities Act Against All Defendants

84.    Plaintiffs incorporate each and every preceding paragraph by reference.

85.    This Cause of Action is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against all Defendants.

86.    This Cause of Action does not sound in fraud.  Plaintiffs do not allege that Defendants had scienter or fraudulent intent, which are not elements of a Section 11 claim.

87.    The Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary in order to make the statements made not misleading, and omitted to state material facts required to be stated therein.

88.    Pinduoduo is the registrant for the IPO.  The Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

89.    As issuer of the ADS stock, Pinduoduo is strictly liable to Plaintiffs and the Class for any misstatements and omissions.

90.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

91.    By reason of the conduct herein alleged, each defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

92.    Plaintiffs acquired ADS stock pursuant and/or traceable to the Registration Statement.

Consolidated Amended Class Action Complaint for Violations of the Securities Act of 1933

93.    Plaintiffs and the Class have sustained damages. The value of the ADS stock purchased pursuant to the Registration Statement declined substantially subsequent to Defendants' violations.

## SECOND CAUSE OF ACTION

### For Violation of § 12(a)(2) of the Seucirites Act Against All Defendants

94.    Plaintiffs incorporate each and every preceding paragraph by reference.

95.    This Cause of Action is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of the Class, against all Defendants.

96.    This Cause of Action does not sound in fraud.  Plaintiffs do not allege that Defendants had scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.

97.    By means of the defective Prospectus, Defendants promoted and sold the ADS stock to Plaintiffs and other members of the Class.

98.    The Prospectus contained untrue statements of material fact and concealed and failed to disclose material facts, as detailed above. Defendants owed Plaintiffs and other members of the Class who purchased the stock the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions as set forth above.

99.    Plaintiffs did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectus at the time Plaintiffs acquired the stock.

100.    By reason of the conduct alleged herein, Defendants violated Section 12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, Plaintiffs and the other members of the Class who purchased the stock sustained damages in connection with their purchases.  Accordingly, Plaintiffs and the other members of the Class who hold the

- 26 -

stock issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their stock to the Defendants sued herein. To the extent Class members have sold their stock, they seek damages to the extent permitted by law.

## THIRD CAUSE OF ACTION

### For Violation of § 15 of the 1933 Act Against the Individual Defendants and Sequoia Capital

101. Plaintiffs incorporate each and every preceding paragraph by reference.

102. This Cause of Action is brought pursuant to Section 15 of the Securities Act against the Individual Defendants and Sequoia Capital.

103. The Individual Defendants each were control persons of Pinduoduo by virtue of their voting power over the Company and/or senior positions with the Company. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Pinduoduo.

104. The Individual Defendants each were culpable participants in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in the Causes of Action above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

105. Sequoia Capital is vicariously liable under Section 15 because it exercised control over Defendant Shen whom it appointed to the Pinduoduo Board of Directors and who signed or authorized the signing of the Registration Statement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows.

A. Declaring this action to be a proper class action and certifying Plaintiffs as a Class Representatives under section 382 of the California Code of Civil Procedure;

B. Awarding Plaintiffs and the members of the Class damages and interest;

- 27 -

C.    Awarding rescission or a rescissory measure of damages;

D.    Awarding Plaintiffs' reasonable costs, including attorneys' fees; and

E.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED:  December 14, 2018

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr.
Albert Y. Chang
Yury A. Kolesnikov

_____
Francis A. Bottini, Jr.

7817 Ivanhoe Avenue, Suite 102
La Jolla, California  92037
Telephone:  (858) 914-2001
Facsimile:   (858) 914-2002


WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
Betsy C. Manifold
Rachele R. Byrd
Marisa C. Livesay
Brittany N. DeJong

_____
Rachele R. Byrd

750 B Street, Suite 2770
San Diego, CA 92101
Telephone:  (619) 239-4599
Facsimile:   (619) 234-4599

*Co-Lead Counsel for Plaintiffs*

PINDUODUO: 25225

- 28 -

Consolidated Amended Class Action Complaint for Violations of the Securities Act of 1933