**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JIAJIA LUO, Individually and on Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>        v.<br><br>SOGOU INC, SOHU.COM, INC., TENCENT HOLDINGS LIMITED, XIAOCHUAN WANG, CHARLES (CHAOYANG) ZHANG, YUXIN REN, JOANNA (YANFENG) LU, BIN GAO, JOSEPH CHEN, JANICE LEE, JAMES (XIUFENG) DENG, CHI PING MARTIN LAU, DONALD J. PUGLISI, J. P. MORGAN SECURITIES LLC, CREDIT SUISSE SECURITIES (USA) LLC, GOLDMAN SACHS (ASIA) L.L.C., and CHINA INTERNATIONAL CAPITAL CORPORATION HONG KONG SECURITIES LTD.,<br><br>        Defendants. | **CASE No.: 1:19-cv-00230-JPO**<br><br>**THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>**CLASS ACTION**</u><br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiffs Lizhen Zhang, Juean Xu, Yuehua Ding, Maggie Xu, Mark S. Frater, and Ketan Patel ("Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' Amended Complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and

regarding Sogou, Inc.com ("Sogou" or "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired Sogou American Depository Shares ("ADSs") pursuant and/or traceable to Sogou's false and misleading Registration Statement and Prospectus issued in connection with the Company's initial public offering on November 9, 2017 ("IPO" or "Offering"), seeking to recover compensable damages caused by defendants' Securities Act of 1933 ("Securities Act") violations ("Class").

2.      Sogou, an Internet search company, was incorporated in the Cayman Islands in December 2005 by Sohu.com, Inc. ("Sohu"). Sogou is a subsidiary of Sohu, and is based in Beijing, the People's Republic of China ("PRC").

3.      As of September 2017, Sogou was China's fourth largest Internet company based on monthly active users ("MAU"). By mobile queries, the Company's Sogou Search engine is the second largest search engine in China.

4.      Prior to February 2006, Sogou's search and search-related businesses were operated by various entities owned or controlled by Sohu. In February 2006, Sohu reorganized its search and search-related businesses, transferring most of those businesses to Sogou. As part of the reorganization, Sohu established Sogou (BVI) Limited, or Sogou BVI, Beijing Sogou Technology Development Co., Ltd., or Sogou Technology, and Sogou Hong Kong Limited, or Sogou HK.

5.      Sogou Search is powered by artificial intelligence ("AI") and provides certain services that are unique from other search engines. One example is its cross-language search service, which eliminates the Chinese-English language barrier by enabling users to locate English content on the Internet by querying searches in Chinese and then reading content for which Sogou provides a Chinese translation.

6.      Sogou filed a draft Registration Statement on Form DRS with the SEC on August 14, 2017 and filed a Registration Statement on Form F-1 ("Registration Statement") with the SEC on October 13, 2017. The SEC declared the Registration Statement effective on November 8, 2017. Defendants used the Registration Statement to sell Sogou ADSs to investors in the Offering, and each of the Individual Defendants signed the Registration Statement.

7.      On November 9, 2017, Sogou filed its Prospectus with the SEC on Form 424B4 ("Prospectus" and together with the Registration Statement, "Offering Documents"). Also on November 9, 2017 Sogou completed its IPO of 45,000,000 ADSs at a price of US$13 per ADS less underwriting discount and commissions. Each ADS represents one Class A Ordinary Share, par value of $0.001 per share. Sogou announced that its ADSs were approved for listing on New York Stock Exchange LLC ("NYSE") under the ticker symbol "SOGO." On November 30, 2017, Sogou announced that the underwriters of the Company's IPO had exercised their over-allotment option to purchase an additional 5,643,856 ADSs. Total proceeds to the Company from the IPO, including the 45,000,000 ADSs sold initially and the 5,643,856 ADSs sold pursuant to the over-allotment option, were approximately US$625,450,000, after deducting underwriting discounts and commissions but before deducting offering expenses payable by the Company.

8.      The Offering Documents, however, were materially misleading for their failure to disclose two material issues that would cause the Company's financial performance to suffer

3

materially in 2018 and, perhaps, beyond.

9.     First, the Offering Documents state that PRC law required Sogou to police content to remove prohibited content before dissemination. PRC laws impose on Sogou an affirmative burden to monitor content, including from third parties, and to prevent dissemination of prohibited content. The Offering Document further noted that Sogou must have controls, specifying standards and processes for content review along with accountability measures. The Offering Documents warned of the PRC's either preventing dissemination of material or subjecting Sogou to liability for disseminating prohibited content that could lead to fines and even to suspension of internet operations. The Offering Documents, however, were materially false and misleading and omitted material information, failing to disclose that Sogou's controls over advertising contents were materially inadequate to meet its obligations to review the content and prevent violations of PRC content laws and regulations. The Company's failure would cause it to suspend operations while it rewrote its advertising policies and audience procedures to ensure full compliance with related regulations going forward, materially impacting its revenues in the second half of 2018.

10.     Second, The Offering Documents failed accurately to describe Sogou's smart hardware or to disclose that it had changed strategies in a way that would adversely impact revenue and earnings within a year from the IPO. Smart hardware, including the Company's Teemo Watch, was a material and growing segment of Sogou's business. The Offering Documents drew a connection from Sogou's claimed artificial intelligence ("AI") capabilities for its search business to its smart hardware products. In the context of claiming frequently to update those products and a solid foundation for their development and success, however, the Offering Statements were false and misleading and omitted material information about Sogou's smart

hardware products. The Offering Documents, however, failed to disclose that, at the time of the IPO, Sogou had determined to "adjust [its] smart hardware strategy by transitioning to products that are better connected with AI capabilities." This caused it to determine to phase out certain legacy models of Teemo Smart Watch, rendering them obsolete. Not only would this hardware strategy cause Sogou to impair smart hardware inventory but also not to sell, manufacture, and sell more, impacting the Company's 2018 financial results materially.

11.     In June and July 2018, Chinese media sources reported that Chinese authorities had ordered Sogou to remove illegal content from its search engine.

12.     On July 30, 2018, Sogou announced its financial and operating results for the second quarter of 2018. The Company revised guidance for its third quarter 2018 financial results, citing an investigation by Chinese regulatory authorities and the implementation of "remedial measures," including a ten-day suspension of part of its advertising business that materially and adversely impacted Sogou's financial results for the second half of 2018. In addition, the Company disclosed and discussed with analysts for the first time that it was accelerating its transition of its smart hardware products to render them AI capable, and that they would reduce revenue from these products. Ultimately the Company impaired its inventory of these watches. The reduction in revenue from and the impairment of inventory of Sogou's smart hardware materially impacted the Company's financial results for the second half of 2018.

13.     In the Offering Documents, Defendants made materially false and misleading statements, causing Plaintiffs and the members of the Class to suffer damages.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o).

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v).

16.     Venue is proper in this Judicial District pursuant to 15 U.S.C. § 77v. Sogou securities are traded on the NYSE, located within this Judicial District.

17.     In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

18.     By order dated April 2, 2019 (ECF No. 20), the Court appointed as Lead Plaintiffs Lizhen Zhang, Juean Xu, Yuehua Ding, Maggie Xu, Mark S. Frater, and Ketan Patel Plaintiff. Each Lead Plaintiff purchased or otherwise acquired Sogou ADSs as described in their certification filed in support of their motions for appointment as lead plaintiffs. *See* (ECF No. 10-2) and (ECF No. 13-1).

19.     Defendant Sogou is incorporated in the Cayman Islands, and its ADSs trade on the NYSE under the ticker symbol "SOGO." The Company's corporate headquarters are located at Level 15, Sohu.com Internet Plaza, No. 1 Unit Zhongguancun East Road, Haidian District, Beijing 100084, PRC.

20.     Defendant Sohu is a Chinese Internet company and is a controlling shareholder of Sogou. Its offices are located at Level 15, Sohu.com Internet Plaza, No. 1 Unit Zhongguancun, Haidian District, Beijing, China, 100084. Sohu's shares trade on the NASDAQ Stock Exchange under the ticker "SOHU." Sogou is founded and controlled by Sohu. The Prospectus states that "Because more than 50% of the voting power in the election of directors of our company will be

held by Sohu immediately following this offering, we will qualify as a controlled company under the [NYSE] Listed Company Manual."

21.     Defendant Tencent Holdings Limited ("Tencent") is a Chinese multinational investment holding conglomerate founded in 1998, whose subsidiaries specialize in various Internet-related services and products, entertainment, artificial intelligence, and technology both in China and globally. Tencent is one of the largest if not the largest gaming and social media companies. Tencent is a controlling shareholder of Sogou. Tencent is headquartered at Tencent Building, Kejizhongyi Avenue Hi-tech Park Nanshan District, Shenzhen, China 518057.

22.     About the holdings of Defendants Sohu and Tencent, the Offering Documents stated:

> Sohu is a leading Chinese online media, search and game service group providing comprehensive online products and services on PCs and mobile devices in China, and has been listed on Nasdaq since 2000. Sohu has been since our incorporation in 2005, and will continue to be after the completion of this offering, our controlling shareholder. We benefit from Sohu's strong brand recognition in China and their experience in strong corporate governance and internal controls, and we intend to continue to leverage our relationships with Sohu in the future.
>
> Tencent is a leading provider of Internet value added services in China. In September 2013, Tencent became our largest shareholder and entered into a strategic collaboration with us, which provides us access to traffic and content generated from users of products and services provided by Tencent. Under our current business collaboration arrangements with Tencent, Sogou Search is the default general search engine on various Tencent products that provide general search offerings, such as the Mobile QQ Browser, qq.com, and the PC Web directories daohang.qq.com and hao.qq.com. Approximately 36.2% of our total search traffic, measured by page views, was contributed by Tencent's Internet properties in September 2017. Tencent has also agreed that for its other products that offer general search functions, Sogou Search will be offered as the default general search engine to users of such products until September 2018, and, provided it does not harm the user experience, Tencent and we intend to extend such agreement

regarding other products with general search functions until 2023. Since 2014, Tencent has made the content of Tencent's Weixin Official Accounts accessible to our users through our search services. We believe that our business collaboration with Tencent has reinforced us as a leader, particularly on the mobile side, in the large and fast-growing online search industry in China. For more detailed descriptions of our business collaboration with Tencent, see "Related Party Transactions—Business Collaboration with Tencent."

In anticipation of this offering, Sohu and Tencent entered into a voting agreement, or the Voting Agreement, with us. Under the Voting Agreement, Sohu and Tencent have agreed that upon the completion of this offering, subject to certain exceptions, (i) within three years following the completion of this offering, Sohu will vote all Class B Ordinary Shares and any Class A Ordinary Shares held by it and Tencent will vote 45,578,896 of its Class B Ordinary Shares to elect a Board consisting of seven directors, four of whom will be appointed by Sohu, two of whom will be appointed by Tencent, and the seventh of whom will be our chief executive officer, and (ii) after three years following the completion of this offering, Sohu will be entitled to change the size and composition of our Board of Directors, subject to Tencent's right to appoint at least one director. The effect of these provisions will be to give Sohu the power to appoint a majority of our Board of Directors, and to give Tencent the power to appoint two directors within three years following the completion of this offering and at least one director after three years of the completion of this offering. The Voting Agreement also provides that for so long as Sohu and Tencent together hold more than 50% of the total voting power of our Class A Ordinary Shares and Class B Ordinary Shares, Sohu or Tencent may remove and replace any director appointed by it. See "Related Party Transactions—Voting Agreement between Sohu and Tencent."

Upon the completion of this offering, Sohu, through its ownership of Class B Ordinary Shares and the Voting Agreement with Tencent, will have the power to appoint a majority of our board of directors. As a result, we will be a "controlled company" under the New York Stock Exchange Listed Company Manual.

23. The following Defendants are referred to as "Individual Defendants:"

    a. Defendant Xiaochuan Wang ("Wang") is, and throughout the relevant period, was a Director and Chief Executive Officer ("CEO") of Sogou. Wang

signed the Registration Statement. Upon information and belief, Wang is a citizen and resident of the PRC.

b.     Defendant James (Xiufeng) Deng ("Deng") is the Company's Chief Financial Officer ("CFO"). Deng has been responsible for overseeing the Company's financial and accounting functions and prepared parts of the Offering Documents. Deng signed the Registration Statement. Upon information and belief, Deng is a citizen and resident of the PRC.

c.     Defendant Charles (Chaoyang) Zhang ("Zhang") is the Chairman of the Board ("Chairman") of Sogou. Zhang is the founder of Sohu and has been its Chairman and CEO since August 1996. Zhang signed the Registration Statement. Upon information and belief, Zhang is a citizen and resident of the PRC.

d.     Defendant Yuxin Ren ("Ren") is a Director of Sogou. Ren signed the Registration Statement. Upon information and belief, Ren is a citizen and resident of the PRC.

e.     Defendant Joanna (Yanfeng) Lu ("Lu") is a Director of Sogou. Lu signed the Registration Statement Upon information and belief, Lu is a citizen and resident of the PRC.

f.     Defendant Chi Ping Martin Lau ("Lau") was a Director of Sogou. Lau Signed the Registration Statement. Upon information and belief, Lau is a citizen and resident of the PRC.

g.     Defendant Donald J. Puglisi ("Puglisi") signed the Registration Statement at Newark, Delaware as "Authorized U.S. Representative" of Sogou. On

information and belief, Puglisi is a United States citizen, residing in or around Newark, Delaware."

    h.    Defendant Bin Gao ("Gao") is identified in the Prospectus as a nominee for Director of Sogou. Upon information and belief, Gao is a citizen and resident of the PRC.

    i.    Defendant Joseph Chen ("Chen") is identified in the Prospectus as a nominee for Director of Sogou. Upon information and belief, Chen is a citizen and resident of the PRC.

    j.    Defendant Janice Lee ("Lee") is identified in the Prospectus as a nominee for Director of Sogou. Upon information and belief, Lee is a citizen and resident of the PRC.

24.    The Prospectus states that "[u]pon the effectiveness of the registration statement on Form F-1 of which this prospectus is a part, our Board of Directors will consist of Dr. Charles Zhang, Xiaochuan Wang, Yuxin Ren, Joanna Lu, Bin Gao, Joseph Chen, and Janice Lee."

25.    The Individual Defendants possessed the power and authority to control the contents of the Company's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements

and omissions pleaded herein.

26.     Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii) ("Item 303"),
required the Offering Documents to "[d]escribe any known trends or uncertainties that have had
or that the registrant reasonably expects will have a material favorable or unfavorable impact on
the sales or revenues or income from continuing operations." Item 303 also required the Offering
Documents to disclose events that the registrant knew would "cause material change in the
relationship between costs and revenues."

27.     The failure to disclose the facts the Offering Documents omitted, as alleged further
below, violated Item 303 because Defendants were aware of them and these adverse, undisclosed
facts would, and ultimately did, have an unfavorable impact on Sogou's sales, revenues, and
income from continuing operations. More, Item 303 required disclosure because these material,
adverse facts were known events or uncertainties that, at the time of Sogou's IPO, had caused or
were reasonably likely to cause Sogou's disclosed financial information not to be indicative of its
future operation results, and likely materially and adversely to affect Sogou's future results and
prospects.

28.     The following Defendants are referred to as the "Underwriter Defendants":

      a.     Defendant J. P. Morgan Securities LLC ("J. P. Morgan") was an underwriter
of the IPO, served as a financial advisor, and assisted in the preparation and
dissemination of the false and misleading Offering Documents. While
incorporated in Delaware, J.P. Morgan's principal place of business is New
York, New York, within this District;

      b.     Credit Suisse Securities (USA) LLC ("Credit Suisse") was an underwriter
of the IPO, served as a financial advisor, and assisted in the preparation and

dissemination of the false and misleading Offering Documents. While incorporated in Delaware, the principal place of business of Credit Suisse is New York, New York, within this District;

c.      Goldman Sachs (Asia) L.L.C. ("Goldman") was an underwriter of the IPO, served as a financial advisor, and assisted in the preparation and dissemination of the false and misleading Offering Documents. While incorporated in Delaware, Goldman's principal place of business is Hong Kong; and

d.      China International Capital Corporation Hong Kong Securities Ltd. ("CICC") was an underwriter of the IPO, served as a financial advisor, and assisted in the preparation and dissemination of the false and misleading Offering Documents. CICC's principal place of business is Hong Kong.

29.     The Underwriter Defendants drafted and disseminated the Offering Documents. The Underwriter Defendants' failure to conduct adequate due diligence investigations was a substantial factor in the dissemination of the false and misleading Offering Documents.

30.     In addition, the Underwriter Defendants met with potential investors and presented highly favorable but materially incorrect or materially misleading information about Sogou, its business, products, financial prospects, and/or omitted to disclose material information required to be disclosed under the federal securities laws and applicable regulations promulgated thereunder.

31.     Representatives of the Underwriter Defendants also assisted Sogou and the Individual Defendants in planning the IPO, purporting to conduct an adequate and reasonable due diligence investigation into the business, operations, products, and plans of Sogou. During the course of their investigations, the Underwriter Defendants had continual access to confidential

corporate information concerning Sogou's business, financial condition, products, plans, and prospects.

32.     In addition to having access to internal Sogou documents, the Underwriter Defendants and/ or their agents, including their counsel, had access to the Company's lawyers, management, directors, and top executives. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Sogou's management and top executives, at a minimum, the Underwriter Defendants should have known of the Company's undisclosed existing problems and plans and the material falsity of the Offering Documents.

33.     The Underwriter Defendants caused the Offering Documents to be filed with the SEC and to be declared effective in connection with the offers and sales of the Company's shares pursuant and/or traceable to the IPO and relevant IPO materials, including to Plaintiffs and the Class. Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Offering Documents.

## **SUBSTANTIVE ALLEGATIONS**

### *Background*

34.     Sogou, an Internet search company, was incorporated in the Cayman Islands in December 2005 by Sohu. Sogou is a subsidiary of Sohu, and is based in Beijing, PRC.  As of September 2017, Sogou was China's fourth largest Internet company based on MAU. By mobile queries, the Company's Sogou Search engine is the second largest search engine in China.

35.     Prior to February 2006, Sogou's search and search-related businesses were operated by various entities owned or controlled by Sohu. In February 2006, Sohu undertook a reorganization of its search and search-related businesses, whereby most of the business was

transferred to Sogou. As part of the reorganization, Sohu established Sogou (BVI) Limited, or Sogou BVI, Beijing Sogou Technology Development Co., Ltd., or Sogou Technology, and Sogou Hong Kong Limited, or Sogou HK.

36.    Sogou Search is powered by AI and provides certain services that are unique from other search engines. One example is its cross-language search service, which eliminates the Chinese-English language barrier by enabling users to locate English content on the Internet by querying searches in Chinese and then reading content for which Sogou provides a Chinese translation.

37.    Sogou filed a draft Registration Statement on Form DRS with the SEC on August 14, 2017, and filed a Registration Statement on Form F-1 with the SEC on October 13, 2017. The SEC declared the Registration Statement effective on November 8, 2017. Defendants used the Registration Statement to sell Sogou shares to investors in the Offering, and each of the Individual Defendants signed the Registration Statement.

38.    On November 9, 2017, Sogou filed its Prospectus with the SEC on Form 424B4.

39.    On November 9, 2017 Sogou completed its IPO of 45,000,000 ADSs at a price of US$13 per ADS. Each ADS represents one Class A Ordinary Share, par value of $0.001 per share. Sogou announced that its ADSs were approved to be listed on the NYSE under the ticker symbol "SOGO."

40.    On November 30, 2017, Sogou announced that the underwriters of the Company's IPO had exercised their over-allotment option to purchase an additional 5,643,856 ADSs, each representing one Class A Ordinary Share of the Company. Pursuant to terms of the over-allotment option, the underwriters purchased the additional ADSs from the Company for the IPO price of US$13.00 per ADS, less an underwriting discount and commission of US$0.65 per ADS, or a net

price of US$12.35 per ADS.

41.     Total proceeds to the Company from ADSs sold in the IPO, including the 45,000,000 ADSs sold initially and the 5,643,856 ADSs sold pursuant to the over-allotment option, were approximately US$625,450,000, after deducting underwriting discounts and commissions but before deducting offering expenses payable by the Company.

***Disseminating Prohibited Content in the PRC***

42.     Article 22 of Law of the PRC on the Protection of Heroes and Martyrs states that "It is forbidden to distort, smear, desecrate, or deny the deeds and spirit of heroes and martyrs." More, "The names, likenesses, reputation, and honor of heroes and martyrs are protected by law. The names and likenesses of heroes and martyrs must not be used, or covertly used, by any organization or individual for trademarks or commercial advertisements, damaging the reputation and honor of heroes and martyrs."

43.     In China, Qiu Shaoyun is one of the few extremely well-known military heroes in the modern history. He and his sacrifices are well-known to the Chinese people, young and old, who respect his sacrificing his own life to protect his teammates during a Korean war military action in the 1950s. The law called Law of Heroes and Martyrs, regulating the usage of the hero names and images, prohibits smearing the images and reputation of heroes like Qiu Shaoyun.

44.     The *Advertising Law of the People's Republic of China* provides that advertisements may not include material that PRC laws and regulations otherwise prohibit. For example, Article 9 states:

> An advertisement shall be prohibited from: (1) using, or using in a disguised form, the national flag, national anthem, national emblem, military flag, military song, or military emblem of the People's Republic of China; (2) using, or using in a disguised form, the name or image of any state authority or its staff member; (3) using "national," "highest," "best," or similar comparative words; (4)

damaging the dignity or interest of the state or divulging any state secret; (5) disturbing social stability or damaging the public interest; (6) damaging personal or property safety or divulging individual privacy; (7) disturbing the public order or departing from a good social climate; (8) containing any obscene, pornographic, gambling, superstitious, horrible, or violent content; (9) containing any ethnically, racially, religiously, or sexually discriminatory content; (10) impeding the protection of environment, natural resources, or cultural heritages; or (11) falling under any other circumstances as set out by any law or administrative regulation.

45.   More, Article 47 of *Cybersecurity Law of the People's Republic of China* requires network operators such as Sogou to:

strengthen management of information published by users, and where they discover information of which the publication or dissemination is prohibited by laws and regulations, they shall immediately stop dissemination of that information, take measures such as deleting it, prevent the information from spreading, save relevant records, and report to the relevant departments in charge.

## FALSE AND MISLEADING STATEMENTS IN THE OFFERING DOCUMENTS

46.   On November 9, 2017, Sogou filed its Prospectus with the SEC on Form 424B4. The Offering Documents contained a series of false and misleading statements as follows.

### The Offering Documents Omit that Sogou Had Failed To Implement an Adequate Controls over Advertising Content

47.   The Offering Documents made clear that PRC laws and regulations governing operating as an internet company were strict, and the Company's adherence was mandatory. To provide internet information services, for example, required a license from Ministry of Industry and Information Technology ("MIIT"). One of the licensing requirements was the Company's obligation to ensure that it did not disseminate prohibited content. With respect to the licensing requirements, the Offering Documents stated:

### Internet Information Services

On September 25, 2000, the State Council issued the Measures for the Administration of Internet Information Services, or the ICP Measures. Under the ICP Measures, entities that provide information to online users on the Internet, or ICPs, are obliged to obtain an operating license from the MIIT or its local branch at the provincial or municipal level in accordance with the Telecom Regulations described above.

The ICP Measures further stipulate that entities providing online information services regarding news, publishing, education, medicine, health, pharmaceuticals and medical equipment must procure the consent of the national authorities responsible for such areas prior to applying for an operating license from the MIIT or its local branch at the provincial or municipal level. Moreover, ICPs must display their operating license numbers in conspicuous locations on their home pages. ***ICPs are required to police their Internet platforms and remove certain prohibited content***. Many of these requirements mirror Internet content restrictions that have been announced previously by PRC ministries, such as the MIIT, the MOC, and the SAPPRFT, that derive their authority from the State Council.

48.     According to Defendants, on November 23, 2015, Sogou received its renewed Telecommunications and Information Services Operating License, or ICP license, from the Beijing Telecom Administration (BTA"). Sogou's ICP license was "subject to annual inspection" and, once again, dependent on its ensuring that it did not disseminate prohibited content.

49.     Under the heading, "Provision of Internet Content," the Offering Documents described various PRC laws and regulations that bound Sogou with respect to the content it delivered, imposing affirmative burdens to monitor that content to prevent dissemination of information of which the PRC did not approve. In particular, the Offering Documents described that since December, 2013, the Administrative Measures for Content Self-Review by Internet Culture Business Entities required Sogou "to review the content of products and services to be provided prior to providing such content and services to the public."

50.     The Offering Documents continued with respect to the requirement that Sogou establish and maintain a content management system, stating that:

> The ***content management system of an Internet culture business entity is required to specify the responsibilities, standards and processes for content review as well as accountability measures, and is required to be filed with the local provincial branch of the MOC***.

> In January 2014 the SAIC promulgated the Administrative Measures for Online Trading, or the Online Trading Measures, which took effect on March 15, 2014, and replaced the Interim Measures for the Administration of Online Commodities Trading and Relevant Services, issued by the SAIC, which took effect on July 1, 2010. The Online Trading Measures regulate online commodity trading and related activities. The Online Trading Measures require that when selling commodities or providing services to consumers, online operators must comply with all applicable laws with respect to the protection of consumer rights and interests, intellectual property rights of others and the prevention of unfair competition. Information provided with respect to commodities and services provided by online commodity operators or related service operators must be accurate. If they fail to comply with all requirements of the Online Trading Measures, the local branch of the SAIC or other governmental authorities could impose fines or other penalties on them. (Emphasis added).

51.     In addition, the Offering Documents described the risk relating to Sogou's distributing content that the PRC government found inappropriate, stating:

> **The PRC government may prevent us from distributing, and we may be subject to liability for, content that it believes is inappropriate.**

> The PRC has enacted regulations governing Internet access and the distribution of news and other information. ***In the past, the PRC government has stopped the distribution of information over the Internet that it believes to violate PRC laws, including content that is obscene, incites violence, endangers national security, is contrary to the national interest or is defamatory***. In addition, we may not publish certain news items, such as news relating to national security, without permission from the PRC government. Furthermore, the Ministry of Public Security has the authority to make any local Internet service provider block any Website

maintained outside the PRC at its sole discretion. Even if we comply with PRC governmental regulations relating to licensing and foreign investment prohibitions, if the PRC government were to take any action to limit or prohibit the distribution of information through our network or to limit or regulate any current or future content or services available to users on our network, our business would be harmed.

*We are also subject to potential liabilities for content delivered through our services that is deemed inappropriate and for any unlawful actions of users of our products and services under regulations promulgated by the MIIT, such potential liabilities including the imposition of fines or even the shutting down of the Internet platforms*.

Furthermore, we are required to delete content that clearly violates PRC laws and report content that may violate PRC laws. *We may have difficulty determining the type of content that may result in liability for us and, if we are wrong, we may be prevented from operating our Internet platforms*. (Emphasis added).

52.     Moreover, recognizing the seriousness of PRC regulations on prohibited content, the Offering Documents tied the PRC regulatory environment directly to the Company's financial results. In their risk disclosures, for example, in the context of boasting of the Company's recent and significant growth in search page views, mobile search page views, and related revenues, Defendants explained the reason for a decline in the rate of growth just prior to the IPO. "[W]hile this represented revenue growth of 53.2% from 2014 to 2015," Defendants stated, "our revenue growth decreased to 11.6% from 2015 to 2016, *as our 2016 revenues were affected by tightened PRC regulation of the online advertising industry during 2016, which had an adverse impact on the search and search-related advertising market in China in general*." (Emphasis added).

53.     The Offering Documents, however, were materially false and misleading and omitted material information, failing to disclose that Sogou's controls over advertising contents— its means of complying with Chinese law to censor from its platform prohibited content—was materially inadequate to meet its obligations to review the content for which it was responsible

and to prevent Sogou from allowing dissemination of prohibited content. Indeed, at the time of the IPO, to prevent dissemination of prohibited content, and thus avoid violating PRC laws and regulations, Sogou was required to, but did not, (a) establish a dedicated team to monitor relevant new regulations and any changes of regulations as well as ensure timely implementation of such new regulations or changes accordingly; (b) strengthen its auditing procedures by leveraging AI to upgrade automated system and expand its manual inspection team to extend the scope of manual inspection; (c) rewrite its advertising policies and procedures to ensure full compliance with related regulations going forward, including establishing a dedicated [improvement team] to its advertisement section mechanisms; and (d) use AI technology to ensure that it combined keyboard and other devices to block timely prohibited content.

54.    For example, on June 6, 2018 the Beijing Municipal Cyberspace Affairs Commission ("CAC") disclosed that Sogou's controls over advertising content were materially inadequate. An article appeared captioned, *Beijing Municipal Cyberspace Affairs Commission and Beijing Municipal Administration of Industry and Commerce lawfully interviewed Douyin and Sogou, ordering reforms.* According to the CAC:

> On the afternoon of June 6, Beijing Municipal Cyberspace Affairs Commission and Beijing Municipal Administration of Industry and Commerce conducted a lawful joint interview with Douyin and Sogou for the appearance of content that insulted heroes and martyrs in advertisements placed by Douyin on the Sogou search engine. The websites were ordered to immediately clear away relevant content in violation of rules and regulations, and to undertake strict reforms.
>
> After investigation, it was shown that Douyin failed to meet due diligence obligations for the advertisement content under its production, and ***Sogou failed to meet its lawful review obligations for the advertisements it published, resulting in the online propagation of illegal information insulting heroes and martyrs, resulting in negative effects***. The aforementioned activities are involved in the violation of stipulations in Article 12, "Any

individual or organization using the network shall comply with the Constitution and laws, follow public order, and respect social morality," and Article 47, "Network operators shall strengthen management of information published by users, and where they discover information of which the publication or dissemination is prohibited by laws and regulations, they shall immediately stop dissemination of that information, take measures such as deleting it, prevent the information from spreading, save relevant records, and report to the relevant departments in charge," of Cybersecurity Law of the People's Republic of China. The activities involved are in the violation of stipulations in Article 22 of Law of the People's Republic of China on the Protection of Heroes and Martyrs, "It is forbidden to distort, smear, desecrate, or deny the deeds and spirit of heroes and martyrs." "The names, likenesses, reputation, and honor of heroes and martyrs are protected by law. The names and likenesses of heroes and martyrs must not be used, or covertly used, by any organization or individual for trademarks or commercial advertisements, damaging the reputation and honor of heroes and martyrs." The activities involved are in the violation of stipulations in Article 9 of Advertising Law of the People's Republic of China, that advertisements may not involve "other circumstances prohibited by laws and administrative regulations."

At present, Beijing Municipal Cyberspace Affairs Commission and Beijing Municipal Administration of Industry and Commerce have initiated administrative legal enforcement procedures to establish a case for investigation into the violations of laws and regulations by Douyin and Sogou.

55.     On July 1, 2018, in a China.com article titled *Douyin Must Rectify Illegal Ads*

*Insulting Chines Martyrs*, Wang Keju wrote:

Cyberspace regulators have required Douyin, a popular Chinese short video app under ByteDance, and Chinese search engine Sogou to carry out rectifications for their illegal advertisements that insulted martyrs.

Instructed by the Cyberspace Administration of China, the Cyberspace Administration of Beijing and the city's Administration of Industry and Commerce held face-to-face talks on Saturday with five companies, demanding them to immediately launch a rectification campaign and clean any content that insults heroes and martyrs, according to a release from the Cyberspace Administration of Beijing on Sunday.

> The move follows Douyin's advertisements on the Sogou search engine, which insulted Qiu Shaoyun, a war hero in the Korean War (1950-53) who let himself burn alive while he laid perfectly still so his platoon wouldn't be exposed.

56.     Also on July 1, 2018, in an article titled ***Chinese Video App Douyin Counts the Cost of Insulting Korean War Hero as Advertising Halted***, the South China Morning Post reported:

> On Sunday afternoon, the watchdog said it had instructed the firms, which include the New York-listed search engine Sogou, to remove all commercials that mention Qiu and that all of them had 'voluntarily suspended [their] commercial services'. . . . The online controversy started on June 5[, 2018] when an advertisement for Douyin appeared on Sogou that invited people to view 'jokes about Qiu Shaoyun getting burned.' The following day, the cyberspace administration issued a statement saying it had spoken to the two companies and ordered them to delete all related content.

57.     Confirming these allegations, a deputy director general ("Deputy Director"), who provided legal guidance and opinion to the various departments at the Beijing Municipal Administration of Industry and Commerce ("AIC"),[1] recalls that the AIC investigated Sogou throughout 2018, mainly relating to the PRC's advertisements law. With regards to the Qiu Shaoyun incident, the Deputy Director stated that both the AIC and the CAC received the original complaint at the end of May 2018. While the Deputy Director does know who submitted the Complaint, the Deputy Director remembers that its quality—it was well written—indicated that

---

[1] Beijing AIC changed its name to Beijing State Administration for Market Regulation on November 16, 2018. The State Administration for Industry and Commerce of China, including its lower level local agencies such as Beijing AIC, was the single most powerful market regulator in China to oversee and supervise all business activities. Pursuant to a government restructuring plan, SAIC merged functions carried out by other agencies such as General Administration of Quality Supervision, Inspection and Quarantine, the Certification and Accreditation Administration, the Standardization Administration of China and the China Food and Drug Administration in 2018. Since 2018, SAMR has become even more powerful and regulates virtually everything in China's business arena, from issuance and revocation of business registrations, intellectual property, food and drug safety, quality control, fair competition and comprehensive supervision of the Chinese market order.

an insider or industry competitor with insight prepared it. The Deputy Director understood that the original complaint was sent to the municipal AIC, and it's also copied to the cyberspace affair commission (CAC)in Beijing. The complaint was mainly about Douyin and its "Qiu Shaoyun" ads through Sogou.

58.     According to the Deputy Director, the AIC began investigating in early June 2018, first interviewing legal affairs personnel from both Douyin and Sogou, including a Ms. Zhang from Sogou's legal staff and Mr. Xie Sumei of Sogou's government affairs staff. Sogou explained its ads sales and content control process to AIC investigators. The Deputy Director recalls that Sogou CFO Joe Zhou ("Zhou") attended several of the AIC meetings with Sogou personnel.

59.     The Deputy Director conveyed that Sogou explained its ads sales and content control process to the authorities during this early gov investigation. The ad in question was user created content ("UCG") on Douyin's platform that third-party company's like Baosheng Media and Beijing Duocai Hudong Co. Ltd. ("Beijing Duocai") distribute through self-developed, advertisement distribution platforms ("ADP"). The Deputy Director conveyed that Sogou ran its own search engine, with a keyword filtering system and a ranking auction system. Sogou sold its advertisement spots within its search engine to clients like Douyin through third-party advertisement agents like Baosheng Media and Beijing Duocai Hudong Co. Ltd. ("Beijing Duocai").

60.     During its June 2018 investigation, Beijing AIC uncovered that Sogou failed to include in its automated content control system a keyword blacklist of "Qiu Shaoyun," "Burned", and "Joke," so it missed blocking the publication of Douyin's ads containing this set of illegal keyword combination. The Deputy Director also added Sogou's manual screening practice was

random which resulted in its failure to manually block the keyword combination.

61.     According to the Deputy Director, the AIC met with Sogou on June 30, 2018 about the investigation into the Qiu Shaoyun incident, including to discuss Sogou's plan to remedy the inadequacies in its systems that permitted Sogou to participate in disseminating the offending ad. In July 2018, according to the Deputy Director, the AIC fined Sogou RMB 1 million, ordering it to disgorge RMB 475 in advertising income for the offending advertisement.

62.     Reacting to these allegations and the possibility of the Company's suspending certain search advertising and attempting to quantify the impact, on July 2, 2018, J.P. Morgan analysts Alex Yao, Daniel Chen and Binbin Ding wrote a report ("July J. P. Morgan Report"), stating:

> Significant negative short-term impact on financials with unquantifiable earnings impact."   Based on their model, JPM predicted that "one week of suspension of auction-based search advertising will have 6% negative impact to Sogou's quarterly revenue and 31-44% negative impact to 3Q non-GAAP OP … as Sogou still needs to pay the vast majority of its traffic acquisition cost to channel partners even if it doesn't monetize search ads. We are unable to quantify the earnings impact in 3Q due to uncertainty around the length of the suspension.

63.     On July 30, 2018, publicly disclosing its results in an earnings press release ("Q2 Earnings Release"), Sogou disclosed both the existence of the Qiu Shaoyun incident and its likely impact on projected financial results for the then upcoming third quarter, 2018, stating:

> Joe Zhou, CFO of Sogou, said, "We achieved solid results in the second quarter with revenue increasing 43% year-over-year and non-GAAP net income up by 58%. Looking forward, we expect that our ***third quarter revenues will be lower than anticipated due to the one-time impact of a regulatory investigation and steps taken to ensure our advertising practices are compliant with relevant regulations***, and the adjustment of our smart hardware strategy. We are confident that our twin growth engines and AI-focused strategy will lead to sustainable growth over the long term."

***

Chinese regulatory authorities, including the Beijing Office of the Cyberspace Administration of China and the Beijing Administration for Industry and Commerce, initiated an investigation of Sogou after certain advertisements involving content that the authorities believed insulted a national hero were displayed on its platform. The advertisements were developed and reviewed by Douyin, a Chinese short-form video platform, and displayed on Sogou Search in June 2018. ***Following the investigation, the regulatory authorities instructed Sogou to amend its advertising practices. Sogou fully cooperated with the authorities in their investigation and the Company has taken steps to revise its advertising policies and audit procedures to ensure compliance with relevant regulations. In connection with implementing such remedial measures, Sogou suspended part of its advertising business for ten days commencing July 1, 2018. This is expected to result in a one-time reduction in revenues in the third quarter of 2018.*** (Emphasis added).

64.     Confirming the material inadequacies of its controls over advertising content, during a July 30, 2018 earnings conference call ("2Q Earnings Call"), Sogou explained both the problem and the nature of the inadequacies of its policies that allowed for the Qiu Shaoyun incident, stating:

> **Xiaochuan Wang**: Finally, I would like to provide an update about a recent incident that result in relation of our advertising practices. On June 6, we discovered that an advertisement placed on our platform by doing a short video app under Chinese company platform Kotiao [ph] contained inappropriate content about Korean War hero, Qiu Shaoyun. We immediately deleted all related content and determined - and culminated [auto-in] [ph] advertisements on our search platform.
>
> Chinese regulatory authorities subsequently launched an investigation into the advertisement. We accepted responsibility for - in other [working app] [ph] in advertisements [indiscernible] complacent - or compliance, sorry - noncompliance campaigns and fully cooperated with authorities in their investigation.
>
> We also took steps to ***rewrite our advertising policies and audience procedures to ensure full compliance with related regulations going forward. This includes the establishment of a dedicated team***

*improvement to our advertisement section mechanisms and enhanced use of AI technology to ensure that we now combined keyboard and other devices and blocked in a timely manner. In connection with implementing this [indiscernible], we suspended part of our advertising service for 10 days from the beginning of July*.

Based on our preliminary analysis, this is expected to result in a onetime reduction in revenue in the third quarter of 2018. Our advertising services returned to a normal operation about - after the 10-day period, while we believe this was a onetime impact on our financials. We are, of course, paying even closer attention to the advertising content on our platform going forward. (Emphasis added).

65.     During the 2Q Earnings Call, analysts questioned the Company about the Qiu Shaoyun incident and its potential impact on Sogou's third quarter 2018 financial results as follows:

**Q:** [Chong Liu] Thank you for taking my question. This is Bill on behalf of Piyush. I have two questions. First one is just a follow-up on the [Yin incident] [ph]. So in recent days, we realized that some more apps are being removed from App Store from third-party for tighter content control. I just wonder if there is any longer-term impact in terms of our cost structure. And so, how should we think about this, because probably your company needs to hire some extra staff to somehow conduct the censorship?

\*\*\*

**A:** [Joe Zhou] Okay. . . the key point to note is that the financial impact is one-time, which will all be reflected in Q3. The search-related advertising has completely recovered, and its revenue growth will return to normal in Q4.

And before that incident, we had a stringent review mechanism that includes multiple steps. So once an ad is submitted to Sogou, the system will automatically filter keywords that are blacklisted. After the ad uploaded to Sogou's database, the system will do another round of auto inspection and we will perform manual inspection on sample basis. So after the incident, we have implemented a range of measures to prevent this from happening again.

***So we have established a dedicated team to monitor relevant new***

> *regulations and any changes of regulations as well as ensure*
> *timely implementation of such new regulations or changes*
> *accordingly. And we strengthened our auditing procedures by*
> *leverage AI to upgrade automated system and expand our manual*
> *inspection team to extend the scope of manual inspection.*
> (Emphasis added).

66.     On July 30, 2018, *BriefingInvestor* released a story captioned *Sogou Trades Lower*

*on Q2 Results; Q3 Revenue Guidance Well Below Expectations* ("*BriefingInvestor* Article"),

asking why Sogou's second half guidance was "poor." That articles stated:

> It seems that Chinese regulatory authorities initiated an investigation
> of Sogou after certain ads involving content that the authorities
> believed insulted a martyred national hero were displayed on its
> platform. The ads were developed and reviewed by Douyin, a
> popular Chinese short-form video sharing platform, and displayed
> on Sogou Search in June 2018. Sogou, as instructed by authorities,
> has taken steps to revise its advertising policies and audit procedures
> to ensure compliance. As a result of these revisions, ***Sogou***
> ***suspended part of its ad business for ten days beginning on July 1.***
> This is expected to result in a one-time reduction in revenue in Q3.
> (Emphasis added).

67.     On June 25, 2018, without any advanced warning and in the midst of Sogou's

troubles with its controls over advertising content, the Company disclosed the "resignation" of its

Chief Operating Officer, Dr. Liyun Ru, stating:

> Sogou Inc. (NYSE: SOGO) today announced that Dr. Liyun Ru, the
> Company's Chief Operating Officer, has resigned, effective June 30,
> 2018, to pursue other opportunities. Dr. Ru will remain an advisor
> to Sogou until June 30, 2019, to ensure a smooth transition.
>
> Dr. Liyun Ru was responsible for the development of Sogou's search
> division. Following Dr. Ru's departure, Dr. Jingfang Xu, Vice
> President, will lead Sogou's search division.
>
> "In more than a decade with the company, Dr. Ru has worked
> closely with me to build an outstanding search team, grow Sogou
> Search from a fledgling start-up into China's second-largest search
> engine, and successfully complete our initial public offering in the
> U.S. We are extremely grateful for his contributions and wish him
> all the best in his future endeavors," said Xiaochuan Wang, CEO of

Sogou. "I'm looking forward to working with Dr. Xu and the rest of the team as we continue to drive innovation and develop the next generation of search."

"It has been a privilege to work for Sogou, one of the most innovative companies involved in search and AI today," said Dr. Liyun Ru. "I am pleased to continue to collaborate with Sogou over the next 12 months as an advisor, and look forward to maintaining this connection as I pursue new opportunities in the education sector."

Dr. Jingfang Xu is an industry veteran with over ten years of experience in search and AI technologies. Since she joined Sogou in 2011, she has led the research and development of Sogou's search division and its efforts to advance AI, helping the team to achieve key breakthroughs. Before joining Sogou, Ms. Xu worked at Microsoft Research Asia and the Institute for Network Science and Cyberspace at Tsinghua University. She received her Ph.D. in Electronic and Information Engineering from Tsinghua University.

***The Offering Documents Omit that Certain Smart Hardware Products were Obsolete***

68.    In addition to search revenue, Sogou derived from other businesses material "Other Revenues." According to the Offering Documents "[o]ther revenues are from [internet value-added services or] IVAS, primarily with respect to our operation of Web games and mobile games developed by third parties, as well as from other products and services that we offer, including smart hardware products."

69.    For the nine months ended September 30, 2017, Other Revenues were $76.2 million, 12.1% of total revenues of $630.6 million. In comparison to the same nine-month period in 2016, Other Revenues increased from $44.1 million to $76.2 million, a period-over-period increase of 72.6%. The Offering Documents attributed the increase "primarily . . . to increases in revenues from IVAS, and sales of smart hardware products."

70.    About smart hardware and the "Teemo Watch," the Offering Documents stated:

In 2014, we launched Teemo Watch, our self-developed smart watch for children that rapidly became one of the leading domestic

brands for smart watches, according to IDC. Also according to IDC, Teemo Watch's sales ranked in the top five for smart wearables in China by shipping volume in the first quarter of 2017.

In July 2017, we launched Teemo Hero Watch, our latest generation of 4G smart watch for children. Teemo Hero Watch offers a dual high-definition camera, which supports two-way HD video calls and HD video sharing. It also integrates our Q&A technology and supports various other AI-powered applications.

*We frequently upgrade Teemo Watch features*, and offer unique content-based services to differentiate our product from those of competitors. Our value-added content service model has evolved from story-pushing in our early days to now offering Teemo news, bedtime stories, "know-ahead-of-time," headlines, FM radio, photos, cloud-based video storage services, and other value-added services.

*Other Devices in Development*

*After three years of developing smart hardware products and our supply chain, we have achieved strong research and development and quality-control capabilities and a wide distribution network, which provides a solid foundation for the development and success of new smart hardware products*. For example, we plan to launch Teemo Home, a home-based smart device, by the end of 2017.

71.     Further, the Offering Documents claimed that Sogou was "at the forefront" of the development of artificial intelligence ("AI"), having "attract[ed]a large pool of talent and developed algorithms and know-how in AI." The Offering Documents continued:

We have a clear roadmap for AI, focusing on natural interaction and knowledge computing. In natural interaction, we have made significant breakthroughs in voice and image recognition, semantic understanding, machine translation, and other technologies. For instance, we have achieved a voice recognition accuracy rate of 97% and were the global champion in the 2017 WMT (Workshop on Machine Translation) Chinese-to-English translation competition and ranked number one in the 2016-2017 13th NTCIR (NII Testbeds and Community for Information access Research) Chinese short text conversation competition. In addition, we are continually building our knowledge graph and enhancing machine learning, natural language understanding, and other technologies to enhance our Q&A technology, which allows us to provide direct answers to

users' queries instead of displaying a list of Web links.

> ***We have applied our AI capabilities to a wide variety of products
> and services***. ***Our voice and image recognition technologies have
> been integrated into*** Sogou Search, Sogou Input Method, and ***smart
> hardware developed in-house*** and by third parties. We are among
> the earliest in China to develop a natural language conversation
> system. We have used our AI technologies to develop our
> proprietary natural interaction interface Zhiyin OS and our
> knowledge computing platform Deep Intelligence Engine that can
> be applied to Internet of Things (IoT) in home, in-vehicle, and other
> environments and position us well for the VPA era. (Emphasis
> added).

72.     Thus, at the time of the IPO, the Offering Documents tied improvement in smart

hardware directly to AI, stating, "AI is also a key enabler for smart hardware, which provides

consumers with new gateways to the Internet and expands the use cases for search beyond PC and

mobile devices to home, in-vehicle, and other environments." The Offering Documents, discussing

the "new opportunities" with respect to AI, continued:

> **AI is a key enabler for smart hardware.**
>
> New Internet-enabled smart hardware, such as wearables and smart
> appliances, is gaining popularity among consumers. According to
> iResearch, China's smart hardware market is expected to grow to
> RMB275.1 billion (US$41.3 billion) in 2021, at a CAGR of 37.9%
> from 2016 to 2021. Smart hardware provides consumers with new
> gateways to the Internet. ***These devices leverage AI technologies,
> including voice recognition and dialogue-based Q&A search
> technology, to expand the use cases for search beyond PC and
> mobile devices to home, in-vehicle, and other environments***.
> (Emphasis added).

73.     The Offering Statements were false and misleading and omitted material

information about Sogou's smart hardware products and its strategy better to leverage AI

technologies. At the time of the IPO, without disclosing the strategy and its impact, Sogou began

to "adjust [its] smart hardware strategy by transitioning to products that are better connected with

AI capabilities." This caused it to phase out certain legacy models of Teemo Smart Watch,

rendering them obsolete. Not only would that cause Sogou to impair smart hardware inventory but also not to sell manufacture and sell more, impacting the Company's 2018 financial results materially.

74.     Discussing this strategy in the 2Q Earnings Release, Defendants stated:

> **Sogou recently adjusted its smart hardware strategy to better leverage the Company's AI capabilities to improve product competitiveness**. The adjustment followed the recent launch of two translation devices that were well-received in the market due to Sogou's industry-leading translation technologies. As a result of the change in strategy, **Sogou will phase out hardware products that are not AI-enabled, such as some legacy models of Teemo Smart Watch, and transition to products that integrate the Company's leading AI technologies**. Sogou expects that this will result in a reduction in hardware revenues in the second half of 2018. (Emphasis added).

75.     During the 2Q Earnings call, Defendants elaborated to the smart hardware Strategy, according to Zhou, discussing the anticipated decline of Other Revenue by 25%-30%, stated:

> We started **to accelerate the adjustment of our smart hardware strategy** by transitioning to products that are better connected with AI capabilities. Therefore, we are phasing out hardware products that are no[t] AI-enabled such as certain legacy models of the Teemo Smart Watch. Although, this will have active impact on the second half, it will increase the competitiveness and better develop our smart hardware business next year and in the long-term. (Emphasis added).

76.     According to the July 30, 2018 *BriefingInvestor* Article, this shift in Sogou's smart hardware strategy was among two reasons for Sogou's "poor" second half 2018 guidance. The BriefingInvestor Article stated:

> Also, in the interest of product competitiveness, Sogou has decided to phase out hardware products that are not AI-enabled, such as some legacy models of Teemo Smart Watch, and to transition to products that integrate the company's AI technologies. Sogou expects to see this strategic change result in a reduction in hardware

revenue in 2H18. So the combination of these two events seem to have impacted near-term revenue outlook.

77.     On November 5, 2018, publicly disclosing its results in an earnings press release ("Q3 Earnings Release"), Sogou disclosed that its "general and administrative expenses rose 149%, year-over-year, representing 5.6% of revenues due in material part to "an increased inventory impairment loss related to smart hardware products. Also, in that Q3 Earnings Release, Sogou disclosed that "other revenue" continued to decline, "primarily due to lower sales of smart hardware products following a decision to upgrade the smart hardware strategy to better leverage Sogou's AI capabilities and improve product competitiveness. During the quarter," the 3Q Earnings Release continued, "the Company continued to phase out hardware products that are not AI-enabled and focus resources on developing products that integrate its leading AI technologies." Thus, the strategy to upgrade smart hardware with AI capabilities cost Sogou both continuing sales and in inventory impairment, materially impacting its financial results.

78.     During a conference call later on November 5, 2018 ("3Q Earnings Call"), with respect to smart hardware, Sogou stated:

> In terms of smart hardware, we continued to implement our upgraded strategy in the third quarter, replaced out the updated version of the Teemo Smart Watch with less integrated AI capabilities. We also shifted our R&D and sales capabilities to new products and better utilize our core AI competencies. This -- that key decision will have a short-term impact on our smart hardware sales in the second half of this year. But we believe that in the mid to long run, this will help us to establish a more competitive position in the market.

79.     Thus, the Offering Documents failed accurately to describe Sogou's smart hardware or to disclose that it had changed strategies in a way that would adversely impact revenue and earnings within a year from the IPO.

## SOGOU DISCLOSES THE INFORMATION THE
## <u>OFFERING DOCUMENTS OMITTED OR STATED FALSELY</u>

80.     On June 6 and 7, 2018, investors began to learn of the Qiu Shaoyun incident, the

investigation of Sogou, and the consequent ads suspension Sogou self-imposed. Throughout June

and July 2018, information about the investigation trickled out.

81.     In the July J. P. Morgan Report, analysts Yao, Chen, and Ding, predicted the

consequence of the Qiu Shaoyun incident, writing that while they based their assessment on

Sogou's intrinsic value on its ability to generate earnings in the future, the "expect[ed] the share

price to react negatively in the near future given the significance of the 3Q18 financial impact."

82.     On July 30, 2018, Sogou issued the 2Q Earnings Release, announcing its Q2 2018

financial results. The 2Q Earnings Release revised downward guidance for its Q3 2018 financial

results:

> ***Chinese regulatory authorities, including the Beijing Office of the
> Cyberspace Administration of China and the Beijing
> Administration for Industry and Commerce, initiated an
> investigation of Sogou after certain advertisements involving
> content that the authorities believed insulted a national hero were
> displayed on its platform.*** The advertisements were developed and
> reviewed by Douyin, a Chinese short-form video platform, and
> displayed on Sogou Search in June 2018. Following the
> investigation, the regulatory authorities instructed Sogou to amend
> its advertising practices. Sogou fully cooperated with the authorities
> in their investigation and the Company has taken steps to revise its
> advertising policies and audit procedures to ensure compliance with
> relevant regulations. ***In connection with implementing such
> remedial measures, Sogou suspended part of its advertising
> business for ten days commencing July 1, 2018. This is expected to
> result in a one-time reduction in revenues in the third quarter of
> 2018***.
>
> ***Sogou recently adjusted its smart hardware strategy*** to better
> leverage the Company's AI capabilities to improve product
> competitiveness. The adjustment followed the recent launch of two
> translation devices that were well received in the market due to
> Sogou's industry-leading translation technologies. As a result of the

change in strategy, **Sogou will phase out hardware products that are not AI-enabled**, such as some legacy models of Teemo Smart Watch, and transition to products that integrate the Company's leading AI technologies. **Sogou expects that this will result in a reduction in hardware revenues in the second half of 2018**.

**Business Outlook**

**For the third quarter of 2018, Sogou expects total revenues to range from $275 million to $285 million**, representing a 7% to 11% increase year-over-year. **The guidance for the third quarter takes into account the one-time impact of the regulatory investigation, lower hardware Sales following the adjustment of the smart hardware strategy, and the depreciation of the RMB**.

83.     On this news, Sogou ADS shares fell from $10.33 on Friday, July 27, 2018, to $9.55 on Monday, July 30, 2018, and to $8.36 by August 15, 2018.

84.     On the July 30, 2018, the *BriefingInvestor* Article attributed Sogou's share price drop to its poor earnings and decreased guidance for Q3 2018, which were directly related to the Company's remedial 10-day suspension, as well as its transition to new smart hardware.[2] According to the article:

The Q2 results were decent but not great; **of greater issue for the stock's performance today is the issued Q3 revenue guidance of $275-285 mln, which is well below market expectations**.

**Why the poor guidance? It seems that Chinese regulatory authorities initiated an investigation of Sogou** after certain ads involving content that the authorities believed insulted a martyred national hero were displayed on its platform. The ads were developed and reviewed by Douyin, a popular Chinese short-form video sharing platform, and displayed on Sogou Search in June 2018. Sogou, as instructed by authorities, has taken steps to revise its advertising policies and audit procedures to ensure compliance. As a result of these revisions, **Sogou suspended part of its ad business for ten days beginning on July. This is expected to result in a one-time reduction in revenue in Q3**.

---

[2] *See Sogou Trades Lower on Q2 Results; Q3 Revenue Guidance Well Below Expectations (SOGO)*, BRIEFING.COM (July 30, 2018, 9:49 ET)

> ***Also, in the interest of product competitiveness, Sogou has decided
> to phase out hardware products that are not AI-enabled***, such as
> some legacy models of Teemo Smart Watch, and to transition to
> products that integrate the company's AI technologies. ***Sogou
> expects to see this strategic change result in a reduction in
> hardware revenue in 2H18. So the combination of these two events
> seem[s] to have impacted near-term revenue outlook***. (Emphasis
> added).

85.     During the 2Q Earnings Call, about the suspension of its ad business and its impact

on Sogou's results, Defendant Wang stated:

> Finally, I would like to provide an update about a recent incident
> that result in relation of our advertising practices. On June 6, we
> discovered that an advertisement placed on our platform by doing a
> short video app under Chinese company platform Kotiao [ph]
> contained inappropriate content about Korean War hero, Qiu
> Shaoyun. We immediately deleted all related content and
> determined - and culminated [auto-in] [ph] advertisements on our
> search platform.
>
> Chinese regulatory authorities subsequently launched an
> investigation into the advertisement. We accepted responsibility for
> - in other [working app] [ph] in advertisements [indiscernible]
> complacent - or compliance, sorry - noncompliance campaigns and
> fully cooperated with authorities in their investigation.
>
> We also took steps to rewrite our advertising policies and audience
> procedures to ensure full compliance with related regulations going
> forward. This includes the establishment of a dedicated team
> improvement to our advertisement section mechanisms and
> enhanced use of AI technology to ensure that we now combined
> keyboard and other devices and blocked in a timely manner. In
> connection with implementing this [indiscernible], we suspended
> part of our advertising service for 10 days from the beginning of
> July.
>
> Based on our preliminary analysis, this is expected to result in a
> onetime reduction in revenue in the third quarter of 2018. Our
> advertising services returned to a normal operation about - after the
> 10-day period, while we believe this was a onetime impact on our
> financials. We are, of course, paying even closer attention to the
> advertising content on our platform going forward.

86.    About the Company's belatedly disclosing its strategy better to leverage AI technology in its hardware, during the 2Q Earnings Calls, Defendant Wang stated:

> Now, I'd like to briefly discuss our smart hardware business. Based on our experience developing the Teemo, our smart-watch for kids, we have built a set of [core scale] [ph] hardware.
>
> From July last year, we began to develop new hardware products that better leverage our AI capabilities. In March and in May, we successfully launched two translation products, the Sogou Travel Translator and the Sogou Smart Recording Translator. These two are industry-leading translation technologies. These two products have been well received in the market and created a strong brand recognition among customers.
>
> Encouraged by this development towards end of the second quarter, we accelerated an adjustment of our smart hardware strategy. Now, we are transitioning to products that better leverage our AI capabilities to improve products' competitiveness and the plan to scale the business as quick as possible.
>
> We already have a few more products in the pipeline that we plan to launch before the end of this year. As a result of the change in strategy, we will phase out hardware products that are not AI-enabled, such as some of the legacy models of the Teemo Smart Watch.
>
> While we expect this will result in a reduction of hardware revenues in the second half of 2018, we are confident that this will further differentiate Sogou as a strong player with the smart hardware over the long term.
>
> In AI, we continued to develop language-centered technologies that enhance natural interaction between humans and the machines as well as knowledge competition. Specifically, we maintained our focus on voice translation and question-and-answer technologies, which are well positioned to empower Sogou Search, Mobile Keyboard and the smart hardware products. We are also leveraging a huge amount of data acquired through these services to accelerate the evolution of our technology.

87.    With respect to 3Q guidance, during the 2Q Earnings Call, Zhou added that "[t]he lower than anticipated guidance is primarily due to the one-time impact of the regulatory

investigation, and the subsequent improvement of our advertising practices, the adjustment of our

smart hardware strategy and the depreciation of the RMB."

88.     About the ad suspension, during the 2Q Earnings Call, analyst Chong Liu stated,

"in recent days, we realized that some more apps are being removed from App Store from third-

party for tighter content control." He then asked, "I just wonder if there is any longer-term impact

in terms of our cost structure. And so, how should we think about this, because probably your

company needs to hire some extra staff to somehow conduct the censorship?" In response, Zhou

responded:

> . . . the key point to note is that the financial impact is one-time,
> which will all be reflected in Q3. The search-related advertising has
> completely recovered, and its revenue growth will return to normal
> in Q4.
>
> And before that incident, we had a stringent review mechanism that
> includes multiple steps. So once an ad is submitted to Sogou, the
> system will automatically filter keywords that are blacklisted. After
> the ad uploaded to Sogou's database, the system will do another
> round of auto inspection and we will perform manual inspection on
> sample basis. So after the incident, we have implemented a range of
> measures to prevent this from happening again.
>
> So we have established a dedicated team to monitor relevant new
> regulations and any changes of regulations as well as ensure timely
> implementation of such new regulations or changes accordingly.
> And we strengthened our auditing procedures by leverage AI to
> upgrade automated system and expand our manual inspection team
> to extend the scope of manual inspection.

89.     Following up on the ad suspension and its impact on 3Q guidance, analyst Alicia

Yap sought elaboration from Defendants, stating "[i]t seems like the 3Q guidance are suggesting

more serious impact than the 10-day suspension."  She continued, "[s]o wanted to know how much

of that coming from exactly the 10 days impact and how much of that is actually coming from the

ongoing cleanup on the monitoring of those ad services. So any detailed elaborations would be

helpful." In response, Zhou stated:

> Okay, I will take this question. ***So first, let me give you more details on Q2 revenue***. That was such a very good basis for you to understanding Q3 revenue guidance. So for Q2, excluding 10 percentage points exchange rate impact total revenues in RMB increased by 33% year-over-year. Among that search-related revenues grew 35% year-over-year and the hardware revenues grew 19% year-over-year. For search-related revenue, the increase of 35% year-over-year were driven by, first, midsingle-digit growth in search traffic and 23% improvement on monetization. ***So for other revenues, it grew by 19%. The modest growth was primarily due to slower-than-expected Teemo sales as we already started to transition to hardware products that are better connected with AI capabilities. So that's for Q2***.
>
> ***For Q3***, excluding 2 percentage points exchange rate impact, if we use the midrange of our guidance that implies total revenues in RMB terms to grow 11% year-over-year. So among that, search-related revenues were increased by mid-teens and ***other revenues were decreased 25% to 30%***. So for search-related revenues to grow by mid-teens year-over-year, that's driven by, first single-digit growth in traffic and about 10% improvement on monetization. So, comparing to 23% year-over-year growth on the monetization improvement in Q2, ***the speed slowdown in Q3 [is] due to the 10-day suspension as a result of the Yin [ph] incident***.
>
> ***So other revenues are expected to decrease by 25% to 30% costs toward the end of Q2. We started to accelerate the adjustment of our smart hardware strategy by transitioning to products that are better connected with AI capabilities. Therefore, we are phasing out hardware products that are now AI-enabled such as certain legacy models of the Teemo Smart Watch***.
>
> So for the Yin [ph] impact, I think the key point to note is that this is one of financial impacts than the revenue already recovered. So in Q4, the revenue growth - I mean, the year-over-year revenue growth will go back to normal. (Emphasis added).

90.     Following these disclosures, Sogou's ADSs that had closed at $11.29 per share on July 19, 2018, fell to $9.21 per share on July 31, 2018, a 19% decline.

91.     On November 5, 2018, Defendants convened an earnings conference call to discuss the Company's results for the third quarter of 2018 ("3Q Earnings Call").  During the 3Q

Earnings Call with analysts and investors to discuss the Company's Q3 2018 results and guidance going forward, Defendant Wang stated:

> In terms of smart hardware, we continued to implement our upgraded strategy in the third quarter, replaced out the updated version of the Teemo Smart Watch with less integrated AI capabilities. We also shifted our R&D and sales capabilities to new products and better utilize our core AI competencies. This -- that key decision will have a short-term impact on our smart hardware sales in the second half of this year. But we believe that in the mid to long run, this will help us to establish a more competitive position in the market.

92.     Zhou continued that Sogou's strategy to upgrade its smart hardware would continue negatively to impact the Company's guidance for 2019:

> And finally, turning to guidance. For the first quarter of 2018, we expect the total revenues to be in the range of $292 million to $307 million, representing a 5% to 11% increase year-over-year or 11% to 17% increase year-over-year in RMB terms. ***The guidance takes into account a year-over-year decrease in other revenues due to the upgrade of our smart hardware strategy***, some macro uncertainties and regulatory headwind for certain sectors.

93.     About the Company's transition to smart hardware, during the 3Q Earnings Call, Sogou's Investor Relations Director, Jessie Zheng, responded to a question from an analyst concerning the Company's transition to smart hardware and its effect on 2019 results:

> ***On smart hardware***, I think our strategy has been that we need to leverage those technologies in voice, computer Vision, machine translation and Q&A, along the roadmap of natural interaction and knowledge computing, and integrate such AI technology closely with smart hardware to help strengthen Sogou's competitiveness and differentiation. ***In the first half and more recently, we launched a series of translation devices that help us showcase our AI capabilities*** and build a stronger brand in the market. And in the future, we 1ook to launch some products that are of more strategic implications, that are designed to serve as a better gateway for user interaction. (Emphasis added).

94.     On the same call, Sogou announced that the Company's sales to Tencent, one of its largest customers, had decreased, while there was still no timetable for any WeChat search business monetization.

95.     Following these disclosures, Sogou's share price continued to fall, reaching a mere $5.50 by October 30, 2018, suffering over a 57% decrease in less than a year from its IPO date.

96.     After disclosure of Defendants' false and/or misleading statements, Sogou's ADSs suffered a precipitous decline in market value well below the IPO price, thereby causing significant losses and damages to Plaintiff and other Class members.

## CLASS ACTION ALLEGATIONS

97.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class (as defined *supra* at ¶ 1).  Excluded from the Class are defendants and their family members, directors and officers of Sogou and their families and affiliates, directors and officers of Sohu and their families and affiliates, and directors and officers of Tencent and their families and affiliates.

98.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Sogou has millions ADSs outstanding, owned by hundreds or thousands of persons.

99.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

      a.     Whether the Securities Act was violated by defendants;

      b.     Whether defendants omitted and/or misrepresented material facts;

      c.     Whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they

were made, not misleading;

d.      Whether defendants knew or recklessly disregarded that their statements were false and misleading;

e.      Whether the price of Sogou ADSs were artificially inflated; and

f.      The extent of damage sustained by Class members and the appropriate measure of damages.

100.    Lead Plaintiffs' claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

101.    Lead Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation. Lead Plaintiffs have no interests which conflict with those of the Class.

102.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**COUNT I**
**Violation of Section 11 of**
**The Securities Act Against All Defendants**

103.    Lead Plaintiffs repeat and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

104.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against the Individual Defendants.

105.    The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

106.    Sogou is the registrant for the IPO. Individual Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

107.     As issuer of the shares, Sogou is strictly liable to Lead Plaintiff and the Class for the misstatements and omissions.

108.     None of the Individual Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

109.     By reason of the conduct alleged herein, each Individual Defendant violated and/or controlled a person who violated Section 11 of the Securities Act. Plaintiffs acquired Sogou ADS pursuant and/or traceable to the Registration Statement for the IPO.

110.     Lead Plaintiffs and the Class have sustained damages. The value of Sogou securities has declined substantially subsequent to and due to the Individual Defendants' violations.

**COUNT II**
**Violation of Section 15 of**
**The Securities Act Against the Individual Defendants**

111.     Lead Plaintiffs repeat and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

112.     This count is asserted against the Individual Defendants and is based upon Section 15 of the Securities Act.

113.     Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Sogou within the meaning of Section 15 of the Securities Act. Individual Defendants had the power and influence and exercised the same to cause Sogou to engage in the acts described herein.

114.     Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Lead Plaintiffs and the Class.

115.    By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Lead Plaintiffs and the Class for damages suffered.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action pursuant to Fed. R. Civ. P. 23, designating Lead Plaintiffs as class plaintiffs, and approving Lead Plaintiffs' counsel as class counsel;

B.    Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expenses and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Lead Plaintiffs hereby demand a trial by jury.

Dated: October 22, 2019                    Respectfully Submitted:

**LEVI & KORSINSKY, LLP**

/s/ *Shannon L. Hopkins*
Shannon L. Hopkins (SH-1887)
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel: (203) 992-4523
Fax: (212) 363-7171
Email: shopkins@zlk.com

and

Donald J. Enright
1101 30th Street NW, Suite 115
Washington, D.C. 20007
Tel: (202) 524-4290
Fax: (202) 333-2121
denright@zlk.com

**THE ROSEN LAW FIRM, P.A.**

/s/ *Phillip Kim*
Phillip Kim (PK 9384)
Laurence M. Rosen (LR 5733)
275 Madison Avenue, 34th Floor
New York, New York, 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
        lrosen@rosenlegal.com

and

Jacob A. Goldberg
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Tel: (215) 686-2817
Fax: (212) 202-3827
Email: jgoldberg@rosenlegal.com

*Co-Lead Counsel for Lead Plaintiffs and the Class*

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this, the 22d day of October, 2019, I caused a true and correct copy of the foregoing ***Third Amended Class Action Complaint for Violations of the Federal Securities Laws*** to be served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/ *Shannon L. Hopkins*
Shannon L. Hopkins