**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JIAJIA LUO, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>    v.<br><br>SOGOU INC, SOHU.COM, INC., TENCENT HOLDINGS LIMITED, XIAOCHUAN WANG, CHARLES (CHAOYANG) ZHANG, YUXIN REN, JOANNA (YANFENG) LU, BIN GAO, JOSEPH CHEN, JANICE LEE, JAMES (XIUFENG) DENG, CHI PING MARTIN LAU, DONALD J. PUGLISI, J. P. MORGAN SECURITIES LLC, CREDIT SUISSE SECURITIES (USA) LLC, GOLDMAN SACHS (ASIA) L.L.C., and CHINA INTERNATIONAL CAPITAL CORPORATION HONG KONG SECURITIES LTD.,<br><br><br>    Defendants. | **CASE No.: 1:19-cv-00230-JPO**<br><br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFFS' OMNIBUS BRIEF IN OPPOSITION TO DEFENDANTS SOGOU INC., SOHU.COM, J.P. MORGAN SECURITIES LLC, CREDIT SUISSE SECURITIES (USA) LLC, AND GOLDMAN SACHS (ASIA) L.L.C.'S MOTIONS TO DISMISS THE THIRD AMENDED COMPLAINT**

**TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT ............................................................................................. 1

II.   STATEMENT OF FACTS .................................................................................................. 4

    A.   Company Background .................................................................................................. 4

    B.   The IPO ........................................................................................................................ 5

    C.   The Offering Documents Claim Full Compliance with PRC Law ..................................... 5

    D.   The Offering Documents Tout A Continued Focus On Smart Hardware Technology ....... 7

    E.   The Market Learns of Omissions from and Misrepresentations in the Offering
        Documents and the Price of Sogou ADSs Falls ................................................................ 7

        1.   At The Time Of The IPO, Sogou Was Not Monitoring Its Search Engine For
            Prohibited Content ................................................................................................. 7

        2.   Sogou Announces Change in Smart Hardware Products to AI Capabilities ..................... 9

    F.   The Revelation of the Truth Causes Sogou's ADS Price to Fall Farther Below the
        Offer Price .................................................................................................................. 9

III.  ARGUMENT ...................................................................................................................... 9

    A.   Applicable Legal Standards Disfavor Defendants' Motion ............................................. 9

    B.   The Complaint Adequately Pleads Violations of Section 11 of the Securities Act for
        Defendants' Failure to Disclose Sogou's Lack of Controls Over Advertising
        Content and Compliance With Local Law ..................................................................... 11

        1.   Defendants Had a Duty to Disclose Sogou's Content Monitoring Procedures Were
            Noncompliant ...................................................................................................... 11

        2.   Defendants Had a Duty to Disclose Under Item 303 .................................................. 19

        3.   Defendants' Disclosures of Content-Related Risk Does Not Insulate Them From
            Liability for Materialization of that Risk ................................................................ 21

    C.   The Complaint Adequately Alleges Section 11 Violations For Defendants' Failure to
        Disclose Discontinuation of Sogou's Smart Hardware .................................................. 24

    D.   Sohu is a Control Person Under Section 15 ................................................................. 26

IV.   CONCLUSION ................................................................................................................. 27

## TABLE OF AUTHORITIES

**Cases**

*Arista Records, LLC v. Doe 3,*
   604 F.3d 110 (2d Cir. 2010) ................................................................................. 10

*Ashcroft v. Iqbal,*
   556 U.S. 662, 129 S. Ct. 1937 (2009) .................................................................... 10

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544, 127 S. Ct. 1955 (2007) .................................................................... 10

*Charter Twp. Of Clinton Police & Fire Ret. Sys. v. KKR Fin. Holdings LLC,*
   No. 08civ7062, 2010 WL 4642554 (S.D.N.Y. Nov. 17, 2010) ................................ 16

*Christine Asia Co. v. Alibaba Grp. Holding Ltd.,*
   192 F. Supp. 3d 456 (S.D.N.Y. 2016), *vacated and remanded on other grounds,* 718 Fed.
   App'x 20 (2d Cir. 2017) ......................................................................................... 19

*Christine Asia Co. v. Ma,*
   718 Fed. Appx. 20 (2d Cir. 2017) .......................................................................... 13

*Credit Suisse First Boston Corp. v. ARM Fin. Group, Inc.,*
   No. 99 CIV 12046 (WHP), 2001 WL 300733 (S.D.N.Y. Mar. 28, 2001) ................ 26

*Dolphin & Bradbury, Inc. v. SEC,*
   512 F.3d 634 (D.C. Cir. 2008) ............................................................................... 23

*ECA & Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.,*
   553 F.3d 187 (2d Cir. 2009) ................................................................................... 10

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.,*
   104 F. Supp. 3d 441 (S.D.N.Y. 2015) .................................................................... 27

*Ganino v. Citizens Utils. Co.,*
   228 F.3d 154 (2d Cir. 2000) ................................................................................... 10

*In re Am. Apparel, Inc. Shareholder Litig.,*
   No. CV 10-06352 MMM, 2013 WL 10914316 (C.D. Cal. Aug. 8, 2013) ................ 17

*In re Barclays Bank PLC Sec. Litig.,*
   No. 09 Civ. 1989 (PAC), 2017 U.S. Dist. LEXIS 148695 (S.D.N.Y. Sept. 13, 2017) ............. 19

*In re BioScrip, Inc. Sec. Litig.,*
   95 F. Supp. 3d 711 (S.D.N.Y. 2015) ...................................................................... 27

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
   986 F. Supp. 2d 487 (S.D.N.Y. 2013)........................................................................ 21, 22, 23

*In re iDreamsky Tech. Ltd Sec. Litig.*,
   236 F. Supp. 3d 824 (S.D.N.Y. 2017)............................................................................ 22, 23

*In re Initial Pub. Offering Sec. Litig.*,
   241 F. Supp. 2d 281 (S.D.N.Y. 2003).................................................................................. 26

*In re Lehman Bros. Mortg.-Backed Sec. Litig.*,
   650 F.3d 167 (2d Cir. 2011).................................................................................................. 27

*In re Morgan Stanley Info. Fund Secs. Litig.*,
   592 F.3d 347 (2d Cir. 2010).................................................................................................. 11

*In re Orion Sec. Litig.*,
   No. 08 CIV. 1328 (RJS), 2009 WL 2601952 (S.D.N.Y. Aug. 20, 2009) ................................. 10

*In re Ply Gem Holdings, Inc.*,
   No. 14-CV-3577 (JPO), 2016 WL 5339541 (S.D.N.Y. Sept. 23, 2016)............................ 22, 25

*In re Ultrafem Inc. Sec. Litig.*,
   91 F. Supp. 2d 678 (S.D.N.Y. 2000)..................................................................................... 11

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016).................................................................................................. 13

*In re WorldCom, Inc. Sec. Litig.*,
   346 F. Supp. 2d 628 (S.D.N.Y. 2004)................................................................................... 11

*Jackson v. City of New York*,
   29 F. Supp. 3d 161 (E.D.N.Y. 2014)..................................................................................... 26

*Litwin v. Blackstone Group, L.P.*,
   634 F.3d 706 (2d Cir. 2011)........................................................................................... passim

*McKenna v. SMART Techs. Inc.*,
   No. 11 CIV. 7673 KBF, 2012 WL 3589655 (S.D.N.Y. Aug. 21, 2012)................................... 24

*Meyer v. Jinkosolar Holdings Co.*,
   761 F.3d 245 (2d Cir. 2014)........................................................................................... passim

*Milman v. Box Hill Sys. Corp.*,
   72 F. Supp. 2d 220 (S.D.N.Y. 1999)..................................................................................... 23

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
   693 F.3d 145 (2d Cir. 2012).................................................................................................. 10

iii

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   135 S. Ct. 1318 (2015) ................................................................................................ 11

*Ontario Teachers' Pension Plan Board v. Teva Pharma Indus. Ltd.*,
   No. 3:17-cv-558 (SRU), 2019 WL 4674839 (D. Conn. Sept. 25, 2019) .................................. 11

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
   681 F.3d 114 (2d Cir. 2012) ................................................................................ 10, 15, 19, 20

*Panther Partners v. Ikano Communs., Inc.*,
   538 F. Supp. 2d 662 (S.D.N.Y. 2008) ................................................................................. 16

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) ................................................................................ 11, 21, 23

*Scott v. Gen. Motors Co.*,
   46 F. Supp. 3d 387 (S.D.N.Y 2014) ................................................................................... 25

*Singh v. Schikan*,
   106 F. Supp. 3d 439 (S.D.N.Y. 2015) ................................................................................ 16

*Slayton v. Am. Express Co.*,
   604 F.3d 758 (2d Cir. 2010) .............................................................................................. 10

*Stratte-McClure v. Morgan Stanley*,
   776 F.3d 94 (2d Cir. 2015) ................................................................................................ 13

*Wallace v. IntraLinks*,
   No. 11cv8861, 2013 WL 1907685 (S.D.N.Y. 2013) ........................................................... 20

*Wigand v. Flo-Tek, Inc.*,
   609 F.2d 1028 (2d Cir. 1979) ............................................................................................ 26

*Yi Xiang v. Inovalon Holdings, Inc.*,
   254 F. Supp. 3d 635 (S.D.N.Y. 2017) ................................................................................ 18

**Statutes**

15 U.S.C. §77 .......................................................................................................................... 1

15 U.S.C. §77k ...................................................................................................................... 11

15 U.S.C. §77o ................................................................................................................. 4, 26

17 C.F.R. § 229.303(a) ......................................................................................................... 20

17 C.F.R. § 229.303(a)(3)(ii) ............................................................................................... 19

17 C.F.R. §229.303(a)(3)(ii) ................................................................................................ 10

**Rules**

Fed. R. Civ. P. 8(a) ........................................................................................................... 10

Fed. R. Civ. P. 8(a)(2) ....................................................................................................... 10

Lead Plaintiffs Lizhen Zhang, Juean Xu, Yuehua Ding, Maggie Xu, Mark S. Frater, and Ketan Patel ("Plaintiffs"), by and through their counsel, respectfully submit this omnibus memorandum of law in opposition to Defendants' motions to dismiss.[1]

## I.    PRELIMINARY STATEMENT[2]

In violation of the Securities Act of 1933, 15 U.S.C. §77, *et seq.* ("Securities Act"), Defendants misrepresented and omitted from offering documents[3] material information regarding both the inadequacy of Sogou's efforts to monitor and prevent illegal content from appearing on its platform and Sogou's strategic plans for the sale of certain smart hardware products. Just as in *Meyer v. Jinkosolar Holdings Co, Ltd.*, 761 F.3d 245, 251 (2d Cir. 2014), where the Second Circuit vacated this Court's order of dismissal, the Offering Documents warned of both Sogou's obligation to comply with  the laws of the People's Republic of China ("PRC")—requiring, in this case, that Sogou monitor its search engine content and remove illegal content—and the consequences of not complying with PRC law. Indeed, the Offering Documents disclosed that a failure to monitor for and adhere to content restriction laws could result in the PRC government suspending Sogou's platform, materially impacting its revenues. The Company also touted its smart hardware

---

[1] Defendants include Sogou, Inc.com ("Sogou" or "Company"), Sohu.com, Inc. ("Sohu"), Tencent Holdings Limited ("Tencent"), Xiaochuan Wang ("Wang"), James (Xiufeng) Deng ("Deng"), Charles (Chaoyang) Zhang ("Zhang"), Yuxin Ren ("Ren"), Joanna (Yanfeng) Lu ("Lu"), Chi Ping Martin Lau ("Lau"), Donald J. Puglisi ("Puglisi"), Bin Gao ("Gao"), Joseph Chen ("Chen"), Janice Lee ("Lee")  (Wang, Xiufeng, Deng, Zhang, Ren, Lu, Lau, Puglisi, Gao, Chen, and Lee are referred to as the "Individual Defendants"), and the Underwriters J. P. Morgan Securities LLC ("J. P. Morgan"), Credit Suisse Securities (USA) LLC ("Credit Suisse"), Goldman Sachs (Asia) L.L.C. ("Goldman"), China International Capital Corporation Hong Kong Securities Ltd. ("CICC") (J. P. Morgan, Credit Suisse, Goldman, and CICC are collectively referred to herein as the "Underwriter Defendants"). The motion to dismiss memorandum of law filed by Sogou (Dkt. 66) is referred to herein as "DB", the memorandum of law filed by J. P. Morgan, Credit Suisse, and Goldman (Dkt. 71) is referred to as "UB", and the memorandum of law filed by Sohu (Dkt. 69) is referred to as "Sohu." By Order dated January 14, 2020 (Dkt. No. 73), this Court permitted Plaintiffs to file an omnibus opposition to Defendants' motions, not to exceed forty (40) pages.

[2] All citations to the Third Amended Class Action Complaint For Violations of the Federal Securities Laws (Dkt. 60) are cited as "¶_".

[3] The "Offering Documents" are the Registration Statement and Prospectus Defendants filed with the Securities and Exchange Commission ("SEC") on and before the November 9, 2017 IPO, supporting Sogou's initial public offering ("IPO").

technology as being a primary driver of other revenue for the Company. Both Sogou's compliance and its smart hardware sales materially impacted the Company's financial results.

Nearly six months after the IPO, on June 6, 2018, the Beijing Municipal Cyberspace Affairs Commission ("Commission") disclosed that Sogou's controls over advertising content were materially inadequate, reporting that, in violation of PRC advertising and cybersecurity laws, Sogou had violated its obligations to review content, causing it to publish illegal content and to violate PRC cybersecurity and advertising content laws. Specifically, the Commission found that Sogou: (i) failed to adequately monitor for illegal words, improperly relying on sampling; (ii) failed to update the blacklisted words to include all prohibited subject matters and keywords; and (iii) failed to stay apprised of and in compliance with new laws. As a result, authorities "instructed Sogou to amend its advertising practices . . . to ensure compliance with relevant regulations" and suspended a material part of its advertising business for ten days.

On July 30, 2018, the Company, itself, disclosed its violations of PRC law. At the same time, it disclosed that it was "phasing out hardware products that are no[t] A-I enabled" as part of an "adjustment of our smart hardware strategy." As a result of the Company's violations and this adjustment, Sogou revised its third quarter 2018 financial results for a "onetime reduction in revenue in the third quarter of 2018" that was "well below market expectations." By November 2018, the Company announced an "increased inventory impairment loss related to smart hardware products" as a result of the strategy shift.

Defendants argue that they could not have omitted material information from the Offering Documents about compliance with PRC laws because the Protection of Heroes and Martyrs law was not enacted until after the IPO. Invoking this "illegality" straw-person, however, they disregard that the Complaint rests not on whether the Company violated PRC content laws at the

2

time of the IPO, but on the material inadequacy of its content monitoring and controls. Indeed, even as the material inadequacy of Sogou's content controls likely violated five other PRC laws in force prior to and that at the time of the IPO, the PRC government had publicized its imminent implementation of the Heroes and Martyrs law as a "priority." The Complaint alleges that Defendants' discussion of those controls and the risks related to Sogou disseminating prohibited content rendered them duty-bound to disclose those material inadequacies. The main thrust of Defendants' motions, therefore, fails, requiring denial.

Defendants similarly argue that the decision to change Sogou's procedures after the Commission fined Sogou and suspended its advertising efforts is insufficient at this stage to plead the material inadequacy of the Company's content controls at the time of the IPO. They ignore, however, that they themselves established the plausibility of the Complaint's allegations, admitting that they "rewr[o]te [Sogou's] advertising policies and audience procedures to ensure full compliance with related regulations *going forward*." That is, Sogou failed to implement sufficient content controls at the time of the IPO. The Chinese regulatory authorities also stated that they "instructed Sogou to amend its advertising practices" because they had not been compliant. No fact of record indicates that Sogou changed its monitoring procedures after the IPO, or that it complied *as of the IPO* and only became non-compliant *after the IPO*. Thus, if Sogou's monitoring procedures were inadequate six months after the IPO, then it is plausible and even more likely than not that they were inadequate at the time of the IPO.

Defendants seek exculpation because the Offering Documents warned of the risk of noncompliance with PRC laws. Sogou's generic risk warnings, however, spoke only of "potential" risks, failing to disclose that at the time of the IPO, Sogou's procedures and capabilities to monitor for "illegal or inappropriate" content were inadequate. Generic warnings about possible future

3

risks cannot shield Defendants from liability for misrepresentations and omissions concerning known or knowable, materially inadequate content controls. Rather, those very risk warnings imposed a duty on the Offering Documents not to mislead or omit that the Company's content controls were materially inadequate at the time of the IPO.

Defendants' arguments about Sogou's hardware strategy are similarly unavailing. They assert that Sogou's decision to phase out smart hardware post-dates the IPO. Yet Defendants referred to this move as an "acceleration" during the July 30, 2018 Earnings Call, thus indicating the shift was already long underway.

Last, Defendant Sohu.com, Inc. ("Sohu") argues that it is not a "control person" under Section 15. Section 15 provides that controlling stockholders are liable for the sections 11 and 12 violations of the company they control. 15 U.S.C. §77o.  The Offering Documents claim throughout that Sohu is Sogou's "ultimate parent and controlling shareholder" with the "right to appoint a majority of [Sogou's] Board of Directors." Sohu is liable, therefore, under Section 15.

For the following reasons, this Court should deny Defendants' Motions in their entirety.

## II.     STATEMENT OF FACTS

### A.     Company Background

Sohu founded Sogou in 2005. ¶2. Sogou has become China's fourth largest internet company by monthly active users, ¶¶2-4, and second largest search engine by mobile queries. ¶34. Powered by artificial intelligence ("AI"), Sogou provides unique cross-language searches that eliminate language barriers by allowing users to locate English content by querying searches in Chinese and then reading content for which Sogou provides a Chinese translation. ¶5. Sogou also develops a number of smart hardware-based products, including the Teemo Watch, which purportedly supports AI technology and is a primary driver of the Company's "other revenue."

¶¶10, 69-70.

### B.    The IPO

On August 14, 2017, Sogou filed a draft Registration Statement on Form DRS, filing a Registration Statement on Form F-1 on October 13, 2017. ¶37. The SEC declared the Registration Statement effective on November 8, 2017. ¶37. Each of the Individual Defendants signed the Registration Statement. ¶¶23, 25.

The Underwriter Defendants drafted and disseminated the Offering Documents. ¶¶29-31. In connection with the IPO, the Underwriter Defendants assisted Sogou and the Individual Defendants in planning the IPO and ensuring that the Offering Documents were accurate and free from any materially misleading information. ¶31. As part of the due diligence review, the Underwriter Defendants had continual access to confidential corporate information concerning Sogou's business, products, plans, and financial prospects. *Id.*

On November 9, 2017, based on the Offering Documents, Sogou completed its IPO of 45,000,000 American Depository Shares ("ADS")[4] at $13 per ADS, ¶39, for total proceeds of approximately $625,450,000, after deducting underwriting discounts and commissions. ¶41. These shares were sold pursuant to a final prospectus dated November 9, 2017 ("Prospectus"), which formed part of the registration statement.

### C.    The Offering Documents Claim Full Compliance with PRC Law

At the time of the IPO, as an internet search company, Sogou was and remains subject to PRC law with respect to content. ¶47. For instance, the PRC required Sogou "to review the content of products and services to be provided prior to providing such content and services to the public,"

---

[4] Each ADS represents one Sogou Class A ordinary share and trades on the New York Stock Exchange under the ticker symbol "SOGO." ¶39.

¶49, prohibiting advertisements "damaging the dignity or interest of the state," "containing any obscene . . . content," or "falling under any other circumstances as set out by any law," ¶44, including information non-affiliated users publish through Sogou's platform. ¶45. On November 23, 2015, Sogou renewed its Telecommunications and Information Services Operating License ("ICP License"), reaffirming its obligation to ensure that it did not disseminate prohibited content. ¶48.

Additionally, at the time of the IPO, the PRC had prioritized a law to protect the nation's "heroes and martyrs," prohibiting their denigration or disparagement. ¶42. Although this law was enacted in April 2018, media outlets began discussing its requirements as early as March and April 2017, when legislation labeled the law as a "priority" and the people of China were made aware of its requirements.[5]

The Offering Documents disclosed that strict PRC laws regulating information service providers bound Sogou not to disseminate prohibited content. ¶47. For instance, PRC law, the Offering Documents stated, required Sogou to "police [its] Internet Platforms and remove certain prohibited content," *id.*, and subjected it to liability for disseminating inappropriate content. ¶51. *see also* ¶48 ("subject to annual inspection"); ¶49 (required to "review the content . . . prior to providing such content and services to the public."). The Offering Documents note that "[t]he content management system of an Internet culture business entity is required to specify the responsibilities, standards and processes for content review as well as accountability measures, and is required to be filed with the local provincial branch of the MOC." ¶50. The Offering

---

[5]   http://cathaysreview.com/2018/10/03/an-introduction-to-chinas-peoples-congress-system/ ("*the Heroes and Martyrs Protection Law was considered a top priority* and was reviewed by the NPC Standing Committee on *April 25, 2017*."); https://www.loc.gov/law/foreign-news/article/china-first-step-towards-adoption-of-a-new-civil-code/ (article by Global Legal Monitor dated March 30, 2017, stating that "*The new General Provisions prohibits defaming 'heroes and martyrs.'* (*Id.* art. 185.) *Anyone who harms the name, portrait, reputation, or honor of heroes and martyrs, insofar as it hurts the public interest, will bear civil liability*. (*Id.*)").

Documents discussed these rules, omitting that at the time, Sogou had not adequately maintained compliance with their requirements.

### D.    The Offering Documents Tout A Continued Focus On Smart Hardware Technology

The Offering Documents also tout Sogou's successful smart hardware products as materially contributing to revenue. ¶68. According to the Offering Documents, Sogou's increase in "other revenue" was due "primarily . . . to increases in revenues from IVAS, and sales of smart hardware products." ¶69. Smart hardware products were purportedly "gaining popularity among consumers." ¶72. With respect to smart hardware, the Offering Documents focused on the "Teemo Watch" as a key smart hardware product. For instance, the Offering Documents state that the Teemo Watch "rapidly became one of the leading domestic brands for smart watches," the Company "frequently upgrade[s] Teemo Watch features," and the success of the Teemo Watch "provides a solid foundation for the development and success of new smart hardware products." ¶70.

### E.    The Market Learns of Omissions From and Misrepresentations in the Offering Documents and the Price of Sogou ADSs Falls

Just six months after the IPO, investors learned both that Sogou was not in compliance with the PRC laws and that it had decided to stop selling certain smart hardware products, adversely impacting Sogou's revenues and future forecasts. *See e.g.,* ¶¶54, 63.

#### 1.    At The Time Of The IPO, Sogou Was Not Monitoring Its Search Engine For Prohibited Content

On June 6, 2018, the Commission revealed that, contrary to the representations in the Offering Documents, Sogou had not properly monitored its internet platform and failed to prevent and remove prohibited content from its platform as PRC law required. Sogou had allowed content disparaging of heroes and martyrs to appear on its platform, the Commission stated, "fail[ing] to

7

meet its lawful review obligations for the advertisements it published, resulting in the online propagation of illegal information . . . ." ¶54. Not only did the Commission fine Sogou RMB 1 million and order it to disgorge RMB 475 in advertising income, but it suspended the Sogou platform for ten days. ¶¶12, 61, 63.

On June 30, 2018, PRC regulators met with Sogou to discuss Sogou's plan to remedy these inadequacies. ¶61. Regulators mandated that Sogou revise its policies to comply with PRC laws. ¶63 ("Following the investigation, the regulatory authorities instructed Sogou to amend its advertising practices"). The Company complied, stating that it would now establish a team "to monitor relevant new regulations and any changes of regulations as well as ensure timely implementation of such new regulations," (¶65) something, for instance, that Article 47 of the Cybersecurity Law had already bound it to do at the time of the IPO. ¶45.

Sogou's own internal review uncovered that its violations of PRC law stemmed from material deficiencies in its ad sales and content control processes. During its July 30, 2018 2Q Earnings Call, Sogou conceded the insufficiency of both its automated and manual inspection processes, stating that it had strengthened its content review process, "leverage[ing] AI to upgrade automated system[s] and expand[ing] our manual inspection team to extend the scope of manual inspection." ¶65. Sogou acknowledged that its new procedures were mandated in order to be in full compliance with the law. ¶64 (Sogou "accepted responsibility for . . . noncompliance" and "rewr[o]te [its] advertising policies and audience procedures to ensure full compliance with related regulations going forward").

On July 30, 2018, Sogou revised its guidance for third quarter 2018, citing the regulatory investigations and the implementation of "remedial measures," including the ten-day suspension of part of its advertising business, as materially and adversely impacting its financial results for

the second half of 2018. ¶¶12, 63 ("we expect that our third quarter revenues will be lower than anticipated due to the one-time impact of a regulatory investigation and steps taken to ensure our advertising practices are compliant with relevant regulations").

### 2. Sogou Announces Change in Smart Hardware Products to AI Capabilities

Sogou also attributed its lower guidance to it accelerating the transition of its smart hardware products to render them AI capable, reducing Sogou's projected revenue from these products. ¶12. Sogou began to "adjust [its] smart hardware strategy by transitioning to products that are better connected with AI capabilities," causing it to "phase out hardware products that are not AI-enabled, such as some legacy models of Teemo Smart Watch," thus rendering them obsolete. ¶¶73-74. This acceleration was anticipated to reduce "other revenue" by 25-30%. ¶75.

On November 5, 2018, however, Sogou announced an "increased inventory impairment loss related to smart hardware products" and a decline in other revenues "primarily due to lower sales of smart hardware products following a decision to upgrade the smart hardware strategy to better leverage Sogou's AI capabilities." ¶77.

### F. The Revelation of the Truth Causes Sogou's ADS Price to Fall Further Below the Offering Price

At the time Plaintiff filed suit, Sogou ADS traded well-below the price at which they were offered to the public in the IPO. ¶83.

## III. ARGUMENT

### A. Applicable Legal Standards Disfavor Defendants' Motion

"To survive a motion to dismiss, a complaint must plead enough facts to state a claim to relief that is plausible on its face." *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 715 (2d Cir. 2011) (quoting *ECA & Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.*, 553 F.3d

9

187, 196 (2d Cir. 2009)). A claim is plausible when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009). On a Rule 12(b)(6) motion, a court must "accept all factual allegations in the complaint as true and must consider the complaint in its entirety," *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010), and draw "all reasonable inferences in the plaintiffs' favor." *Litwin*, 634 F.3d at 715; *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000) (same).

Federal Rule 8(a) governs the pleading of claims under Sections 11 and 15 of the Securities Act, requiring only "a short plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). *Litwin*, 634 F.3d at 715. This is so because §11 imposes strict liability on the issuer and subjects others to liability for their negligence, requiring no proof of a defendant's scienter or an investor's reliance. *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012); *see also NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 156-57 (2d Cir. 2012) (to plead a Section 11 or 12 claim, "the provisions 'place[ ] a relatively minimal burden on a plaintiff'") (citations omitted). Under Fed. R. Civ. P. 8(a), the pleading standard "does not require 'detailed factual allegations,'" *Iqbal*, 556 U.S. at 678, and neither *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S. Ct. 1955 (2007) nor *Iqbal* "require the pleading of specific evidence or extra facts beyond what is needed to make the claim plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120-21 (2d Cir. 2010). The Complaint satisfies these requirements, adequately pleading causes of action under Fed. R. Civ. P. 8(a).[6] *Ontario Teachers'*

---

[6] Defendants incorrectly contend that Plaintiffs' claims "sound in fraud," requiring that the Complaint satisfy Rule 9(b)'s heightened pleading standard. DB at 10 n. 6; UB at 1. Courts in this District have held that allegations "that a fact was known and not disclosed does not mean, as a matter of law, that the circumstances of the resulting omission sound in fraud." *In re Orion Sec. Litig.*, No. 08 CIV. 1328 (RJS), 2009 WL 2601952, at *1 (S.D.N.Y. Aug. 20, 2009) (allegations that a defendant was "aware" are "miles away from alleging fraudulent conduct"). Indeed, the Complaint alleges that Defendants violated Regulation S-K, Item 303, 17 C.F.R. §229.303(a)(3)(ii), ¶¶26-27, requiring that

*Pension Plan Board v. Teva Pharma Indus. Ltd*., No. 3:17-cv-558 (SRU), 2019 WL 4674839, at

\*10-11 (D. Conn. Sept. 25, 2019) (Rule 8(a) pleading applies where no Exchange Act claims are

pled).

> **B.** **The Complaint Adequately Pleads Violations of Section 11 of the Securities Act for Defendants' Failure to Disclose Sogou's Lack of Controls Over Advertising Content and Compliance With Local Law**
>
> **1.** **Defendants Had a Duty to Disclose Sogou's Content Monitoring Procedures Were Noncompliant**

A duty to disclose under § 11 arises whenever a registration statement omits material

information "necessary to make the statements therein not misleading." *Omnicare, Inc. v.*

*Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1323 (2015) (quoting 15

U.S.C. §77k). "[W]hen an offering participant makes a disclosure about a particular topic,

whether voluntary or required, the representation must be 'complete and accurate.'" *In re Morgan*

*Stanley Info. Fund Secs. Litig.*, 592 F.3d 347, 365-66 (2d Cir. 2010). Therefore, "a prospectus

violates Section 11 'if it does not disclose material objective factual matters, or buries those

matters beneath other information, or treats them cavalierly.'" *In re WorldCom, Inc. Sec. Litig.*,

346 F. Supp. 2d 628, 658 (S.D.N.Y. 2004).

Because the Offering Documents expressly referenced Sogou's content management

---

Defendants knew of trends, uncertainties or events. Violations of Item 303 are not automatically fraud, even as a complaint must plead that defendants knew of the trend, uncertainty, or event to plead a violation. Defendants ignore, too, that even under Rule 9(b), a complaint need only alleged state of mind "generally." Fed. R. Civ. P. 9(b). The cases on which Defendants rely are inapposite, DB 10 n. 6, as each involved a complaint pleading *both* Securities Act claims, requiring pleading and proof of neither scienter nor reliance, *and* fraud-based Securities Exchange Act claims, requiring both. *See Rombach v. Chang*, 355 F.3d 164, 168 (2d Cir. 2004) (complaint pleaded both negligence-based Securities Act claims and fraud-based Exchange Act claims); *In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 2d 678, 691-92 (S.D.N.Y. 2000) (where complaint alleges both Exchange Act fraud and Securities Act negligence claims, court should not have to parse the allegations to separate the two and will apply heightened pleading standards to all claims). The Complaint here, however, asserts no claim whatsoever for fraud. Allegations of knowledge or awareness in the context of omitted facts that must be "known or knowable" do not convert a strict liability and negligence claim into one for fraud.

system in the context of its policing internet platforms and preventing and removing prohibited content in compliance with PRC laws—and the material impact of noncompliance—Defendants had a duty to disclose that Sogou's content monitoring controls were materially inadequate to comply with PRC law. ¶¶47-52. Specifically, the Offering Documents emphasized that PRC law required Sogou to monitor and remove any prohibited content from its internet platform. *See, e.g.,* ¶47 ("ICPs are required to police their Internet Platforms and remove certain prohibited content"); ¶48 (Sogou's ICP license was "subject to annual inspection"); ¶49 (Sogou is required "to review the content of products and services to be provided prior to providing such content and services to the public"); ¶50 (Sogou is "required to specify the responsibilities, standards and processes for content review as well as accountability measures"). The Prospectus further represented that pursuant to the PRC CyberSecurity Law, Sogou had "established an internal security committee and adopted security maintenance measures, employed a full-time supervisor and exchanged information on a regular basis with the local public security bureau with regard to sensitive or censored information and Websites." *See* Dkt. 67, Declaration of Joshua M. Looney in support of Defendant Sogou Inc.'s Motion to Dismiss, Ex. A, at 140.

The Offering Documents also discussed the importance of compliance and warned of the consequences of noncompliance, stating that "[t]he PRC government may prevent us from distributing, and we may be subject to liability for, content that it believes is inappropriate," "[w]e are also subject to potential liabilities for content delivered through our services that is deemed inappropriate and for any unlawful actions of users of our products and services under regulations promulgated by the MIIT, such potential liabilities including the imposition of fines or even the shutting down of the Internet Platforms," and "we may be prevented from operating our Internet platforms." ¶51.

12

Having included in the Offering Documents information about the adequacy of Sogou's content controls in compliance with PRC law and the consequences of noncompliance, Defendants were duty-bound to disclose that, at the time of the IPO, Sogou lacked content controls and processes to identify and prevent the dissemination of illegal content under PRC laws. *See Christine Asia Co. v. Ma*, 718 Fed. Appx. 20, 23 (2d Cir. 2017) (citing *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015)) (reversing dismissal finding duty to disclose adverse facts to convey "accurately . . . the seriousness of the problems Alibaba faced, so as not to render Defendants' public disclosures 'inaccurate, incomplete, or misleading'").[7] While the Offering Documents' disclosures about content imply compliance with the PRC law, Sogou's then-existing controls failed to monitor for and to remove prohibited content. ¶54 (Commission found that Sogou was not monitoring or removing prohibited content from its internet platform). This information was material since noncompliance with PRC laws meant that Sogou was subject to the very same liabilities and consequences that it couched as mere potential risks.[8] *See infra* III.B.3.; *see also In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 249-51 (2d Cir. 2016) (affirming verdict that statements about liquidity risk are actionable in the context of facts showing that liquidity risk had already materialized); *Jinkosolar*, 761 F.3d at 251 (vacating dismissal, stating "[o]ne cannot, for example, disclose in a securities offering a business's peculiar risk of fire, the installation of a comprehensive sprinkler system to reduce fire danger, and omit the fact that the system has been found to be inoperable, without misleading investors"); *Stratte-McClure*, 776 F.3d at 107-108 (reversing

---

[7] As set forth below, Defendants were also duty-bound to make such disclosures under Item 303. *See Stratte-McClure*, 776 F.3d at 101 ("failing to comply with Item 303 by omitting known trends or uncertainties from a registration statement or prospectus is actionable under Sections 11 and 12(a)(2) of the Securities Act of 1933").

[8] As explained *infra*, III.B.3, while Sogou identified certain potential consequences in its discussion of potential risk factors, this does not shield Defendants from liability since those risks had already actually materialized. Thus, having warned of the effects on financial results if not in compliance with PRC laws, Defendants were duty-bound to disclose that their internal controls and processes for content review failed to capture illegal content.

13

holding of no duty to disclose, finding that disclosing potential negative impact of adverse condition does not eliminate the duty to disclose the materialization of that risk).

*Jinkosolar* is directly on point, requiring denial of Defendants' motions. In that case, vacating this Court's dismissal of the complaint, the Second Circuit found that the defendants' omission from offering documents of then-existing facts that rendered misleading "the comforting statements in the prospectus about compliance measures," was actionable. The offering documents in *Jinkosolar* discussed pollution abatement in the context of the company's storing dangerous chemicals and waste. Just as in this case, the registrant warned of the potential of fines and suspensions for violations of PRC law. *Id*. at 251.

The Second Circuit found that while the offering statements were "technically true. . . , the description of pollution-preventing equipment and 24–hour monitoring teams gave comfort to investors that reasonably effective steps were being taken to comply with applicable environmental regulations. To be sure," the Second Circuit continued, "these descriptions did not guarantee 100% compliance 100% of the time. Such compliance may often be unobtainable, and reasonable investors may be deemed to know that." It concluded, "investors would be misled by a statement such as that quoted above if in fact the equipment and 24–hour team were then failing to prevent substantial violations of the Chinese regulations." *Id*. at 251. Just as in *Jinkosolar*, therefore, because the Complaint pleads plausibly that Sogou's content controls were deficient as of the IPO, the Offering Documents were materially misleading and actionable.

Given the Second Circuit's mandate, therefore, this Court should reject Defendants' arguments. First, Defendants argue that the Complaint fails to plead how Sogou's content controls were deficient at the time of the IPO. DB 12-14; UB at 1, 3; Sohu at 2, 7. Defendants' argument, however, presupposes that this Court will apply an inapplicable heightened pleading standard. The

only question for this Court is whether the allegations render it ***plausible*** that the Offering Documents omitted material facts that Defendants were duty-bound to disclose. *Litwin*, 634 F.3d at 715. To rule in Defendants' favor at the pleading stage, this Court must hold that it is implausible that the inadequacies that the Commission found and Defendants admitted did not exist at the time of the IPO—that Sogou's systemic and material failure to monitor and remove illegal content arose only after the IPO. Together, the unlikeliness of Sogou's beginning to fail to adequately monitor content only after the IPO and the absence of disclosure about a change in monitoring practices after the IPO rises above the speculative level and becomes plausible. *Panther Partners*, 681 F.3d at 121-22, is directly on point. In that case, reversing an order of dismissal, the Second Circuit found that neither of two relevant, intervening "facts undermine[d] the plausible inference that, . . . Ikanos was aware of the 'uncertainty' that it might have to accept returns of a substantial volume, if not all, of the chips it had delivered to its major customers. It goes without saying," the court wrote, "that such 'known uncertainties' could materially impact revenues." *Id*. Here too, the Complaint alleges plausibly that Sogou's content controls were materially inadequate at the time of the IPO. This case is, however, even stronger than *Panther Partners*, for unlike that case, no intervening fact disturbs the link between Sogou's inadequate content controls at the time of the IPO and the state of those controls at time the Commission fined Sogou in June 2018. The Complaint, therefore, adequately pleads a plausible Securities Act claim.

More, the Complaint identifies the existing deficiencies, including that during the Class Period Sogou: (i) monitored for illegal content only on a "sample" or "random" basis (¶¶60, 65, 88); (ii) failed to update the blacklisted words to include all prohibited subject matters and keywords as required by PRC laws (¶55); and (iii) failed to stay apprised of and in compliance with new laws, as required by the PRC Cybersecurity Law and Advertising Law of the PRC (¶¶44-

15

45, 58-59 ).[9] Indeed, Sogou admitted in its 2Q Earnings Call that its review process was operating on a "sample" basis:

> And before that incident we had a stringent review mechanism that includes multiple steps. So once an ad is submitted to Sogou, the system will automatically filter keywords that are blacklisted. After the ad uploaded to Sogou's database, the system will do another round of auto inspection and **we will perform manual inspection on sample basis.**

¶65.  As the Commission ultimately discovered, Sogou's manual screening practice was random and therefore failed to detect and block illegal content. ¶60. Defendants also acknowledged Sogou was not properly keeping itself apprised of all relevant PRC laws. For example, after Sogou was found to be in violation, the Company stated that it would thereafter establish a team "***to monitor relevant new regulations*** and any changes of regulations as well as ***ensure timely implementation of such new regulations,***" (¶65), thus implicitly conceding that previously, including at the time of the IPO, Defendant Sogou had not implemented sufficient measures to ensure that all PRC laws were accounted for in its monitoring process.

In fact, as the Commission disclosed, Sogou failed to implement a keyword blacklist containing all the enumerated PRC illegal keywords. ¶60. Instead, only some keywords appeared as blacklisted despite that the PRC regulators sent directly to Sogou the precise keywords it was required to monitor. *Id.* In other words, at the time of the IPO, Sogou had implemented a haphazard

---

[9] Unlike the cases upon which Defendants rely, DB at 12-14, the deficiencies here were entirely within Defendants' control, had already existed at the time of the IPO, and were known and knowable at the time of IPO. By contrast, in *Panther Partners v. Ikano Communs., Inc.*, the company outsourced its quality assurance program to another entity, so it had no direct control or first-hand knowledge that the program was insufficient or going to result in a defect. 538 F. Supp. 2d 662, 672 (S.D.N.Y. 2008). Similarly, *Singh v. Schikan* involved a clinical trial that was not completed until four months after the IPO; therefore, the company could not have known what the clinical trial results would be before the trial concluded. 106 F. Supp. 3d 439 (S.D.N.Y. 2015). Similarly, in *Charter Twp. Of Clinton Police & Fire Ret. Sys. v. KKR Fin. Holdings LLC*, defendants could not have known that the asset backed commercial paper market was going to deteriorate at the time of the offering, which was prior to the market deterioration. No. 08 civ7062, 2010 WL 4642554, at *16 (S.D.N.Y. Nov. 17, 2010). Thus, these cases are inapposite to the instant matter, and Defendants' reliance thereon is misplaced.

system that only randomly sampled some online content while failing to search for all blacklisted terms, thereby allowing illegal content to go undetected.[10]

Furthermore, and contrary to Defendants' assertions, the additional procedures Sogou put in effect after the IPO are further evidence of its noncompliance at the time of the IPO. The procedures Sogou implemented were required by regulatory authorities, who mandated that Sogou revise its policies to comply with PRC laws. ¶63 ("Following the investigation, the regulatory authorities instructed Sogou to amend its advertising practices. Sogou fully cooperated with the authorities . . . . "). Sogou acknowledged that its new procedures were mandated in order to be in full compliance with the law. ¶64 (Sogou "accepted responsibility for . . . noncompliance" and "rewr[o]te [its] advertising policies and audience procedures *to ensure full compliance* with related regulations going forward.") ¶64. Thus, these were not voluntary remedial measures but, instead, were required steps that Sogou was legally obligated to implement to comply with relevant laws. Accordingly, that Sogou was required to implement adequate controls to comply with PRC's Cybersecurity law and Advertising law—each of which were in full effect prior to the IPO— supports the plausibility of the Complaint's allegations that Sogou was noncompliant under relevant PRC laws and regulations at the time of the IPO. *See In re Am. Apparel, Inc. Shareholder Litig.*, No. CV 10-06352 MMM, 2013 WL 10914316, at *14 (C.D. Cal. Aug. 8, 2013) (terminating a "large number of employees" after an Immigration and Customs Enforcement division audit found the company employed workers in violation of immigration laws supported falsity because "no company would discharge so many employees simultaneously if it felt the results of ICE's audit were wrong").

---

[10] In fact, Sogou admitted that it had insufficient policies in place, stating that it would now be "paying even closer attention to the advertising content on our platform going forward." ¶64

Next, Defendants argue there can be no liability for violating the Heroes and Martyrs Act since it was not passed until after the IPO, rendering the Complaint's allegations backward-looking and impermissible. DB at 12-13; UB at 2-3; Sohu at 7. This is a red herring. The Complaint does not allege that Defendants violated the Heroes and Martyrs Act prior to the IPO. *See* ¶53. Rather, the Complaint alleges adequately that Sogou failed to establish adequate content controls to prevent dissemination of prohibited conduct—obligations that well pre-dated the IPO. That Defendants got caught for violating the Heroes and Martyrs Act in no way whatsoever alleviates their duty to disclose the systemic content monitoring problems that the Complaint alleges existed at the time of the IPO. *See Jinkosolar*, 761 F.3d at 251 ("[a] generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability").

In addition, prior to the IPO, the efforts to pass the Heroes and Martyrs Act became a legislative "priority" in the PRC and a topic of public debate.[11] Accordingly, in light of the systemic problems the Company had at the time of the IPO and the likelihood that the Heroes and Martyrs Act would become law and impose additional content prohibitions on Sogou, it was knowable that the  Company could run afoul of that Act. Defendants' failure to disclose its deficient content controls, therefore, were material and actionable. *See Yi Xiang v. Inovalon Holdings, Inc.*, 254 F. Supp. 3d 635, 643 (S.D.N.Y. 2017) (duty to disclose impact of expected new law where "[t]he Consolidated Complaint alleges that the State of New York had already changed its tax laws by the time of the IPO and that 'it was widely expected' that New York City

---

[11] http://cathaysreview.com/2018/10/03/an-introduction-to-chinas-peoples-congress-system/ ("***the Heroes and Martyrs Protection Law was considered a top priority*** and was reviewed by the NPC Standing Committee on April 25, 2017."); https://www.loc.gov/law/foreign-news/article/china-first-step-towards-adoption-of-a-new-civil-code/ (article by Global Legal Monitor dated March 30, 2017, stating that "***The new General Provisions prohibits defaming 'heroes and martyrs.'*** (*Id.* art. 185.) ***Anyone who harms the name, portrait, reputation, or honor of heroes and martyrs, insofar as it hurts the public interest, will bear civil liability***. (*Id.*)").

18

would soon follow suit.").

These deficient content control violations are directly contrary to Defendants' representations in the Offering Documents that Defendants were actively monitoring and in constant contacts with authorities to ensure compliance. *See e.g., supra* III.B.1 (established security committee, full time supervisor, and exchange information on regular basis with authorities regarding censored and sensitive information and websites); ¶¶47-50 (noting requirements to police and remove prohibited content). Accordingly, Defendants' argument that the Complaint is based on post-IPO and retrospective allegations, DB at 12-13 UB at 2-3; Sohu at 7, is simply incorrect.

### 2.      Defendants Had a Duty to Disclose Under Item 303

Item 303 of SEC Regulation S-K also imposed "an affirmative legal disclosure obligation," requiring Sogou and management "to '[d]escribe any known trends or uncertainties ... that the registrant reasonably expects will have a material ... unfavorable impact on ... revenues or income from continuing operations.'" *Panther Partners*, 681 F.3d at 120  (quoting 17 C.F.R. § 229.303(a)(3)(ii)).[12] "The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." 17 C.F.R. §

---

[12] While Defendants argue that Form F-1 registration statements are not subject to Item 303, DB at 11 n.7; UB at 1; Sohu at 7, "the SEC has stated that its interpretations of Item 303 'apply to [Management Discussion & Analysis disclosures] drafted pursuant to Item 5 of Form 20-F,' which does apply to foreign corporations. *See* In Re Comm'n Guidance Regarding MD&A of Fin. Condition & Results of Operation, Release No. 8350 (Dec. 19, 2003). Accordingly, the Court will "interpret [Item 5 of Form 20-F] as calling for the same disclosure as Item 303 of Regulation S-K.' *See* Release No. 33-7745 (Sept. 28, 1999) [64 FR 53900 at 59304]." *Christine Asia Co. v. Alibaba Grp. Holding Ltd.*, 192 F. Supp. 3d 456, 476 (S.D.N.Y. 2016), *vacated and remanded on other grounds*, 718 Fed. App'x 20 (2d Cir. 2017) (also noting that "Defendants had a duty to disclose . . . under SEC Regulation S-K, 17 C.F.R. § 229.10, *et seq.,* Item 303"). *See also In re Barclays Bank PLC Sec. Litig.*, No. 09 Civ. 1989 (PAC), 2017 U.S. Dist. LEXIS 148695, at *38 n. 11 (S.D.N.Y. Sept. 13, 2017) (analyzing Item 303 claims against foreign issuer and stating that "[t]he SEC interprets Item 5 of Form 20-F, which imposes disclosure requirements on foreign issuers such as Barclays, as 'calling for the same disclosure as Item 303 of Regulation S-K.'").

229.303(a) instruction 3.

The SEC's interpretive release on Item 303 specifically states that "a disclosure duty exists where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations." Management's Discussion & Analysis of Fin. Condition & Results of Operations, Release No. 6835 (May 18, 1989); *see also Panther Partners*, 681 F.3d at 120 (failure to disclose an increasing number of calls regarding product defects created plausible inference that defendants were aware of the "uncertainty" that it would have to accept a substantial number of returns); *Litwin*, 634 F.3d at 715-16 (allegations of a "known" downward trend in the real estate market that was "reasonably likely" to materially affect the company's financial condition adequately pleaded a presently existing trend, event, or uncertainty). Thus, to demonstrate a disclosure obligation under Regulation S-K, Plaintiffs need only allege "known uncertainties" that could materially impact Sogou's financial results. *See Panther Partners*, 681 F.3d at 122-23.[13]

Here, the Complaint alleges that the Offering Documents failed to disclose that Sogou lacked adequate procedures for monitoring, updating, or preventing illegal content from dissemination on its internet platform. ¶¶26-27, 53, 60. Defendants were also aware that Sogou's noncompliance was likely to materially impact its revenues and result in a shutdown. ¶¶51-52. The Offering Documents failed to disclose that Sogou's controls were materially inadequate to ensure compliance with PRC's censorship laws, including the imminent Heroes and Martyrs Act. Accordingly, the Complaint adequately pleads that the Offering Documents failed to disclose that

---

[13] The allegations pertain to the "fail[ure] to disclose a known uncertainty supports the claim of Section 11 and 12(a)(2) liability pursuant to Regulation S-K, which plaintiffs are able to allege without requiring the application of Rule 9(b)." *See Wallace v. IntraLinks*, No. 11cv8861, 2013 WL 1907685, at *12 (S.D.N.Y. 2013).

Sogou lacked sufficient controls under PRC law.

### 3. Defendants' Disclosures of Content-Related Risk Does Not Insulate Them From Liability for Materialization of that Risk

Defendants argue that the Offering Documents disclosed the alleged content-related risks. *See* DB 15-16; UB 3-5; Sohu at 7. Sogou's risk disclosures, however, were themselves materially misleading for failing to disclose their materialization.

"Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach*, 355 F.3d at 173; *Lin*, 574 F. Supp. 2d at 417 ("no amount of general cautionary language can protect a company from failure to disclose a specific, known risk or a risk that has already occurred"); *In re Prudential Sec. Inc. Ltd. P'ship Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("There is a difference between knowing that any product in development may run into a few snags and knowing that a particular product has already developed problems"). Indeed, risk warnings, themselves, give rise to a duty to disclose and are, therefore, actionable misrepresentations where the risk of which a registrant warned had already materialized. *In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) ("Courts in this Circuit have held that a company's purported risk disclosures are misleading where the company warns only that a risk may impact its business when that risk has already materialized").[14]

In a substantially similar case, denying a motion to dismiss Securities Act claims, this Court

---

[14] To receive protection under the bespeaks caution doctrine, any "cautionary language must be specific, prominent and must directly address the risk that plaintiffs claim was not disclosed." *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 396 (S.D.N.Y. 2010). While Defendants need not "predict the precise manner in which the risks will manifest themselves," *In re ProShares Trust Sec. Litig.*, 889 F. Supp. 2d 644, 655 (S.D.N.Y. 2012), *aff'd*, 728 F.3d 96 (2d Cir. 2013), "[i]f a party is aware of an actual danger or cause for concern, the party may not rely on a generic disclaimer in order to avoid liability." *Fannie Mae*, 742 F. Supp. 2d at 396. "Courts in this Circuit have held that a company's purported risk disclosures are misleading where the company warns only that a risk may impact its business when that risk has already materialized." *In re Facebook, Inc. IPO Securities and Derivative Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013).

rejected Defendants' assertion that risk warnings, themselves, are inactionable and otherwise shield them from liability. *In re iDreamsky Tech. Ltd Sec. Litig*., 236 F. Supp. 3d 824 (S.D.N.Y. 2017) (Oetken, J.).[15] In *iDreamsky*, the registrant, a Chinese game-publishing platform, *id*. at 829, warned of the risk of it delaying the launch of new games, including potential blockbusters. *Id*. at 830. At the time of the registrant's IPO, however, in the context of its risk warnings, the registrant had delayed launching Cookie Run, a potential blockbuster game. *Id*. at 829. Rejecting the defendants' attempt to shield themselves from liability by invoking the registration statement's generalized risk disclosures, this Court held that "generalized disclosures of potential risks are thus insufficient to shield Defendants from their obligation to disclose known risks that had already materialized by the time of the IPO." *Id*. at 831 (citing *In re Facebook*, 986 F.Supp.2d at 516; *Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F.Supp.2d 210, 226 (S.D.N.Y. 2008) ("If a party is aware of an actual danger or cause for concern, the party may not rely on a generic disclaimer in order to avoid liability")).

This Court's holding in *iDreamsky* counsels denial of Defendants' motions to dismiss in this case. Here, the Offering Documents' risk warnings disclosed that circumstances "may" occur with potential "adverse effect[s]" if Sogou does not comply with PRC laws by implementing adequate content controls.[16] As Defendants acknowledge, "the Company ***might*** be unable to

---

[15] In *iDreamsky*, the complaint alleged claims under both the Securities act and the Exchange Act. This Court did not resolve the pleading standard to apply because, it held, the complaint sufficed under either ordinary or heightened. 236 F. Supp. 3d at 830. *iDreamsky*, therefore, does not counsel this Court to apply a heightened pleading standard to Plaintiffs' claims,  asserting, as they do, only strict liability and negligence. Indeed, in *In re Ply Gem Holdings, Inc*., No. 14-CV-3577 (JPO), 2016 WL 5339541 (S.D.N.Y. Sept. 23, 2016) (Oetken, J.), denying, in part, a motion to dismiss a case alleging only Securities Act violations but that included allegations of a duty to disclose under SEC Reg. S-K, Item 303, this Court applied "ordinary notice pleadings" standards in evaluating the Complaint's sufficiency. *Id*. at *2. In this case, as in *Ply Gem*, therefore, "no heightened pleading standard applies and 'this is an ordinary notice pleading case, subject only to the 'short and plain statement' requirements of Federal Rule of Civil Procedure 8(a).'" *Id*. (citations omitted).

[16] Accordingly, the cases upon which Defendants rely are universally inapposite because they all involve risks that had not yet materialized at the time of the risk disclosure. DB at 15-16.  Here, the purported risk of non-compliance with Chinese law was an existing fact at the time of the IPO.

comply" (DB at 15), not that Sogou's content controls were already inadequate. Furthermore, as noted, the Prospectus falsely implied full compliance with the Cybersecurity law by noting the purportedly extensive efforts and committees created to monitor compliance efforts. *See supra* III.B.1.

Defendants do not and cannot contend that any of those risk disclosures revealed to investors that, at the time of the IPO, the Company was not monitoring all of its content, lacked procedures to ensure that all words PRC law required to be blacklisted were included in relevant keyword packages, and was not staying apprised of current laws, thereby allowing illegal content to infiltrate its internet platform in violation of PRC laws. *iDreamsky*, 236 F. Supp. 3d at 830-31; *see also Rombach*, 355 F.3d at 173 ("[S]omeone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away" is not shielded from liability); *Dolphin & Bradbury, Inc. v. SEC*, 512 F.3d 634, 640 (D.C. Cir. 2008) (finding there is an important difference between warning that something "might" occur and that something "actually had" already occurred); *Facebook*, 986 F. Supp. 2d at 510-12 (finding that risk warnings were inadequate to satisfy disclosure duty imposed by Item 303 where they noted that "potential issues" with trend of increasing mobile usage "'may' negatively affect the Company's revenues" but did not disclose "the extent" that those factors had "already affect[ed] Facebook's revenues"); *Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 231 (S.D.N.Y. 1999) (holding that hypothetical warnings will not eliminate liability based on the failure to disclose present knowledge).

Further, the Company's disclosure that it "cannot assure you that the PRC governmental authorities will not issue new laws or regulations specifically regulating sponsored search services," DB at 15, UB at 5, does not disclose that the Company was not staying abreast (or was

23

disregarding) current and impending laws, and therefore had *already* failed to block illegal content. As discussed *supra*, III.B.1., Defendants were well aware of the terms and conditions of the Heroes and Martyrs Act, as well as the fact that it was going to be enacted shortly after the IPO, yet failed to monitor Sogou's content for compliance.

Similarly, while many of the risk disclosures Defendants rely upon explain the potential consequences of hypothetical noncompliance, none disclose the Company's then-present failure to disclose the material inadequacy of Sogou's controls over advertising content. *See* DB at 15; UW at 4-5 (same). *McKenna v. SMART Techs. Inc.*, No. 11 CIV. 7673 KBF, 2012 WL 3589655, at *5-6 (S.D.N.Y. Aug. 21, 2012) (finding cautionary language that "[i]f there are decreases in spending or changes in . . . budget priorities for government funding . . . we could lose revenue" was "too generic to provide defendants a safe haven" where there was an existing uncertainty concerning demand). Indeed, the very case that Sogu relies upon (DB at 14) acknowledges that "[a] generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability." *Jinkosolar*, 761 F. 3d at 251.

For these reasons, the disclosures of potential future risks do not relieve Defendants from liability for their misstatements and omissions concerning facts that already existed at the time of the IPO, and Defendants' arguments to the contrary should be disregarded.

**C.     The Complaint Adequately Alleges Section 11 Violations For Defendants' Failure to Disclose Discontinuation of Sogou's Smart Hardware**

Sogou argues that Plaintiffs' claims about its failure to disclose that it intended to phase out its non-AI enabled hardware is nothing but fraud by hindsight.  DB 17-21.  Sogou ignores, however, that, in the Offering Documents, it stated that "AI is a key enabler for smart hardware." ¶72.  The Offering Documents also emphasized Sogou's dedication to AI, stating their investment

24

in this technology took "three years" of development which provided a "solid foundation for the development and success of new smart hardware products." ¶70.  Sogou clearly knew at that time that it would be phasing out hardware that was not AI enabled, thereby impacting the Company's 2018 financial results materially.  ¶73.  In fact, the AI-enabled translation hardware devices that Sogou later said spurred this change came on the market soon after the IPO.

Scott v. Gen. Motors Co., 46 F. Supp. 3d 387 (S.D.N.Y 2014) is wholly distinguishable.  According to Sogou's own description of that case, the decision hinged on the court's finding that the complaint relied on "backward-looking logic."  Id. at 396; DB 18-19.  In that case, plaintiffs alleged defendant General Motors ("GM") had engaged in "channel stuffing" to keep its inventory high at the dealership level and never intended to stop, despite representing that it intended to "control inventory management."  Scott, 46 F. Supp. 3d at 394-396.  In other words, that case was about GM failing to stop doing something it allegedly had been doing.  Id.  This case is about just the opposite, it is about Sogou failing to disclose it was planning to cease doing something it had always done.  Here, Sogou knew that it was moving to AI-enabled devices--its first was about to hit the market.  Sogou knew it was going to have to phase out old models of the Teemo Smart Watch.  ¶73.  This was "well within Defendants' knowledge."  Ply Gem, 2016 U.S. Dist. LEXIS 130588 at *16-17.

Sogou's argument that the "impact of the smart hardware transition on revenue was" not material information is similarly unavailing.  DB n.13.  Sogou states simply that this move impacted "less than 1%" of overall revenue.  Id.  It is well-settled in this circuit that materiality is about more than a quantitative analysis.  See Litwin, 634 F.3d at 719.  Here, qualitative factors weigh in favor of materiality.  The question is not the percentage of revenue lost, but whether Sogou "reasonably expects the impact to be material."  Id.  Here, Sogou went out of its way to

25

emphasize the success of Teemo Watches.  ¶70.  They were a "significant aspect" of Sogou's

business.  *See Litwin*, 634 F.3d at 719.  In fact, a Briefing Investor article cited the shift in Sogou's

smart hardware strategy as one of the two reasons for Sogou's "poor" second half guidance.  ¶76.

Sogou failed to disclose that it was phasing out its older, successful products because the

Company knew it was material information to investors.  They failed to disclose there was even a

risk that they would act in this way or a risk that such action would negatively impact company

financials.  *See Credit Suisse First Boston Corp. v. ARM Fin. Group, Inc.*, No. 99 CIV 12046

(WHP), 2001 WL 300733, at *9 (S.D.N.Y. Mar. 28, 2001) (denying a motion to dismiss when "at

the pleading stage,  plaintiffs adequately allege that the omission . . . failed to warn investors of

the magnitude of the risk associated" associated with a business).  These omissions are actionable.

### D.      Sohu is a Control Person Under Section 15[17]

Section 15 provides that "[e]very person who, by or ***through stock ownership, agency, or***

***otherwise***, . . . controls any person liable under sections [11] or [12] of this title, shall also be liable

jointly and severally with and to the same extent as such controlled person[.]"  15 U.S.C. §77o.

To allege a claim under Section 15, "a plaintiff need only establish (1) control, and (2) an

underlying violation of Section 11 (or Section 12(a)(2))." *In re Initial Pub. Offering Sec. Litig.*,

241 F. Supp. 2d 281, 352 (S.D.N.Y. 2003).

As detailed above, Plaintiffs have adequately pled an underlying violation of Section 11

against Sogou.  The allegations in the Complaint are clearly sufficient at this stage to establish

---

[17] Sohu's omission from Count II is inadvertent. *See Jackson v. City of New York*, 29 F. Supp. 3d 161, 183 n. 29 (E.D.N.Y. 2014) ("The complaint actually does not name the City as a defendant in either Count 12 or 13. However, since the City is the only party that could be responsible for a claim of improper training or discipline, the Court assumes that it was one of the intended defendants for purposes of this motion."); *Wigand v. Flo-Tek, Inc.*, 609 F.2d 1028, 1033 n. 4 (2d Cir. 1979) ("Since Flo-Tek is named as a defendant in the caption and the complaint seeks relief with respect to it, the failure to name it in the 'heading' of Count I is no defense."). Lead Plaintiffs have thus far been unable to serve the Individual Defendants, who reside in the *People's Republic of China.*

Sohu's control of Sogou. Sohu has more than 50% of the voting power in the election of Sogou directors and therefore controls Sogou. ¶¶20, 22. The Prospectus states that Sogou is a "controlled company under the [NYSE] Listed Company Manual." ¶20; *see also* ¶22 (including statements from the Offering Documents that state "Sohu has been since our incorporation in 2005, and will continue to be after the completion of this offering, our controlling shareholder" and that Sohu has "the power to appoint a majority of our Board of Directors" ); ¶34 ("Sogou is a subsidiary of Sohu").

Sohu's reliance on *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711 (S.D.N.Y. 2015), is misplaced. Sohu at 7. In that case, the court found control allegations insufficient when "at its zenith, [the alleged control person] controlled approximately 26 percent of BioScrip stock and had the right to designate two directors on BioScrip's eight-person board." *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d at 740. The court discussed how this amounted to "substantial influence" but not "actual control." *Id.* In the instant case, even Sogou says it is controlled by Sohu. ¶¶20, 22. Unlike in *BioScrip,* Sohu controls the Sogou board. *Id.* Sohu has "actual control" of Sogou.

There is no question that Sohu meets the Second Circuit definition of "control" by having "the power to direct or cause the direction of the management and policies of the primary violators, whether through the ownership of voting securities." *See Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 574-575 (S.D.N.Y. 2015) (*quoting In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 185 (2d Cir. 2011)).

## IV.    CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that Defendants' motions to dismiss be denied in their entirety.

Dated: January 17, 2020                                     Respectfully Submitted:

**LEVI & KORSINSKY, LLP**

/s/ *Shannon L. Hopkins*
Shannon L. Hopkins (SH-1887)
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel: (203) 992-4523
Fax: (212) 363-7171
Email: shopkins@zlk.com

and


Donald J. Enright
1101 30th Street NW, Suite 115
Washington, D.C. 20007
Tel: (202) 524-4290
Fax: (202) 333-2121
denright@zlk.com

**THE ROSEN LAW FIRM, P.A.**

/s/ *Phillip Kim*
Phillip Kim (PK 9384)
Laurence M. Rosen (LR 5733)
275 Madison Avenue, 34th Floor
New York, New York, 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
        lrosen@rosenlegal.com

and

Jacob A. Goldberg
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Tel: (215) 686-2817
Fax: (212) 202-3827
Email: jgoldberg@rosenlegal.com

*Co-Lead Counsel for Lead Plaintiffs and the Class*

28