# Exhibit 1

2020 WL 1950783
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

IN RE **BLUEAPRON** HOLDINGS, INC.
SECURITIES LITIGATION
Rustem Nurlybayev, et al., Plaintiffs,
v.
**BlueApron** Holdings, Inc., et al., Defendants.

17-CV-4846 (WFK)
|
Signed 04/22/2020

## DECISION & ORDER

WILLIAM F. KUNTZ, II, United States District Judge:

**\*1** By Amended Complaint filed February 27, 2018 (the "Amended Complaint") Plaintiffs Christina Davis, Sanzhar Khussainov, Stephen Waugh, and Susan Finkel, on behalf of themselves and all others similarly situated, ("Plaintiffs") bring this action against Blue Apron Holdings, Inc. ("Blue Apron") and nine individual defendants (collectively, "Defendants") alleging: (1) violations of Section 11 of the Securities Act, against all Defendants, and (2) violations of Section 15 of the Securities Act, against the individual defendants. Defendants move to dismiss the Amended Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). ECF No. 58. For the reasons stated below, the Court DENIES Defendants' motion in its entirety.

## BACKGROUND

For the purposes of this Rule 12(b)(6) motion to dismiss the Court "accept[s] all factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiff." *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP*

*Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). The Court considers "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

Founded in 2012, Blue Apron is a company which provides a subscription-based meal kit delivery service. Am. Class Action Compl. ¶ 43, ECF No. 55 ("Am. Compl."). Subscribers of the service receive kits with recipes and ingredients, allowing the subscriber to cook meals at home with the convenience of delivery. *Id.* ¶ 44. After its founding, Blue Apron grew rapidly, shipping 100,000 meals per month by August 2013, 500,000 per month by March 2014, and 3,000,000 per month by June 2015. *Id.* ¶ 51. By October 2016, Blue Apron was shipping 8,000,000 meals every month to the entire contiguous United States. *Id.*

Blue Apron's founder described the company's business model as "reinventing the grocery supply chain from the farm to the dinner table." *Id.* ¶ 46. "Blue Apron's business model is predicated on a hugely complicated feat of precision logistics, executed at an enormous volume." *Id.* ¶ 48 (quoting Caroline O'Donovan, *In Blue Apron's Chaotic Warehouses, Making Dinner Easy Is Hard Work*, Buzzfeed (Oct. 2, 2016, at 10:45 A.M.), https://www.buzzfeed.com/carolineodonovan/the-not-so-wholesome-reality-behind-the-making-of-your-meal). The significant logistical challenges involved in developing, measuring, preparing, packaging, and shipping thousands of meals results in "little room for error." *Id.* ¶ 49. To ship the millions of meals each month, Blue Apron opened and operated fulfillment centers across the United States. *Id.* ¶ 52. One of the key metrics for Blue Apron was its On-Time In-Full ("OTIF") rating, indicating the number of meal kits delivered on time with all of their ingredients. *Id.* ¶¶ 5, 90.

**\*2** In 2016, Blue Apron announced it would be building two new fulfillment centers in Linden, New Jersey and Fairfield, California. *Id.* ¶ 72. A Blue Apron press release in February 2017 announced "The Linden facility will be outfitted with state-of-the-art technology and a variety of employee amenities. The fulfillment center is currently under construction and slated to officially open for production later this year." *Id.* (emphasis omitted). The new state-of-the-art fulfillment center in Linden, New Jersey (the "Linden Facility") became a "key part of the pitch to Wall street" for Blue Apron's planned initial

public offering. *Id.* ¶ 73. However, Plaintiffs allege "before the IPO, the Linden center was encountering major undisclosed problems, repeatedly delaying and disrupting its planned opening." *Id.* ¶ 74. Additionally, "Linden was so far behind schedule that, by the time it finally shipped its first box [on May 15, 2017], it should have been packaging between 5,000 and 6,000 meals each day." *Id.* ¶ 76.

Blue Apron leadership had begun to consider a public offering of stock and began interviewing potential underwriters by September 2016. *Id.* ¶ 57. In December 2016, Blue Apron delayed the planned offering, in order to show a stronger performance. *Id.* ¶ 60. On June 29, 2017, Blue Apron filed the final prospectus (the "IPO Prospectus"). *Id.* ¶ 62. Then, on July 5, 2017, Blue Apron completed its initial public offering (the "IPO") and sold 30 million shares of Class A common stock at $10.00 per share. *Id.* ¶ 65.

After the IPO, however, Blue Apron's stock dropped in price to $6.55 by July 21, 2017. *Id.* ¶ 112. On August 10, 2017, Blue Apron announced its financial results for the second quarter of 2017 showing the company's revenue and customer numbers had declined. *Id.* ¶¶ 120, 126. Blue Apron identified one cause of the decline as "unexpected complexities and costs" at the Linden Facility, "which are adversely affecting our revenue expectations, the rollout of our new product offerings, and our ability to acquire and retain new customers." *Id.* ¶ 121 (emphasis omitted). Blue Apron explained during the earnings call with investors: "Much of the delay [in the infrastructure rollout] is related to the launch of our Linden fulfillment center, the newest and most automated facility in our network. Linden shipped its first delivery on May 15th, but in the second quarter still only represented approximately 3% of our network's national volume." *Id.* (emphasis omitted). "The delay is related to experiencing greater operational complexity than we initially planned for." *Id.* (emphasis omitted).

Plaintiffs, as well as former lead plaintiff Rustem Nurlybayev, brought suit on August 17, 2017 against Blue Apron, its executives, and the underwriters of the IPO, on behalf of a purported class of investors. Class Action Compl., ECF No. 1. In the Amended Complaint, Plaintiffs, no longer including Rustem Nurlybayev, bring suit against only Blue Apron and the nine individual Blue Apron defendants. Am. Compl. ¶¶ 18–32. Plaintiffs allege a number of statements in the IPO Prospectus are materially false or misleading because Blue Apron failed to disclose several pieces of material information, including: (1) Blue Apron was already experiencing adverse OTIF rates; (2) significant delays had already

materialized in ramping up the Linden, New Jersey facility; (3) the adverse OTIF rates and delays at Linden were hurting customer retention and Blue Apron's ability to compete in the marketplace; and (4) because of the OTIF rates and delays at Linden Blue Apron had already decided to change its strategic approach for 2017 by reducing marketing spending. Am. Compl. ¶ 5. Defendants now move to dismiss the Amended Complaint under Fed. R. Civ. P. 12(b)(6). ECF No. 58.

**Alleged Misstatements in the IPO Prospectus**
Plaintiffs specifically allege the following statements of the Prospectus were materially false or misleading:

- "[A]s we have improved our supply chain, we have achieved *attractive and improving margins*," and Blue Apron "anticipated declines in cost of goods sold as a percentage of net revenue" which "we expect to result in attractive lifetime customer values." *Id.* ¶ 97 (quoting IPO Prospectus) (emphasis in original).

**\*3** • "[We have] [a]ttractive unit economics" and "as we have continued to scale our business, grow our direct supplier relationships, and introduce increased automation into our fulfillment centers, *we have become more cost efficient.*" *Id.* (emphasis in original).

- "*[W]e are completing the build out of a new fulfillment center in Linden, New Jersey, which we have recently begun to utilize.*" *Id.* ¶ 99 (emphasis in original).

- "*Upon completion of our new fulfillment centers in Linden, New Jersey and Fairfield, California, we anticipate that such fulfillment centers, together with our Arlington, Texas fulfilment center, will comprise our primary fulfilment operations for the foreseeable future.*" *Id.* ¶ 99 (emphasis omitted).

- "In the second quarter of 2017, *we expect to invest significantly less in marketing compared to the first quarter of 2017 due to the seasonal factors discussed above, the ongoing operational effort associated with launching our new fulfillment center in Linden, New Jersey, and our planned product expansion to offer greater flexibility in recipes.*" *Id.* ¶ 104 (emphasis in original).

- "[W]e anticipate that our quarterly net revenue in the second quarter of 2017 will be modestly lower

than the seasonally high level of net revenue in the first quarter of 2017, which decline *will be more than offset by a reduction in our operating expenses*, including a significant planned reduction in our marketing expenses due to our seasonal marketing strategies." *Id.* (emphasis in original).

• "*As we expand our operational capabilities*, increase the automation in our fulfillment centers, and grow our supplier network, *we plan to expand our core product by* offering greater flexibility in the number of recipes per order and greater diversity in the number of recipes from which customers may choose." *Id.* ¶ 106 (emphasis in original).

• "We are *developing product expansion initiatives ...* in order to continue to expand our addressable market and drive greater satisfaction among current customers, thereby increasing their Average Order Value and rate of Repeat Orders." *Id.* (emphasis in original).

• "*We are currently in the process of introducing additional product expansions* to increase both customer flexibility (the ability to select greater or fewer recipes per Order) and the number of recipe options (the ability to choose from a greater number of recipes each week). *We expect that this product expansion will favorably impact our cumulative net revenue per Customer.*" *Id.* ¶ 108 (emphasis in original).

• "*In the near term, we plan to further invest in equipping our fulfillment centers with automated portioning and packaging equipment, which we believe will increase our operational efficiency.*" *Id.* ¶ 110 (emphasis in original).

Plaintiffs allege the statements were false because the "already-materialized adverse OTIF rates and the persistent delays at the Linden facility" meant the "Company had not become more cost efficient in its efforts to scale up."*Id.* ¶ 98. The statements "creat[ed] the impression that construction and operational improvements at Linden were proceeding on schedule." *Id.* ¶ 100. Further, Plaintiffs allege Blue Apron had already decided it would reduce marketing spending in 2017 and would have to delay product expansion in order to address the existing operational problems with fulfillment. *Id.* ¶¶ 105, 107, 109. And Blue Apron had no reasonable basis to project its operational efficiency would increase in the near term, considering the significant existing delays. *Id.* ¶ 111.

**\*4** Plaintiffs also allege risk statements in the Prospectus

to have been misleading or incomplete. *Id.* ¶¶ 101–03. Specifically, Plaintiffs cite the following risk statements:

• "If we do not have sufficient fulfillment capacity or *experience problems or delays in fulfilling orders, our customers may experience delays in receiving their meal deliveries, which could harm our reputation and our customer relationships and could materially adversely affect our business*, financial condition and operating results." Am. Compl. ¶ 101 (quoting Prospectus) (emphasis in original).

• "We also may be unable to procure and implement automated production equipment and processes on a timely basis, and they may not operate as intended or achieve anticipated cost efficiencies." *Id.*

• "*Difficulties we experience in automating our fulfillment processes could impair our ability to reduce costs and could materially adversely affect our business, financial condition and operating results.*" *Id.*

• "Developing and launching new product offerings or enhancements to our existing product offerings involves significant risks and uncertainties, including *risks related to ... unanticipated delays or challenges in implementing such offerings or enhancements*, increased strain on our operational and internal resources...." *Id.* ¶ 102 (emphasis in original).

• "*[S]ignificant new initiatives have in the past resulted in, and in the future may result in, operational challenges affecting our business.*" *Id.* (emphasis in original).

Plaintiffs allege the statements regarding risk factors were misleading as they portrayed the risks as hypothetical and did not disclose previously known issues with OTIF rates and the Linden facility. *Id.* ¶ 103.

## LEGAL STANDARDS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter ... to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted). To establish facial plausibility, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The standard is not a "probability requirement, but it asks for

more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (citations and quotations omitted). In deciding a motion to dismiss, district courts must "assess the legal feasibility of the complaint, not ... assay the weight of the evidence which might be offered in support thereof." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 113 (2d Cir. 2010) (internal citation and quotation marks omitted). The Court must "accept[ ] all factual allegations in the complaint as true, and draw[ ] all reasonable inferences in the plaintiff's favor." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). Nonetheless, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Cts. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717 (2d Cir. 2013) (citation and internal quotation marks omitted).

### A. Section 11 of the Securities Act of 1933

**\*5** "The Securities Act of 1933 was designed to provide investors with full disclosure of material information concerning public offerings of securities in commerce, to protect investors against fraud and, through the imposition of specified civil liabilities, to promote ethical standards of honesty and fair dealing." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976) (citation omitted). Under 15 U.S.C. § 77k ("Section 11"), any signer, director of the issuer, preparing or certifying accountant, or underwriter may be liable if "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a).

To state a claim under Section 11, a plaintiff may allege material facts were omitted from the registration statements or "presented in such a way as to obscure or distort their significance." *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir. 1991) (quotation omitted). In Section 11 cases there are two central issues: "(1) the existence of either a misstatement or an unlawful omission; and (2) materiality." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010). "To determine whether a misstatement or omission is material is an 'inherently fact-specific' inquiry." *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 485 (2d Cir. 2011) (citing *Basic v. Levinson*, 485 U.S. 224, 236, (1988)). "A fact is material

if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act." *Hutchison*, 647 F.3d at 485 (internal quotations and alternations omitted); *Rombach v. Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004); *In re Morgan Stanley Tech. Fund Sec. Litig.*, 643 F. Supp. 2d 366, 373 (S.D.N.Y. 2009) (Jones, J.), *aff'd sub nom.In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347 (2d Cir. 2010). "[B]ecause the materiality element presents 'a mixed question of law and fact,' it will rarely be dispositive in a motion to dismiss." *Morgan Stanley Info. Fund*, 592 F.3d at 360. However, "[w]hen pleading an actionable omission, plaintiffs must, 'at a minimum, plead facts to demonstrate that allegedly omitted facts both existed, and were known or knowable, at the time of the offering.' " *Singh v. Schikan*, 106 F. Supp. 3d 439, 446 (S.D.N.Y. 2015) (Buchwald, J.).

Ultimately, on a Rule 12(b)(6) motion, "[s]o long as plaintiffs plausibly allege that [defendant] omitted material information that it was required to disclose or made material misstatements in its offering documents, they meet the relatively minimal burden of stating a claim pursuant to Sections 11 ..., under which, should plaintiffs' claims be substantiated, [defendant's] liability as an issuer is absolute." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 718 (2d Cir. 2011).

To establish a plausible claim for liability, Plaintiffs must have alleged facts sufficient to establish the allegedly omitted "information [was] available to [Defendants] at the time" of the IPO. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 196 (2015). If the facts were unknown to Defendants or did not exist at the time of the IPO, liability will not attach. *In re CIT Grp., Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 690–91 (S.D.N.Y. 2004) (Sprizzo, J.). "[I]t is 'not a reasonable inference' to assume prior knowledge based upon actual knowledge at a later date." *Coronel v. Quanta Capital Holdings Ltd.*, 07-CV-1405, 2009 WL 174656, at \*14 (S.D.N.Y. Jan. 26, 2009) (Patterson, J.) (quoting *Scibelli v. Roth*, 98-CV-7228, 2000 WL 122193 (S.D.N.Y. Jan. 31, 2000) (Baer, J.)).

### B. Item 303

**\*6** Under 17 C.F.R. § 229.303(a)(3)(ii) ("Item 303"), an issuer must "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). Item 303 "imposes a

disclosure duty where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations." *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012) (quotation omitted).

To survive a motion to dismiss, a plaintiff must allege the trend "was already known and existing at the time of the IPO, and that the trend or uncertainty in the market was reasonably likely to have a material impact" on the defendant's financial condition. *Litwin*, 634 F.3d at 716. A trend subject to Item 303 must be disclosed under Section 11 as "a reasonable investor would interpret the absence of an Item 303 disclosure to imply the nonexistence of known trends or uncertainties." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 102 (2d Cir. 2015) (quotation omitted).

### C. Section 15 of the Securities Act of 1933

Under 15 U.S.C. § 77*o* ("Section 15") joint and several liability attaches to "[e]very person who, by or through stock ownership, agency, or otherwise, ... controls any person liable under" Section 11. 15 U.S.C. § 77*o*(a). In this case, to state a violation under Section 15 Plaintiffs must have (1) pled an underlying primary violation of Section 11 and (2) control over the primary violator. *Morgan Stanley Tech. Fund*, 643 F. Supp. 2d at 374. As Defendants have not moved to dismiss for failure to plead control over the primary violator, both of Plaintiffs' claims rest on having pled a violation of Section 11. The Court addresses each of Defendants' arguments Plaintiffs failed to plead a violation of Section 11 in turn.

**DISCUSSION**

### I. Plaintiffs Have Sufficiently Alleged Defendants Were Aware of Some Omitted Material Facts at the Time of the IPO

The Amended Complaint alleges four omissions from the IPO Prospectus:

(i) Blue Apron was already experiencing adverse OTIF rates; (ii) significant delays had already materialized in opening and ramping up production at the Linden facility; (iii) the already-materialized adverse OTIF rates and delays at Linden were hindering the Company's customer retention and would necessarily delay the Company's announced plans to add new products, which would be essential to gain new customers and compete effectively in the marketplace; and (iv) because of the already-materialized adverse OTIF rates and delays at Linden, Blue Apron had already decided it would be forced to change its strategic approach for the remainder of 2017 by reducing marketing spending until it could address its operational problems and improve its margins and OTIF rates.

Am. Compl. ¶ 96. The third and fourth alleged omissions are predicated on the existence of the first, materially adverse OTIF rates, and the second, material delays at the Linden Facility. Defendants argue Plaintiffs have failed to allege sufficient facts to show OTIF rates were materially declining before the IPO. Defs.' Mem. in Supp. of Mot. to Dismiss, at 7, ECF No. 59 ("Def. Mem."). Defendants also argue Plaintiffs have not alleged the delays at the Linden Facility had arisen by the time of the IPO. Def. Mem. at 10–14.

### A. The Amended Complaint Adequately Describes the Confidential Witnesses

**\*7** As an initial matter, the Court must determine an essential question underpinning the factual basis of Plaintiffs' allegations. In support of their allegations, Plaintiffs include confidential source allegations by eight former employees. Am. Compl. ¶¶ 35–42. Defendants argue the Court should not credit statements by some of the confidential employees as they are insufficiently described in the Amended Complaint. Def. Mem. at 12–13. The Court disagrees.

"[I]f personal sources must be identified, there is no requirement that they be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000). Specifically, the confidential witnesses' job responsibilities must be "described sufficiently to indicate a high likelihood that they actually knew facts underlying their allegations." *Long Miao v. Fanhua, Inc.*, 18-CV-8183, 2020 WL 996602, at *17 (S.D.N.Y. Mar. 2, 2020) (Engelmayer, J.). But, "when independent adequately pled factual allegations corroborate[s] a confidential source's statements, the requirement of a description of the source's job is loosened." *Id.* (internal quotations omitted).

Defendants specifically challenge the sufficiency of the description for Former Employee 4 ("FE 4") for their statement "Linden was so far behind schedule that, by the time it finally shipped its first box, it should have been packaging between 5,000 and 6,000 meals each day." Def. Mem. at 13. The Amended Complaint describes FE 4 as "a Quality Associate for Blue Apron from January to October 2017, based at Linden, New Jersey fulfillment center." Am. Compl. ¶ 38. Defendants characterize the statement of FE 4 as "high-level operations knowledge," and argues FE 4's description in the Amended Complaint is insufficient. Def. Mem at 13. As a quality associate working in the Linden Facility for 10 months, there is a high probability FE 4 would have been aware of the goals set by Blue Apron, at least as they were communicated to their employees, in terms of output for the Linden Facility. FE 4 is sufficiently described for the purposes of this motion.

Defendants also challenge the Amended Complaint's use of Former Employee 8 ("FE 8") for their statement they received company flyers describing delays at Linden. The Amended Complaint describes FE 8 as "a Senior Runner and Quality Control Specialist for Blue Apron from April 2015 to August 2017, based in Jersey City, NJ." Am. Compl. ¶ 42. Again, there is a high likelihood FE 8 would have been provided flyers from Blue Apron regarding delays at the Linden Facility, considering FE 8's role in the other New Jersey-based fulfillment center, which presumably would have had to compensate for alleged delays in production at the Linden Facility.

**B. The Amended Complaint Fails to Adequately Allege Materially Adverse OTIF Rates Existed and Were Known at the Time of the IPO**

Plaintiffs allege the statements in the Prospectus were misleading because at the time of the IPO "Blue Apron was already experiencing adverse OTIF rates." Am. Compl. ¶ 105. Regarding the declining OTIF rates, Plaintiffs have alleged "customers regularly complained that their orders had been botched or were missing key condiments or spices," *id.* ¶ 91, there were "frequent issues with missing order items and, when that occurred, the time required to fix it placed a significant drag on operations," *id.*, and Blue Apron "was experiencing challenges related to getting orders to customers in a timely manner" from January to October 2017, *id.* ¶¶ 38, 91. These generalized statements are "facts that are merely consistent with a defendant's liability, [ ] stop[ping] short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (internal quotations omitted). Plaintiffs bolsters their allegations regarding adverse OTIF rates by select quotations from Blue Apron's Second Quarter Earnings Call ("Earnings Call") held on August 10, 2017, more than a month after completing the IPO. Am. Compl. ¶¶ 120–31. However, none of the statements made in the Earnings Call demonstrate the adverse OTIF rate was a known issue prior to the IPO. *Coronel*, 2009 WL 174656, at *14 ("[I]t is 'not a reasonable inference' to assume prior knowledge based upon actual knowledge at a later date.").

**\*8** Plaintiffs argue because the "IPO Prospectus was filed on June 29, 2017—one day before the end of the second quarter" any issues described in the Earnings Call "must have materialized at least one day before the end of that quarter—in other words, before the IPO." Pls.' Mem. in Opp'n to Mot. to Dismiss, at 13–14, ECF No. 62 ("Pl. Mem."). The relevant inquiry is not whether the issues had materialized prior to the IPO, but whether the facts were known to Defendants at the time of the IPO. *Omnicare, Inc.*, 575 U.S. at 196. Moreover, Plaintiffs have failed to allege any specific discrepancy between the baseline OTIF levels and the levels prior to the IPO. Plaintiffs have an obligation to at least "attempt, to approximate the magnitude or degree of the alleged misstatements." *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 408 (S.D.N.Y. 2006) (Karas, J.); *Gavish v. Revlon, Inc.*, 00-CV-7291, 2004 WL 2210269, at *16 (S.D.N.Y. Sept. 30, 2004) (Stein, J.) (Dismissing Petition which failed "to even attempt to approximate the magnitude or degree of those misstatements in relation to [defendant's] total financial picture.").

Though Plaintiffs have alleged facts to support the conclusion "OTIF performance was regarded as one of several key metrics the entire time he worked at Blue

Apron," the Amended Complaint fails to allege any specific facts to support a conclusion Blue Apron knew the OTIF rates were materially adverse at the time of the IPO. Am. Compl. ¶ 90; *Coronel*, 2009 WL 174656 at *14.

### C. The Amended Complaint Sufficiently Alleges Production Issues at the Linden Facility Existed and Were Known at the Time of the IPO

Plaintiffs have alleged "significant delays had already materialized in opening and ramping up production at the Linden facility." Am. Compl ¶ 105. Specifically, "[t]he Linden facility began running into repeated delays in early 2017 due to construction and equipment issues," *id.* ¶ 75, "Linden was so far behind schedule that, by the time it finally shipped its first box, it should have been packaging between 5,000 and 6,000 meals each day,"*id.* ¶ 76, and "there were still delays at Linden when Blue Apron went public," *id.* ¶ 79. Drawing the allegations in the light most favorable to Plaintiffs, there is no question Defendants were aware of the existence of significant delays at the Linden Facility. Moreover, Blue Apron management were "aware of the delays and disruptions at the Linden facility," which "were often discussed during operations meetings ... as well as during weekly operations calls." Am. Compl. ¶ 92. Plaintiffs have alleged "factual content that allows the court to draw the reasonable inference" Defendants knew of the delays at the Linden facility prior to the IPO. *Iqbal*, 556 U.S. at 678. As Plaintiffs have sufficiently alleged significant delays at the Linden Facility existed and were known by Defendants at the time of the IPO, the Court turns to evaluate whether Plaintiffs have sufficiently alleged a violation of Section 11 based on the circumstances of the Linden Facility.

### II. Plaintiffs Have Alleged Sufficient Facts to Identify a Trend Under Item 303

Plaintiffs have sufficiently alleged the delays at the Linden Facility began in early 2017 and continued through the IPO in the mid-summer of 2017. Am. Compl. ¶¶ 75, 79. Blue Apron management were "aware of the delays and disruptions at the Linden facility," which "were often discussed during operations meetings ... as well as during weekly operations calls." *Id.* ¶ 92. Plaintiffs have also sufficiently alleged the ongoing delays at the Linden Facility were reasonably likely to have material effects on Blue Apron's financial condition

by reference to Blue Apron's statement in the Prospectus: "If we do not have sufficient fulfillment capacity or experience problems or delays in fulfilling orders, our customers may experience delays in receiving their meal deliveries, which could harm our reputation and our customer relationships and could materially adversely affect our business, financial condition and operating results." *Id.* ¶ 101 (quoting IPO Prospectus).

**\*9** The post-IPO earnings call demonstrated the delays at the Linden Facility *in fact* adversely affected Blue Apron's financial condition. *Id.* ¶ 121 ("Much of the delay is related to the launch of our Linden fulfillment center, ... Linden shipped its first delivery on May 15th, but in the second quarter still only represented approximately 3% of our network's national volume."). The post-IPO statements by Blue Apron are not dispositive. However, coupled with the allegations Blue Apron knew delays at Linden would cause material impacts on the company, *id.* ¶ 101, and knew of ongoing delays at Linden Facility prior to the IPO, *id.* ¶ 92, the Court draws the inference Blue Apron managers reasonably expected the delays at Linden to be material prior to the IPO. *Litwin*, 634 F.3d at 719 ("The relevant question under Item 303 is whether [defendant] reasonably expects the impact to be material."). Plaintiffs have pled sufficient factual content to allow the Court to draw the reasonable inference an Item 303 trend, namely significant delays at the Linden Facility, existed but was not disclosed by Defendants in their IPO filings, a violation of Section 11. *Iqbal*, 556 U.S. at 678.

### III. The Amended Complaint Plausibly Alleges Some Statements in the IPO Prospectus Were Misleading

Though liability under Section 11 may attach solely on the basis of an undisclosed Item 303 trend, *Stratte-McClure*, 776 F.3d at 102, in the interest of completeness, the Court turns to Plaintiffs' claims of specifically misleading statements in the IPO Prospectus. If a plaintiff sufficiently alleges "any part of the registration statement ... contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading" they have stated a claim for liability under Section 11. 15 U.S.C. § 77k(a).

### A. The Bespeaks Caution Doctrine Does Not Apply

**to Statements Regarding Possible Delays at Linden Facility**

Not all statements in an IPO Prospectus may serve as a basis for Section 11 liability. "A forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading." *Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010). However, "[t]he bespeaks caution doctrine does not serve if it is abused or gamed. Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach*, 355 F.3d at 173. "If a party is aware of an actual danger or cause for concern, the party may not rely on a generic disclaimer in order to avoid liability. Indeed, the inclusion of general cautionary language regarding a prediction would not excuse the alleged failure to reveal known material, adverse facts." *Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 226 (S.D.N.Y. 2008) (Koeltl, J.) (quotation omitted). To establish the "risk has transpired" a plaintiff must allege sufficient facts to show the risk existed in a definitive way at the time of the IPO. *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 580 (S.D.N.Y. 2013) (Koeltl, J.), *aff'd*, 566 F. App'x 93 (2d Cir. 2014) ("[P]laintiffs allege no more than that the potential loss was somewhere between zero and ten billion dollars. The general risk disclosures were not rendered misleading by the failure to include a disclosure about a lawsuit that could be filed at an uncertain date seeking damages that could not be estimated.").

Plaintiffs argue their allegations of already-declining OTIF rates and existing delays at the Linden Facility, by the time of the IPO meant the risk had already transpired, invalidating the bespeaks caution protections. Pl. Mem. 22–23. Defendants contend Plaintiffs failed to allege contemporaneous facts to support an inference OTIF rates had declined or delays at the Linden Facility were known at the time of the IPO. Def. Mem. 21. As discussed above, the Court finds Plaintiffs' allegations regarding material, existing delays at the Linden Facility to be sufficiently well-pled. Thus, for the purposes of this motion the Court finds the general cautionary language in the IPO Prospectus does not "excuse the alleged failure to reveal known material, [the] adverse facts" of the Linden Facility delays. *Edison Fund*, 551 F. Supp. 2d at 226.

**B. Ongoing, Material Delays at Linden Facility Render Portions of the IPO Misleading**

**\*10** Plaintiffs have identified statements from the Prospectus which, drawing the allegations in the light most favorable to Plaintiffs, raise the plausibility they were materially misleading. Though Defendants argue "only three [statements] specifically refer to the Linden Facility," Def. Mem. at 11, the inquiry is not limited to those statements specifically referring to Linden but rather, "whether defendants' representations, taken together and in context, would have misled a reasonable investor about the nature of the investment." *Morgan Stanley Tech. Fund*, 643 F. Supp. 2d at 373.

Specifically, the statements (1) "[a]s we have continued to scale our business, grow our direct supplier relationships, and introduce increased automation into our fulfillment centers, we have become more cost efficient," (2) "[w]e are completing the build out of a new fulfillment center in Linden, New Jersey, which we have recently begun to utilize," and (3) "we plan to further invest in equipping our fulfillment centers with automated portioning and packaging equipment, which we believe will increase our operational efficiency" are plausibly misleading. Am. Compl. ¶¶ 97, 99–100, 110 (quoting Prospectus). These statements directly link increased automation at the fulfillment centers with increases to cost efficiency and suggest these efficiencies are increasing. Once Blue Apron spoke on the topic of fulfillment center automation "there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014). Taken in context together and with the remaining statements, it could plausibly "have misled a reasonable investor" through the suggestion increasing automation was actively improving cost-efficiency, when delays at the Linden Facility were in fact doing the opposite. *Morgan Stanley Info. Fund*, 592 F.3d at 360.

Additionally, the statements, "[i]f we do not have sufficient fulfillment capacity or experience problems or delays in fulfilling orders, our customers may experience delays in receiving their meal deliveries, which could harm our reputation and our customer relationships and could materially adversely affect our business, financial condition and operating results," and "[w]e also may be unable to procure and implement automated production equipment and processes on a timely basis, and they may not operate as intended or achieve anticipated cost efficiencies," are plausibly misleading as they suggests the risks of fulfillment center delays are hypothetical, rather than actual and ongoing as Plaintiffs have alleged. Am. Compl. ¶ 101 (quoting IPO Prospectus). Finally, the statement "[w]e have scaled our business rapidly, and significant new initiatives have in the past resulted in, and in the future may result in, operational challenges affecting our business," is plausibly mis-leading as referring to past and future operational challenges suggest

a lack of present operational challenges. *Id.* ¶ 102.

Though the other identified statements in the Amended Complaint are not plausibly misleading, based on the sufficiently well-pled allegations in the Amended Complaint, liability under Section 11 requires only "any part of the registration statement" to have contained "an untrue statement of a material fact or omitted to state a material fact ... necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a).

### C. Statements About Product Releases and Changes in Marketing Spending Were Not Misleading

Plaintiffs allege a number of statements in the Prospectus were misleading because "the already-materialized adverse OTIF rates and delays at Linden would necessarily delay the Company's 'planned product expansion' " and "Blue Apron had already decided it would be forced to change its strategic approach for the remainder of 2017 by reducing marketing spending." Am. Compl. ¶ 105. However, Plaintiffs have not alleged facts to show the specific statements in the Prospectus discussing production expansions or changes in marketing spending "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."15 U.S.C. § 77k(a).

**\*11** All of the challenged statements regarding product expansion initiatives are forward-looking and Plaintiffs have not alleged any facts to support the conclusion Blue Apron knew delays at Linden would *necessarily* delay plans to expand Blue Apron's products. Am. Compl. ¶¶ 106, 108 ("[W]e plan to expand our core product...." "We are developing product expansion initiatives...." "We are

currently in the process of introducing additional product expansions...."). "When pleading an actionable omission, plaintiffs must, 'at a minimum, plead facts to demonstrate that allegedly omitted facts both existed, and were known or knowable, at the time of the offering.' " *Singh*, 106 F. Supp. 3d at 446.

Additionally, Plaintiffs' claims Blue Apron omitted material information regarding a planned reduction in marketing spending fails on the face of the Prospectus. Plaintiffs allege Blue Apron was misleading because it had already decided it would reduce marketing spending in 2017, prior to the IPO, because of operational issues at the Linden Facility. Am. Compl. ¶ 105. However, the allegedly misleading statement in the Prospectus states the very information Plaintiffs allege was omitted: "we expect to invest significantly less in marketing compared to the first quarter of 2017 due to the seasonal factors discussed above, the ongoing operational effort associated with launching our new fulfillment center in Linden, New Jersey, and our planned product expansion...." *Id.* ¶ 104.

### CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss, ECF No. 58, is DENIED in its entirety.

**SO ORDERED.**

**All Citations**

Slip Copy, 2020 WL 1950783

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.