UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___6/8/2020___
```

---------------------------------------------------------------------X
:
JIAJIA LUO, *individually and on behalf of all others*          :
*similarly situated*, ET AL,                                    :
                        Plaintiffs,          :
:                19-cv-230 (LJL)
       -v-                                                :
:                OPINION & ORDER
SOGOU, INC., ET AL,                                             :
                      Defendants.          :
:
---------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Defendant Sogou Inc. ("Sogou") is a China-based technology company. (Dkt. No. 60 ¶ 2.) It is a subsidiary of defendant Sohu.com, Inc. ("Sohu"). (*Id.*) On November 9, 2017, Sogou completed its initial public offering ("IPO") of 45,000,000 American Depositary Shares ("ADS") at a price of $13 per share. (*Id.* ¶ 7.) In connection with the IPO, Sogou filed a Registration Statement on Form F-1 (the "Registration Statement") and a Prospectus on Form 424B4 ("Prospectus" and, together with the Registration Statement, the "Offering Documents") with the Securities and Exchange Commission ("SEC"). (*Id.* ¶¶ 6, 7.) By October 30, 2018, approximately one year later, the price of Sogou's ADS had fallen to $5.50. (*Id.* ¶ 95.)

      Lead Plaintiffs Lizhen Zhang, Juean Xu, Yuehua Ding, Maggie Xu, Mark S. Frater, and Ketan Patel ("Plaintiffs") purchased ADS pursuant and/or traceable to the Offering Documents. (*Id.* ¶¶ 1, 18.) Plaintiffs filed their first Complaint with this Court on January 9, 2019, alleging that the Offering Documents contained material misstatements and omissions in violation of Section 11 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77k (Count I), and Section 15 of the Securities Act (Count II). (Dkt. No. 1.) The most recent and operative complaint, the Third Amended Complaint ("TAC"), names seventeen defendants

("Defendants").  (Dkt. No. 60.)  Defendants are: Sogou; Sohu; Tencent Holdings Limited

(alleged to be a controlling shareholder of Sogou); Sogou's Chief Executive Officer (Xiaochuan

Wang); Sogou's Chief Financial Officer (James (Xiufeng) Deng); the Chairman of Sogou's

Board (Charles (Chaoyang) Zhang); three of Sogou's non-management directors (Yuxin Ren,

Joanna (Yanfeng) Lu, and Chi Ping Martin Lau); three nominees for director of Sogou (Bin Gao,

Joseph Chen, and Janice Lee); the authorized United States Representative of Sogou (Donald J.

Puglisi); and underwriters of the IPO as financial advisors who allegedly assisted in preparing

and disseminating the Offering Documents (J.P. Morgan Securities LLC, Credit Suisse Securities

(USA) LLC, Goldman Sachs (Asia) L.L.C., and China International Capital Corporation Hong

Kong Securities Ltd.) (the "Underwriters").  (*Id.*)

Defendants Sogou, Sohu, and the Underwriters now move to dismiss the TAC pursuant

to Fed. R. Civ. P. 9(b) and 12(b)(6), arguing that the TAC fails to state a claim for relief.  (Dkt.

Nos. 65, 68, 70.)  For the reasons that follow, the motions are granted.

## BACKGROUND

The following facts are taken from the TAC, documents referenced therein, and/or

documents of which the court may take judicial notice, including the Offering Documents.  *See*

*Gray v. Wesco Aircraft Holdings, Inc*., 2020 WL 1904019, at \*10 (S.D.N.Y. Apr. 16, 2020)

("[R]elying on Federal Rule of Civil Procedure Rule 10(c), the Second Circuit has long held that

a complaint 'is deemed to include any written instrument attached to it as an exhibit or any

statements or documents incorporated in it by reference,' and that a court may consider

documents incorporated in a complaint by reference on a motion pursuant to Federal Rule of

Civil Procedure 12(b)(6) without converting it to a motion for summary judgment pursuant to

Federal Rule of Civil Procedure 56.") (quoting *Cortec Indus., Inc. v. Sum Holdings*, 949 F.2d 42,

47 (2d Cir. 1991)); *id.* ("[I]n federal securities fraud cases, courts can consider 'public disclosure documents required by law to be filed, and actually filed, with the SEC.'") (quoting *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)).

### A.  Sogou's Business and IPO

Sogou is a Beijing-based Internet search company that Sohu incorporated in December 2005.  (Dkt. No. 60 ¶ 34.)  By mobile queries, Sogou has the second largest search engine in China.  (*Id.*)  Sogou characterizes itself as an innovator in China's Internet industry.  (*Id.* ¶¶ 36, 67.)  Its search engine, Sogou Search, is powered by artificial intelligence ("AI") and offers a unique cross-language search functionality.  (*Id.* ¶ 36.)  Sogou generates revenue primarily from its search and search-related advertising services.  (Dkt. No. 67–1 at 2.)  Sogou's other businesses, which comprise the rest of its revenue, consist of Internet value-added services (primarily the operation of Web games and mobile games) and other products and services, including smart hardware products.  (*Id.* at 73, 115, F-17.)

On October 13, 2017, Sogou filed the Registration Statement with the SEC.  (Dkt. No. 60 ¶ 37.)  The SEC declared the Registration Statement effective on November 8, 2017.  (*Id.*)  On November 9, 2017, Sogou filed the Prospectus with the SEC.  (*Id.* ¶ 38.)  The following day, Sogou completed its IPO of 45,000,000 ADS at a price of $13 per share.  (*Id.* ¶ 39.)  Within the next several weeks, underwriters of the IPO exercised their over-allotment option to purchase additional ADS.  (*Id.* ¶ 40.)  In all, and after deducting underwriting discounts and commissions, the IPO generated $625,450,000 in proceeds to Sogou from the sale of approximately 5,643,856 ADS.  (*Id.* ¶ 41.)

### B.  Regulation of the Internet in China

As an Internet search company in China, Sogou was and is subject to heavy regulation. For example, the Advertising Law of the People's Republic of China provides that advertisements may not include material that People's Republic of China ("PRC") laws and regulations otherwise prohibit.  (*Id.* ¶ 44.)  Specifically, Article 9 of that law states:

> An advertisement shall be prohibited from: (1) using, or using in a disguised form, the national flag, national anthem, national emblem, military flag, military song, or military emblem of the People's Republic of China; (2) using, or using in a disguised form, the name or image of any state authority or its staff member; (3) using 'national,' 'highest,' 'best,' or similar comparative words; (4) damaging the dignity or interest of the state or divulging any state secret; (5) disturbing social stability or damaging the public interest; (6) damaging personal or property safety or divulging individual privacy; (7) disturbing the public order or departing from a good social climate; (8) containing any obscene, pornographic, gambling, superstitious, horrible, or violent content; (9) containing any ethnically, racially, religiously, or sexually discriminatory content; (10) impeding the protection of environment, natural resources, or cultural heritages; or (11) falling under any other circumstances as set out by any law or administrative regulation.

(*Id.*)  Further, Article 47 of the Cybersecurity Law of the PRC requires network operators such as Sogou to:

> [s]trengthen management of information published by users, and where they discover information of which the publication or dissemination is prohibited by law and regulations, they shall immediately stop dissemination of that information, take measures such as deleting it, prevent the information from spreading, save relevant records, and report to the relevant departments in charge.

(*Id.* ¶ 45.)  There are other regulations applicable to entities that provide information to Internet users.  (*See id.* ¶ 51; Dkt. No. 67–1 at 125–35.)  For instance, since December 2013, the Administrative Measures for Content Self-Review by Internet Culture Business Entities have required Sogou "to review the content of products and services to be provided prior to providing such content and services to the public."  (Dkt. No. 60 ¶ 49 (quoting Dkt. No. 67–1 at 132).)  Sogou is also subject to the Measures for the Administration of Internet Information Services (the "ICP Measures").  (*Id.* ¶ 47 (quoting Dkt. No. 67–1 at 125).)  Under the ICP Measures,

entities that provide information to Internet users must obtain an operating license from the

Ministry of Industry and Information Technology ("MIIT") or its local branch.  (*Id.* (quoting

Dkt. No. 67–1 at 125).)  Licensed entities are required to police their Internet platforms and

remove certain prohibited content.  (*Id.* (quoting Dkt. No. 67–1 at 126).)  Further, under

regulations promulgated by the MIIT, Sogou is subject to liability ("including the imposition of

fines or even the shutting down of the Internet platforms") for unlawful actions taken by users of

Sogou products.  (*Id.* ¶ 51 (quoting Dkt. No. 67–1 at 33).)

The PRC's Ministry of Public Security has authority to make any local Internet service

provider block any website maintained outside the PRC at its sole discretion.  (*Id.* (quoting Dkt.

No. 67–1 at 33).)  In the past, the PRC government has stopped distribution of information over

the Internet that it believed to violate PRC laws, including content that was obscene, incited

violence, endangered national security, was contrary to the national interest, or was defamatory.

(*Id*. (quoting Dkt. No. 67–1 at 33).)

### C.  The Qiu Shaoyun Investigation

On April 27, 2018 (over five months after the IPO), the PRC enacted Article 22 of the

Law of the PRC on the Protection of Heroes and Martyrs.  (Dkt. No. 67–3.)  That law makes it

"forbidden to distort, smear, desecrate, or deny the deeds and spirit of heroes and martyrs" and

provides that "[t]he names and likenesses of heroes and martyrs must not be used, or covertly

used, by any organization or individual for . . . commercial advertisements, damaging the

reputation and honor of heroes and martyrs."  (Dkt. No. 60 ¶ 54 (citation omitted).)

Qiu Shaoyun was one such hero and martyr who served for the PRC in the Korean War.

*See* Kiki Zhao, *For Mocking a Martyr, Chinese Blogger Runs Afoul of Beijing Court*, N.Y.

Times (Sept. 23, 2016), https://www.nytimes.com/2016/09/24/world/asia/china-qiu-shaoyun-

korean-war.html.  According to an account by a fellow soldier, Shaoyun was "hiding in high grass" in 1952 when "an American incendiary bomb fell nearby."  *Id.*  "Instead of escaping, he held his ground," so that he would not reveal his army's position, "and died a martyr."  *Id.*  The account proclaims: "This great soldier, till his last breath, did not move or even moan."  *Id.* (citation omitted).  As a result, he is considered a Chinese war hero.  (Dkt. No. 60 ¶¶ 43, 55.)

In or about early June 2018, a Chinese short-form video platform company called Douyin produced advertisements containing jokes about Qiu Shaoyun getting burned.  (*Id.* ¶ 56, 63.) The advertisements were displayed on Sogou Search.  (*Id.* ¶ 63.)  Shortly thereafter, the Beijing Municipal Cyberspace Affairs Commission and the Beijing Municipal Administration of Industry and Commerce (the "Beijing AIC")[1] launched an investigation into Douyin and Sogou. (*Id.* ¶ 60.)  Sogou was ordered to delete the offensive content.  (*Id.* ¶ 56.)

During the investigation, the Beijing AIC determined that Sogou had failed to include a keyword blacklist of the three words "Qiu Shaoyun," "burned," and "joke" in its automated content control system, which caused Sogou to miss blocking the publication of ads containing that illegal keyword combination.  (*Id.* ¶ 60.)  A deputy director general who provided legal opinions to the Beijing AIC concluded that Sogou's manual screening practice was "random," which resulted in its failure to block the keyword combination.  (*Id.* ¶¶ 57, 60.)  Following the investigation, regulatory authorities fined Sogou approximately $151,045 and ordered it to disgorge approximately $71.75 in advertising income.  (*Id.* ¶ 61; Dkt. No. 76 at 4 n.4.)[2]  But, as Sogou highlighted at oral argument, without contradiction, there was never a "finding . . . made by the Chinese authorities that Sogou's procedures prior to the IPO were in breach of any statute or law or were in fact deficient at all."  (Or. Arg. Trans. at 9.)  Still, following the incident,

---

[1] On November 16, 2018, the Beijing AIC changed its name to the Beijing State Administration for Market Regulation.  (Dkt. No. 60 ¶ 57 n.1.)
[2] That equates to an RMB 1 million fine and an advertising disgorgement of RMB 475.  (Dkt. No. 60 ¶ 61.)

Sogou agreed to revise its advertising policies and audit procedures to ensure compliance with relevant regulations.  (Dkt. No. 60 ¶ 63.)  Specifically, Sogou established a team devoted to improving its advertisement screening mechanisms and to enhancing its use of AI technology to ensure that unlawful advertisements were blocked in a timely manner.  (*Id.* ¶ 64.)  In connection with implementing those measures, Sogou suspended part of its advertising business for ten days beginning on July 1, 2018.  (*Id.* ¶ 63.)[3]

### D.  Hardware

Sogou earns revenue through means other than advertising.  The TAC focuses on a sub-category that Sogou has called "Other Revenues."  (*Id.* ¶ 68.)  According to the Offering Documents, Sogou's "[o]ther revenues are from [Internet value-added services, or] IVAS, primarily with respect to . . . operation of Web games and mobile games developed by third parties, as well as from other products and services that [Sogou] offer[s], including smart hardware products."  (Dkt. No. 67–1 at 86.)  One of those products was a smart watch for children called the "Teemo Watch," which Sogou launched in 2014.  (Dkt. No. 60 ¶ 70 (quoting Dkt. No. 67–1 at 114).)  In July 2017, Sogou launched the "Teemo Hero Watch," a "4G smart watch for children" that offered a "dual high-definition camera, which support[ed] two-way HD video calls and HD video sharing."  (*Id.* (quoting Dkt. No. 67–1 at 115).)

Addressing the Teemo products, Sogou's Offering Documents celebrated:

After three years of developing smart hardware products and our supply chain, we have achieved strong research and development and quality-control capabilities and a wide distribution network, which provides a solid foundation for the development and success of new smart hardware products. For example, we plan to launch Teemo Home, a home-based smart device, by the end of 2017.

---

[3] Plaintiffs allege that Sogou's Chief Operating Officer, Dr. Liyun Ru, resigned on June 25, 2018, to pursue other opportunities.  (*Id.* ¶ 67.)  They do not link the resignation to the Qiu Shaoyun incident.  "[T]he resignations of Individual Defendants—without factual allegations linking the resignations to the alleged fraud—[are not] sufficient to raise the inferences required to establish fraud."  *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 366 (S.D.N.Y. 2011).

. . .

We have applied our AI capabilities to a wide variety of products and services. Our voice and image recognition technologies have been integrated into Sogou Search, Sogou Input Method, and smart hardware developed in-house and by third parties.

. . .

AI is also a key enabler for smart hardware, which provides consumers with new gateways to the Internet and expands the use cases for search beyond PC and mobile devices to home, in-vehicle, and other environments.

. . .

New Internet-enabled smart hardware, such as wearables and smart appliances, is gaining popularity among consumers. According to iResearch, China's smart hardware market is expected to grow to RMB275.1 billion (US$41.3 billion) in 2021, at a CAGR of 37.9% from 2016 to 2021. Smart hardware provides consumers with new gateways to the Internet. These devices leverage AI technologies, including voice recognition and dialogue-based Q&A search technology, to expand the use cases for search beyond PC and mobile devices to home, in-vehicle, and other environments.

(Dkt. No. 67–1 at 2, 99, 104, 115.)

### E.  Sogou's Post-IPO Financial Results

The TAC states that on July 2, 2018, J.P. Morgan issued a research report (the "J.P. Morgan Report") estimating that the suspension of search advertising instituted after the Qiu Shaoyun investigation would have a "6% negative impact to Sogou's quarterly revenue" and a "31–44% negative impact" on Sogou's third quarter non-GAAP operating profit.  (Dkt. No. 60 ¶ 62.)  The J.P. Morgan Report predicted that Sogou's "share price [would] react negatively in the near future."  (*Id.* ¶ 81.)

On July 30, 2018, Sogou filed its second quarter earnings press release (the "Q2 Earnings Release") with the SEC.  (*Id.* ¶ 82.)  Sogou discussed the Qiu Shaoyun investigation and the ten-day advertising suspension.  (*Id.*)  Sogou also disclosed a change in strategy with respect to its hardware business: it would "phase out hardware products that [were] not AI-enabled, such as some legacy models of Teemo Smart Watch, and transition to products that integrate[d] [Sogou's] leading AI technologies."  (*Id.*)  Sogou expressly anticipated that the new strategy

would "result in a reduction in hardware revenues in the second half of 2018."  (*Id.*)  The Q2 Earnings Release further explained that Sogou expected that its third quarter revenues would be lower than anticipated due to the "one-time impact" of the regulatory investigation and "the adjustment" of its hardware strategy.  (*Id.*)

On an earnings call with investors that same day, Sogou's Chief Executive Officer (defendant Xiaochuan Wang) stated that Sogou's advertising services "returned to a normal operation" after the ten-day suspension and that, while Sogou acknowledged that the suspension would have a "onetime impact on [its] financials," the company was "paying even closer attention to the advertising content on [its] platform going forward."  (*Id.* ¶ 85.)  With respect to the change in hardware strategy, Mr. Wang reported that the prior July (July 2017, four months before the IPO), the company had begun developing new hardware products that "better leverage[d] [its] AI capabilities."  (*Id.* ¶ 86.)  Mr. Wang explained that, in March and May 2018 (four and six months after the IPO), the company successfully launched two new translation products that employed such "industry-leading translation technologies" and that those products were well-received in the market.  (*Id.*)  "Encouraged by this development," Mr. Wang stated, Sogou "accelerated an adjustment of [its] smart hardware strategy."  (*Id.*)  Mr. Wang disclosed that, as a result of the change in strategy, the company would "phase out hardware products that [were] not AI-enabled," resulting in a reduction of hardware revenues in the second half of 2018. (*Id.*)  However, he added, Sogou was "confident that this will further differentiate Sogou as a strong player with the smart hardware over the long term."  (*Id.*)

In response to analyst questions regarding the financial impact of the Qiu Shaoyun incident and the change in hardware strategy, Sogou's Chief Financial Officer (Joe Zhou) reiterated that the incident had a one-time impact and that the company's revenue had "already

recovered."  (*Id.* ¶ 89.)  He also disclosed that "modest growth" in the second quarter resulted from "slower-than-expected Teemo sales" as the company transitioned to AI-enabled hardware products.  (*Id.*)

On July 30, 2018—the same day as the earnings release and earnings call—*BriefingInvestor* published a story titled "Sogou Trades Lower on Q2 Results; Q3 Revenue Guidance Well Below Expectations."  (*Id.* ¶ 66.)  The article ascribed a "one-time reduction in revenue in Q3" to the Qiu Shaoyun investigation and Sogou's ten-day suspension of its advertising business, as well as Sogou's adoption of new policies and audit procedures.  (*Id.*)

Following the July 30, 2018 disclosures, the price of Sogou's ADS fell from $11.29 per share (on July 19, 2018) to $9.21 per share (on July 31, 2018)—a 19% decline.  (*Id.* ¶ 90.)

On November 5, 2018, Sogou released its third quarter earnings and convened an earnings call with investors.  (*Id.* ¶ 91.)  During the call, Mr. Wang stated that the company had "continued to implement" its "upgraded" hardware strategy by replacing the outdated Teemo Watch.  (*Id.*)  Mr. Wang acknowledged that the decision would "have a short-term impact on [Sogou's] smart hardware sales in the second half of [the] year."  (*Id.*)  He added, "[W]e believe that in the mid to long run, this will help us to establish a more competitive position in the market."  (*Id.*)  Sogou's Investor Relations Director (Jessie Zheng) noted: "In the first half [of 2018] and more recently, we launched a series of translation devices that help us showcase our AI capabilities and build a stronger brand in the market."  (*Id.* ¶ 93.)

By October 30, 2018, Sogou's share price had declined to $5.50—a 57% decrease from its share price at the time of the IPO.  (*Id.* ¶ 95.)[4]

---

[4] It is curious, to say the least, that Plaintiffs mention the October 30, 2018 ADS price after discussing the November 5, 2018 earnings call.  (*See* Dkt. No. 60 ¶¶ 91–96.)  Obviously, disclosures in November 2018 could not have been responsible for the stock price decline in October.  Indeed, the market price of Sogou ADS increased by about 15.5% on November 5, 2018—the day of the earnings call—from the market price on October 30, 2018.  *See Action*

### F.  Plaintiffs' Claims

The Offering Documents contained the following disclosures:

- that Shogou was "required to police [its] internet platforms and remove certain prohibited content" (Dkt. No. 67–1 at 126);
- that licenses were "subject to annual inspection" (*id.*);
- that the Administrative Measures for Content Self-Review by Internet Culture Business Entities required Sogou "to review the content of products and services to be provided prior to providing such content and services to the public" (*id.* at 132);
- that "[t]he content management system of an Internet culture business entity is required to specify the responsibilities, standards and processes for content review as well as accountability measures" (*id.*);
- that "[t]he PRC government may prevent [Sogou] from distributing, and [may subject Sogou] to liability for, content that it believes is inappropriate" (*id.* at 33); and
- that Sogou "may have difficulty determining the type of content that may result in liability" and that, if Sogou determined incorrectly, Sogou might "be prevented from operating our Internet platforms" (*id.* at 34).

Plaintiffs allege that such language was false and misleading and contained material omissions in that it "fail[ed] to disclose that Sogou's controls over advertising contents" were "materially inadequate to meet its obligations to review the content for which it was responsible and to prevent Sogou from allowing dissemination of prohibited content."  (Dkt. No. 60 ¶ 53.)

Plaintiffs assert that, at the time of the IPO, Sogou was required to, but did not:

> (a) establish a dedicated team to monitor relevant new regulations and any changes of regulations as well as ensure timely implementation of such new regulations or changes accordingly;

> (b) strengthen its auditing procedures by leveraging AI to upgrade automated system and expand its manual inspection team to extend the scope of manual inspection;

> (c) rewrite its advertising policies and procedures to ensure full compliance with related regulations going forward . . . ; and

> (d) use AI technology to ensure that it combined keyboard and other devices to block timely prohibited content.

(*Id.*)

---

*AG v. China N.E. Petroleum Holdings Ltd.*, 692 F.3d 34, 37 n.1 (2d Cir. 2012) (Court can take judicial notice of well-publicized stock prices on a motion to dismiss).

Plaintiffs also allege that the Offering Documents were false and misleading and omitted material information about Sogou's smart hardware products and Sogou's strategy to better leverage AI technologies.  (*Id.* ¶ 73.)

As noted above, Sogou's Offering Documents disclosed that in 2014, the company had launched Teemo Watch, that in July 2017, it launched Teemo Hero Watch, and that Sogou "frequently upgrade[d] Teemo Watch features."  (*Id.* ¶ 70.)  The Offering Documents also disclosed that, "[a]fter three years of developing smart hardware products," Sogou had "achieved strong research and development and quality-control capabilities and a wide distribution network, which provide[d] a solid foundation for the development and success of new smart hardware products."  (*Id.*)  Further, Sogou disclosed that it had "applied [its] AI capabilities to . . . smart hardware developed in-house" and that its smart hardware "leverage[s] AI technologies."  (*Id.* ¶¶ 71–72).  According to Plaintiffs, those disclosures did not reveal the change in strategy or that certain hardware products were to become (to use Plaintiffs' word) "obsolete."  (*Id.* ¶ 73.)  Additionally, Plaintiffs allege that "the Offering Documents failed accurately to . . . disclose that it had changed strategies in a way that would adversely impact revenue and earnings within a year from the IPO."  (*Id.* ¶ 79.)

## APPLICABLE LAW

In reviewing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court "accept[s] all factual allegations as true, and draw[s] all reasonable inferences in the plaintiff's favor."  *Austin v. Town of Farmington*, 826 F.3d 622, 625 (2d Cir. 2016).  This requirement "is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*  A complaint must offer more than "labels and conclusions," or "a formulaic recitation of the

elements of a cause of action" or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007). The ultimate question is whether "[a] claim has facial plausibility, [*i.e.*,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011) (same).

Section 11 of the Securities Act prohibits materially misleading statements or omissions in registration statements filed with the SEC and provides a cause of action to persons who purchased securities based on registration statements containing such statements or omissions. 15 U.S.C. § 77k(a). "To state a claim under section 11, the plaintiff must allege that: (1) she purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358–59 (2d Cir. 2010) (quoting 15 U.S.C. § 77k(a)).[5]

"Any of the following may form the basis for a claim under § 11 . . . of the Securities Act: '(1) a material misrepresentation; (2) a material omission in contravention of an affirmative

---

[5] Section 15 of the Securities Act creates liability for individuals or entities that "control[] any person liable" under Section 11. 15 U.S.C. § 77o(a).

legal obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading.'" *City of Pontiac Policemen's and Firemen's Fund Retirement Sys v. UBS Ag*, 752 F.3d 173, 182 n.38 (2d Cir. 2014) (quoting *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 715–16 (2d Cir. 2011)); *see also Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 484 (2d Cir. 2011) (same).  Moreover, Section 11—by its plain language—speaks to the truth or falsity of "any part of the registration statement[] *when such part became effective.*"  15 U.S.C. § 77k(a) (emphasis added); *see Lin v. Interactive Brokers Grp., Inc.*, 574 F. Supp. 2d 408, 421 (S.D.N.Y. 2008) ("To be actionable under Section 11, the registration statement must contain an untruth or material omission '*when such part became effective.*'") (quoting 15 U.S.C. § 77k(a)) (emphasis added); *see also Singh v. Schikan*, 106 F. Supp. 3d 439, 446 (S.D.N.Y. 2015) ("When pleading an actionable omission, plaintiffs must, at a minimum, plead facts to demonstrate that *allegedly omitted facts both existed, and were known or knowable, at the time of the offering.*") (citation and internal quotation marks omitted) (emphasis added).  It is not sufficient that, at some point after the registration statement became effective, some subsequent event made it no longer accurate.

Under the federal securities laws, "literal accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another."  *Omnicare, Inc. v. Laborers Dist. Council Const. Industry*, 575 U.S. 175, 192 (2015).  Still, "it bears emphasis that [the law does] not create an affirmative duty to disclose any and all material information."  *Siracusano*, 563 U.S. at 44.  Absent a regulation affirmatively requiring disclosure, "[d]isclosure is required . . . only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'"  *Id.* (quoting 17 C.F.R. § 240.10b–5(b)).

"Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014). "Thus, when an offering participant makes a disclosure about a particular topic, whether voluntary or required, the representation must be complete and accurate." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010) (citation and internal quotation marks omitted). However, "revealing one fact about a subject does not trigger a duty to reveal all facts on the subject." *Richman v. Goldman Sachs Group, Inc.*, 868 F. Supp. 2d 261, 274 (S.D.N.Y. 2012); *see Chistrine Asia Co., Ltd. v. Alibaba Group Holding Ltd.*, 192 F. Supp. 3d 456, 471 (S.D.N.Y. 2016) (same).

To be actionable, a misrepresentation or omission also must be material, *i.e.*, the plaintiff must allege facts showing that there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Ganino v. Citizen Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)).[6] "In judging whether an alleged omission was material in light of the information already disclosed to investors, [the court] consider[s] whether there is 'a *substantial* likelihood that the disclosure of the [omitted material] would have been viewed by the *reasonable* investor as having *significantly* altered the total mix of information [already] made available.'" *In re ProShares Trust Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013) (quoting *Demaria v. Anderson*, 318 F.3d 170, 180 (2d Cir. 2003) (citations omitted) (emphasis in original)). However, as noted above, the law does not "create an affirmative duty to disclose any and all material information." *Siracusano*, 563 U.S. at 44. Just as the "duty to disclose" does not "encompass non-material information," "[m]ateriality alone

---

[6] The materiality standards under Section 11 are identical to those under Section 10(b) of the Securities Exchange Act of 1934. *See Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004).

does not demand disclosure." *In re ProShares Trust Sec. Litig.*, 728 F.3d at 101 (quoting *Panther Partners, Inc. v. Ikanos Comm'n, Inc.*, 538 F. Supp. 2d 662, 668 (S.D.N.Y. 2008)).

The Private Securities Litigation Reform Act ("PSLRA") imposes additional requirements on a plaintiff bringing a private securities fraud action. Plaintiff must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). A plaintiff cannot plead "the materiality of the alleged misstatements or omissions . . . in a conclusory or general fashion." *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 626 (S.D.N.Y. 2005); *see also In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 367 (E.D.N.Y. 2013) ("The materiality of allegedly false financials may not be pled in a conclusory or general fashion.") (citation omitted); *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 564 (S.D.N.Y. 2018) ("[P]laintiffs 'must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so.'") (quoting *Rombach*, 355 F.3d at 174), *aff'd sub nom. Ark. Pub. Emps. Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019).

Because Plaintiffs' claims sound in fraud, they must also satisfy the heightened pleading requirements of Fed R. Civ. P. 9(b) and the PSLRA. *See Rombach*, 355 F.3d at 170–72 (applying Rule 9(b)'s particularity pleading standard to a Section 11 claim sounding in fraud even though the plaintiff purported to state only a negligence claim).[7] Where scienter is at issue, the plaintiff must "state with particularity facts giving rise to a strong inference that the

---

[7] The TAC is replete with explicit claims of fraud. For example, the TAC alleges, "[T]he Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading" and, "Defendants were aware . . . [that] these adverse, undisclosed facts would, and ultimately did, have an unfavorable impact on Sogou's sales, revenues, and income from continuing operations." (Dkt. No. 60 ¶¶ 25, 27.) "Whether defendants knew or recklessly disregarded that their statements were false and misleading" predominates Plaintiffs' claims. (*Id.* ¶ 99(d).) Plaintiffs cannot avoid Rule 9(b) with their generic disclaimer of "any allegation of fraud, recklessness or intentional misconduct." (*Id.* ¶¶ 103, 111.) *See In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 2d 678, 691 (S.D.N.Y. 2000) (applying Rule 9(b) to a Section 11 claim despite the plaintiffs' "boilerplate disclaimer" of fraud).

defendant acted with the requisite state of mind."  15 U.S.C. § 78u-4(b)(2).  Under this

heightened pleading standard for scienter, a "complaint will survive . . . only if a reasonable

person would deem the inference of scienter cogent and at least as compelling as any opposing

inference one could draw from the facts alleged."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd*.,

551 U.S. 308, 324 (2007).  In determining whether a strong inference exists, the allegations are

not to be reviewed independently or in isolation, but the facts alleged must be "taken

collectively."  *Id.* at 323.

## DISCUSSION

### A.  Plaintiffs Have Failed to State A Claim for Relief Based on Sogou's Controls Over Prohibited Content

Plaintiffs argue that, because the Offering Documents included information about the

adequacy of Sogou's content controls and the consequences of noncompliance, Defendants were

duty-bound to disclose that, at the time of the IPO, "Sogou's controls over advertising contents

were materially inadequate to meet its obligations to review . . . content and prevent violations of

PRC content laws and regulations."  (Dkt. No. 60 ¶ 9.)  Specifically, according to Plaintiffs, the

Offering Documents unlawfully "fail[ed] to disclose that Sogou's controls over advertising

contents were materially inadequate to meet its obligations to review the content and prevent

violations of PRC content laws and regulations."  (*Id.*)  To be clear, it is not alleged that Sogou

failed to disclose that its compliance procedures were inadequate to screen out content that

regulations existing at the time of the IPO prohibited.  Rather, it is alleged that Sogou failed to

disclose that its screening mechanisms at the time of the IPO were inadequate to screen out

content that *new* Chinese law (passed after the IPO) would prohibit.

That claim cannot survive for several reasons.  First, Plaintiffs fail to allege a false or

misleading statement or an actionable omission.  Plaintiffs do not allege that any single one of

17

the statements Sogou made regarding any PRC regulation or Sogou's compliance efforts was false or misleading at the time it was made.  It is important to note that the Offering Documents provided no assurance to investors that Sogou's procedures would be sufficient to guarantee compliance with PRC law or to prevent the dissemination of illegal content.  To the contrary, the Offering Documents warned that Sogou "may have difficulty determining the type of content that may result in liability" and that, if Sogou was "wrong," the company might "be prevented from operating [its] Internet platforms."  (Dkt. No. 67–1 at 34.)

Plaintiffs also fail to allege an actionable omission, *i.e.*, the omission of a then-existing fact necessary to make what was said, at the time it was said, not misleading.  *See Omnicare, Inc.*, 575 U.S. at 192.  Crucially, Sogou did not disclose any particular steps it was taking to comply with PRC law such that the omission of facts regarding those measures made the description of the measures misleading.

In all of these respects, this case is easily distinguishable from the Second Circuit's decision in *Jinkosolar*, 761 F.3d 245, upon which Plaintiffs rely.  In *Jinkosolar*, the defendant company's offering documents had described "pollution-preventing equipment and 24-hour monitoring teams" in such detail as to give "comfort to investors that reasonably effective steps were being taken to comply with applicable environmental regulations."  *Id.* at 251.  All the while, the company knew that it was experiencing undisclosed "ongoing and serious pollution violations."  *Id.*  The Second Circuit held that the plaintiffs had stated a claim for relief under Section 11 of the Securities Act because "the comforting statements in the prospectus about compliance measures" would be rendered misleading "if in fact the equipment and 24-hour team were then failing to prevent substantial violations of the Chinese regulations."  *Id.*

18

Several features of *Jinkosolar* are critical to its holding.  First, as the Second Circuit later emphasized, "the company described its compliance measures in confident detail, including references to 24-hour monitoring teams, specific compliance equipment, and its clean compliance record."  *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019).  More "tentative and generic" statements would not have produced a duty to disclose.  *Id.*  Second, the *Jinkosolar* holding depended on the fact that, at the time the registration statement became effective, the prophylactic environmental measures it described "were *then* failing."  *Jinkosolar*, 761 F.3d at 251 (emphasis added).  The court illustrated the point: "One cannot, for example, disclose in a securities offering a business's peculiar risk of fire, the installation of a comprehensive sprinkler system to reduce fire danger, and omit the fact that the system has been found to be inoperable, without misleading investors."  *Id.*  Third, the undisclosed ongoing violations were "serious" and "substantial."  *Id.*  They resulted in fines, payments to local landowners, and eventually a 40% drop in Jinkosolar's stock price.  *Id.* at 249.

*Jinkosolar* is thus distinguishable from this case in several respects.  To the extent Sogou made any disclosures at all about its compliance measures, those disclosures were "tentative and generic."  *Singh*, 918 F.3d at 64.  The Offering Documents acknowledged that Sogou was "required to police [its] Internet platforms and remove certain prohibited content" but did not state precisely how Sogou planned to do that.  (Dkt. No. 67–1 at 126.)  The Offering Documents also noted that Sogou was required "to review the content of products and services to be provided prior to providing such content and services to the public."  (*Id.* at 132.)  But, the Offering Documents warned, "Although we are committed to complying with . . . PRC laws and regulations applicable to Internet-related service . . . activities, we cannot guarantee that *we are*

*now* or will in the future be in full compliance with any such laws and regulations that apply to our services and activities." (*Id.* at 40 (emphasis added).)

The Offering Documents further stated that "[t]he content management system of an Internet culture business entity is required to specify the responsibilities, standards and processes for content review as well as accountability measures, and is required to be filed with the local provincial branch of the [Ministry of Culture]." (Dkt. No. 60 ¶ 50 (quoting Dkt. No. 67–1 at 132).) At oral argument, Plaintiffs relied on that part of the TAC as a sufficient allegation that Sogou's Registration Statement had attested to a robust compliance system, creating a duty to disclose that the system would not be able to detect content that would be prohibited under the not-yet-enacted Chinese law. (Or. Arg. Trans. at 23.) But as Plaintiffs' counsel effectively conceded, what that statement really said was only that Sogou had submitted "something that . . . enabled [them] to get a license." (*Id.*) That is a neutral disclosure about Chinese licensing procedure of the type that any company would make about important laws to which it is subject. It is not a testament to the adequacy of Sogou's compliance program, and certainly not a "descri[ption] [of Sogou's] compliance measures in confident detail." *Singh*, 918 F.3d at 63.

From the disclosures above, no reasonable investor could infer that Sogou's compliance efforts were particularly effective. *See Menaldi v. Och-Ziff Management Group LLC*, 277 F. Supp. 3d 500, 513 (S.D.N.Y. 2017) (dismissing complaint where description of compliance measure was generalized and "did not describe specific regions, specific initiatives, or make any assurances of efficacy"); *Diehl v. Omega Protein Corp.*, 339 F. Supp. 3d 153, 163 (S.D.N.Y. 2018) ("[I]t is the specificity of the disclosures in *Jinkosolar* that makes them actionable, specificity that is not present here.").

Moreover, Plaintiffs do not allege that Sogou was in violation of PRC law or regulation at the time the Registration Statement became effective.  Nor do they assert that the compliance measures Sogou later added were ones that the company was contemplating (but choosing not to adopt) at the time of the IPO.  The Registration Statement was declared effective in November 2017.  Sogou did not adopt the additional compliance measures about whose omission Plaintiffs complain until late June or July 2018—in direct response to the Qiu Shaoyun incident that occurred after the IPO, which led to an investigation after the IPO.  (*See* Dkt. No. 60 ¶ 63 ("Following the investigation, the regulatory authorities instructed Sogou to amend its advertising practices."))  Indeed, the legislation that provoked the investigation and the reforms—the Law of the PRC on the Protection of Heroes and Martyrs—did not even exist at the time of the IPO.  (Dkt. No. 67–3.)  It was enacted five months later.  (*Id.*)  This is simply not a case where the company described compliance measures in a registration statement while knowing that the company was simultaneously experiencing undisclosed "ongoing and serious . . . violations."  *Jinkolar*, 761 F.3d at 251.

At oral argument, Plaintiffs' counsel called Sogou's compliance measures "the . . . Maginot Line of content filtration systems."  (Or. Arg. Trans. at 17.)[8]  The analogy is inapt.  To call a compliance measure a "Maginot Line" is to signify that the measure is inadequate to confront a known present risk.  The French line was designed to be effective to meet a German threat of the type France faced decades earlier but not the threat it faced in 1940.  The analogy might be well-taken if Sogou's measures were inadequate to address the risk that a third party

---

[8] "The Maginot Line, the massive series of fortifications built by France in the 1930s to defend its borders with Germany and Italy, is perhaps the most maligned collection of fortifications ever built, commonly viewed as an abject failure, a disaster for France, a total waste of both money and manpower, and a monument to the folly of static defence."  William Alcorn, *The Maginot Line 1928–45*, at 4 (Osprey Pub. Ltd. 2003).  The Maginot Line's static fortification proved dramatically ineffective during WWII against motorized components of the German army.  Calling something a "Maginot Line" conveys that it can be "easily circumvented" by a "simpl[e] maneuver[]."  *Bank Markazi v. Peterson*, 136 S.Ct. 1310, 1335 (2016) (Roberts, C.J., dissenting).

would post content that was then—at the time of the IPO—in violation of Chinese law. Even in that case, however, it would be inadequate to satisfy *Jinkosolar* in the absence of a pleading that, prior to the IPO, there was a failure with respect to the compliance measures or a violation of PRC law by Sogou. *See Jinkosolar*, 761 F.3d at 251 (metaphorical "comprehensive sprinkler system . . . *found to be inoperable*" yet only disclosed as existing) (emphasis added). The allegation is even more far-fetched with respect to the existence of compliance measures that would prove to be inadequate to address the risk of a posting that was not even in violation at the time but would be so in the future if Chinese law was amended. The Securities Act requires candor in disclosures, not clairvoyance.

The TAC also fails to state a claim because the Prospectus "warn[ed] investors of exactly the risk the plaintiffs claim was not disclosed." *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996). "When a registration statement warns of the exact risk that later materialized, a Section 11 claim will not lie as a matter of law." *In re Coty Inc. Sec. Litig.*, 2016 WL 1271065 at *11 (S.D.N.Y. Mar. 29, 2016) (quoting *In re ProShares Tr. Sec. Litig.*, 889 F Supp.2d 644, 653 (S.D.N.Y. 2012), *aff'd*, 728 F.3d 96 (2d Cir. 2013)).

This is not a case where a disclosure, while technically accurate, disproportionately communicated the severity of the risk posed. *See In re Prudential Secs. Inc. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) (no protection afforded "to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away"). Sogou forthrightly disclosed the risk posed by existing and possible future PRC Internet control laws. It stated:

- "We may have difficulty determining the type of content that may result in liability for us and, if we are wrong, we may be prevented from operating our Internet platforms." (Dkt. No. 67–1 at 31.)

- "We cannot assure you that the PRC governmental authorities will not issue new laws or regulations specifically regulating sponsored search services, which could further impact our revenues." (*Id.* at 28.)
- "PRC laws and regulations relating to the liability of providers of online products and services for activities of their users are undeveloped, and their current and future reach are unclear." (*Id.* at 21.)

It thus warned of the exact risk that was threatened and later materialized—that the PRC would issue a new law or regulation, that Sogou might have difficulty policing the content that was prohibited, and that the failure to detect prohibited content would prevent Sogou from operating its Internet platform and impact its revenues. *See Panther Partners*, 538 F. Supp. 2d at 672; *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 579 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014).

Plaintiffs argue that "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." (Dkt. No. 74 at 21 (quoting *Rombach*, 335 F.3d at 173).) That is, indisputably, a correct legal proposition, but it does not help Plaintiffs here. The TAC does not identify a risk that had "transpired" or even one that was a near certainty. (*Id.*; *see* Or. Arg. Trans. at 17 (Plaintiffs' counsel unable to identify any paragraph in the TAC indicating that, prior to the IPO, there was a failure with respect to the compliance measures or a violation of PRC law by Sogou).) The TAC identifies a single incident involving a single advertiser that occurred over a half-year after the IPO, which involved violation of a law that was not in existence at the time of the IPO.

The consequences of accepting Plaintiffs' argument, if taken to its logical conclusion, would be profound and perverse. The thrust of the argument is that if a company discloses certain compliance measures, it can only adopt new ones only at peril of a securities lawsuit. Companies constantly update their internal controls by adding or amending procedures, creating specialized teams, and studying new risks. They often do so because they learn from past

mistakes.  They do so other times because, simply, the art and science of compliance is ever-evolving.  Sometimes they do so because the substantive law has changed.  What may be best practice in one year, or one month, might cease to be best practice in future years or future months.  Indeed, guidance from the SEC, the United States Department of Justice, and the United States Sentencing Commission all encourage companies to update their internal controls.  *See, e.g.*, Commission Guidance Regarding Management's Report on Internal Control Over Financial Reporting Under Section 13(a) or 15(d) of the Securities Exchange Act of 1934, 72 Fed. Reg. 35,324 (June 27, 2007); *Evaluation of Corporate Compliance Programs*, U.S. DEP'T JUST. CRIM. DIVISION (June 2020), https://www.justice.gov/criminal-fraud/page/file/937501/download; USSG §8B2.1.

Under Plaintiffs' view, any company making an anodyne and conventional compliance statement (or stating that it was subject to a licensing law) would invite a securities lawsuit in the event of a program upgrade.  The statements in the Offering Documents are unexceptional.  Sogou stated that it was "required to police [its] internet platforms and remove certain prohibited content" (Dkt. No. 67–1 at 126), that certain consequences would follow from noncompliance, and that Sogou was "committed to complying with the above-described PRC laws and regulations."  (*Id.* at 31.)  If, based on these statements, Sogou can be sued for not disclosing the absence of compliance measures that it only later adopted in response to an incident that occurred after the IPO, then any company considering compliance improvements will have to think hard about litigation exposure before doing so.  Companies would necessarily fear that adopting the very measure intended to benefit the shareholders would lead to harm for those same shareholders in the form of a securities lawsuit.  That is obviously not the law.

Finally, Plaintiffs do not support their argument that Sogou had a duty to disclose the future insufficiency of its compliance program under Item 303 of Regulation S-K.  Item 303 requires the registrant to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."   An SEC interpretative release states that "a disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operations." *Management's Discussion & Analysis of Fin. Condition & Results of Operations*, Release No. 6835 (May 18, 1989).  Quoting from the SEC's interpretive release, Plaintiffs argue that, "to demonstrate a disclosure obligation under Regulation S-K, Plaintiffs need only allege 'known uncertainties' that could materially impact Sogou's financial results."  (Dkt. No. 74 at 20.)  And Plaintiffs insist that the TAC did so by "alleg[ing] that the Offering Documents failed to disclose that Sogou lacked adequate procedures for monitoring, updating, or preventing illegal content from dissemination on its internet platform."  (*Id.*)

That argument fails for several reasons.  Item 303 is not applicable at all to a registration statement on Form F-1.[9]  Additionally, Plaintiffs have failed to allege facts sufficient to support either of the two elements of an Item 303 claim: (1) that there was a known trend or uncertainty; and (2) that the trend or uncertainty had, or that the registrant reasonably expected it to have, a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.  *See Litwin*, 634 F.3d at 716–17 (Item 303 disclosure required when, at time of IPO, management knew of downward trend in real estate market and that the trend was reasonably

---

[9] Because Sogou filed the Registration Statement on Form F-1, *see* 17 C.F.R. § 239.31, the company was required to disclose "for at least the current financial year, any known trends, uncertainties, or . . . events that [were] reasonably likely to have a material effect on the company's net sales or revenues[.]"  Part I, Item 5.D of Form 20-F at 16; *see also* Form F-1, Part I, Item 4.a.

likely to have a material impact on registrant's financial condition); *Panther Partners Inc. v. Ikanos Communications Inc.*, 681 F.3d 114 (2d Cir. 2012) (Item 303 disclosure required where chip defect issue and its potential impact on registrants' business was known and registrant reasonably expected it would have a material unfavorable impact on revenues or income from continuing operations); *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 104–05 (2d Cir. 2015) (Item 303 disclosure required where soaring default rate on subprime mortgage lending was known and reasonably expected to have material effects on the company's financial position).

Here, Plaintiffs allege no facts suggesting that Sogou's allegedly insufficient compliance procedures were known to management, let alone that management reasonably expected such deficiencies to have a material unfavorable impact on Sogou's financials.  The TAC allegations simply do not aver that Sogou's controls *at the time of the IPO* were insufficient under the PRC law that existed at the time of the IPO.

Moreover, there is no free-standing obligation under United States law to disclose even criminal conduct that is uncharged—let alone insufficient regulatory compliance.  *See City of Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014); *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 650 (S.D.N.Y. 2017) ("[A]bsent an express prior disclosure, a corporation has no affirmative duty to speculate or disclose uncharged, unadjudicated wrongdoing or mismanagement.") (quoting *In re UBS AG Securities Litigation*, 2012 WL 4471265, at *31 (S.D.N.Y. Sept. 28, 2012)).

For the foregoing reasons, Plaintiffs have failed to state a claim for relief based on Sogou's allegedly misleading statements or omissions pertaining to its compliance with PRC Internet regulations.

**B.   Plaintiffs Have Failed to State A Claim for Relief Based on Sogou's Statements About Its Hardware and Its Change in Strategy**

Plaintiffs make two arguments in support of a Section 11 claim with respect to Sogou's smart hardware disclosures.  First, they allege that Sogou failed to disclose at the time of the IPO that the company had decided to transition to smart hardware with better-connected AI capabilities and to phase out hardware that was not AI-enabled.  Second, they assert that Sogou wrongly implied that all of its smart hardware was AI enabled.   Plaintiffs fail to state a claim under either theory.

As to the first theory, Plaintiffs fail to identify any statement about hardware in the Offering Documents that was false or misleading when it was made.  Sogou disclosed that it "intend[ed] to grow [its] business and improve [the] results of operations by . . . continu[ing] to pursue innovations in AI technologies" and "broaden[ing] the application of [its] AI technologies."  (Dkt. No. 67–1 at 106–07.)  Sogou also disclosed that "[n]ew Internet-enabled smart hardware" would "leverage AI technologies."  (*Id.* at 99.)

To the extent Plaintiffs complain that the Offering Documents did not disclose that the application of AI technologies to hardware would result in the phase-out of hardware such as the Teemo Watch, Plaintiffs do not allege that facts showing that such decision was made at the time the Registration Statement became effective.  To the contrary, the TAC and documents incorporated by reference establish that, while in July 2017 the company had begun to develop new hardware products that better leveraged AI capabilities, it was not until after the IPO (in March and May 2018) that the company successfully launched the new translation products that resulted in the company's acceleration of its new smart hardware strategy.  *See, e.g.*, *Scott v. General Motors Co.*, 46 F. Supp. 3d 387, 395 (S.D.N.Y. 2014) (dismissing complaint where it alleged "no facts that, if true, would demonstrate that the Registration Statement contained a material misstatement or omission at the time it became effective"); *In re Hi-Crush Partners L.P.*

*Sec. Litig.,* 2013 WL 6233561 at *11 (S.D.N.Y. Dec. 2, 2013) (issuer's duty to disclose is "adjudged by the facts as they existed when the registration statement became *effective*" and holding that issuer did not violate Section 11 when it failed to disclose a breach of contract claim by a third party that was not asserted until "over a month after the Registration Statement became effective") (citation omitted).[10]

As to the second theory, Plaintiffs rely on a plain misreading of Sogou's Registration Statement.  Sogou did not state that all of its smart hardware had AI capabilities.  It described two products, the Teemo Watch and the Teemo Hero Watch, and stated that the Teemo Hero Watch "integrates . . . Q&A technology and supports various other AI-powered applications." (Dkt. No. 67–1 at 115.)  It did not say that the Teemo Watch had AI-powered capabilities.  If there was any implication in the Registration Statement about the Teemo Watch's capabilities, it was the opposite of what Plaintiffs contend—namely, that unlike the Teemo Hero Watch, the Teemo Watch did *not* have AI capabilities.  (*See id.* at 114–115 (suggesting that AI-powered applications on the Teemo Hero Watch, which launched in July 2017, were a new development).)  Plaintiffs do not state any "concrete facts" showing that any statement Sogou made was false.  *See In re IAC/InterActiveCorp.*, 695 F. Supp. 2d 109, 112–13, 120 (S.D.N.Y. 2010).

### C.  Leave to Amend

For the reasons explained above, Plaintiffs have failed to state a claim under Section 11 of the Securities Act.  "To establish § 15 liability, a plaintiff must show a primary violation of §

---

[10] *In re Ply Gem Holdings, Ltd.*, 2016 WL 5339541 (S.D.N.Y. Sept. 23, 2016) does not support Plaintiffs' claim. There, the court reiterated that "Section 11 . . . requires plaintiffs to, 'at a minimum, plead facts to demonstrate that allegedly omitted facts both existed, and were known or knowable, at the time of the offering.'"  *Id.* at 5 (quoting *Lin v. Interaction Brokers Grp., Inc.*, 574 F. Supp. 2d 408, 421 (S.D.N.Y. 2008)) (internal citations omitted).  The court sustained the claim only because the plaintiffs were able to allege that the omitted facts had occurred and were known prior to the IPO.  *Id.*

11 and control of the primary violator by defendants." *In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 185 (2d Cir. 2011) (internal quotation marks and citation omitted). Accordingly, the failure of the Section 11 claim establishes *a fortiori* the failure of the Section 15 claim—the only other claim in this case.

Defendants ask the Court to dismiss the action with prejudice. Although Plaintiffs have argued vociferously that the TAC states a claim for relief, they do not argue for leave to replead. The Court dismisses the TAC with prejudice. To be sure, the "usual practice" in this Circuit is to permit amendment of the complaint upon granting a motion to dismiss, particularly where the possibility exists that the defect can be cured. *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990) (citation omitted). But the courts do not grant leave to amend without limits. At some point, defendants are entitled to be free from litigation. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007) (noting that "courts typically grant plaintiffs at least one opportunity to plead fraud with greater specificity when they dismiss under Rule 9(b)" but denying leave to amend where the plaintiff was already given that opportunity); *Sodhi v. Gentium S.p.A*, 2015 WL 273724, at *9 (S.D.N.Y. Jan. 22, 2015) (plaintiff "not entitled to an advisory opinion from the Court informing [him] of the deficiencies in the complaint and then an opportunity to cure those deficiencies") (citation omitted).

In the Court's judgment, that time has come. This is Plaintiffs' fourth attempt to state a claim. Plaintiffs were on notice of the defects in their pleadings when Defendants moved to dismiss the second amended complaint. (*See* Dkt. Nos. 48, 51, 53.) The defects in the TAC are fundamental. Plaintiffs identify no facts they could assert by way of further amendment that could cure those defects. They do not ask to replead. The TAC must now be dismissed with prejudice.

**CONCLUSION**

For the reasons stated, the motions to dismiss (Dkt. Nos. 65, 68, 70) are GRANTED.


SO ORDERED.

Dated: June 8, 2020
      New York, New York

                                          LEWIS J. LIMAN
                                  United States District Judge