K5SALUOOps

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------x

JIAJIA LUO, Individually and on Behalf
of All Others Similarly Situated,

                    Plaintiffs,

          v.                              19-cv-230 (LJL)

SOGOU INC., SOHU.COM, INC., TENCENT
HOLDINGS LTD., XIAOCHUAN WANG,
CHARLES (CHAOYANG) ZHANG, YUXIN REN,
JOANNA (YANFENG) LU, BIN GAO, JOSEPH
CHEN, JANICE LEE, JAMES (CIUFENG) DENG,
CHI PING MARTIN LAU, DONALD J. PUGLISI,
J. P. MORGAN SECURITIES LLC, CREDIT
SUISSE SECURITIES (USA) LLC, GOLDMAN
SACHS (ASIA) L.L.C., and CHINA
INTERNATIONAL CAPITAL CORPORATION HONG
KONG SECURITIES LTD.,

                    Defendants.           Oral Argument

------------------------------------------x

                                          New York, N.Y.
                                          **(via telephone)**

                                          May 28, 2020
                                          11:00 a.m.

Before:

                    HON. LEWIS J. LIMAN

                                          District Judge

                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

K5SALUOOps

APPEARANCES

THE ROSEN LAW FIRM, P.A.
      Attorneys for Lead Plaintiffs Lizhen Zhang, Juean Xu,
      Yuehua Ding, Maggie Xu, Mark S. Frater, and Ketan Patel
BY:   JACOB ALEXANDER GOLDBERG, ESQ.
      -and-
LEVI & KORSINSKY, LLP
      Attorneys for Lead Plaintiffs
BY:   SHANNON LEE HOPKINS, ESQ.
      DONALD J. ENRIGHT, ESQ.
      STEPHANIE A. BARTONE, ESQ.

POMERANTZ LLP
      Attorneys for Plaintiff Jiajia Luo
BY:   CARA JOY DAVID, ESQ.


GOULSTON & STORRS PC
      Attorneys for Defendants Sogou Inc., Sohu, Inc.,
      Sogou Inc..com, and Sohu.com Inc.
BY:   RICHARD J. ROSENSWEIG, ESQ.
      NICHOLAS CUTAIA, ESQ.
      JOSHUA LOONEY, ESQ.

MORGAN LEWIS & BOCKIUS, LLP
      Attorneys for Underwriter Defendants JPMorgan
      Securities LLC, Credit Suisse (USA) LLC,
      and Goldman Sachs (Asia) L.L.C.
BY:   KENNETH IAN SCHACTER, ESQ.




            (Via telephone)

            THE COURT:  Good morning.  This is Judge Liman.

            Matt, do we have all parties on the phone?

            THE CLERK:  Yes, Judge.  All parties are on the phone.

            THE COURT:  Terrific.  And have you had a chance to

remind them that this is a public proceeding and all the rules

and procedures that go with that?

            THE CLERK:  Yes, I have.

K5SALUOOps

THE COURT:  Terrific.  Great.

All right.  So we're here for oral argument on the Luo v. Sogou matter.  Who do I have who will be arguing for the plaintiffs?

MR. GOLDBERG:  Good morning, your Honor.  On behalf of lead plaintiffs Zhang, Xu, Ding, Xu, Frater and Patel, Jacob Goldberg from The Rosen Law Firm.

THE COURT:  Good morning, Mr. Goldberg.

And I know there are a number of defendants in the case.  Is there going to be a single counsel for defendants who are arguing?

MR. ROSENSWEIG:  Your Honor, this is Richard Rosensweig.  I will be arguing for the defendants Sogou Inc. and Sohu.com Inc.  You'll also hear from Mr. Schacter from Morgan Lewis, who will be arguing for certain of the underwriter defendants.  There are a number of defendants for whom there will be no argument as a number of defendants have not been served in the case.

THE COURT:  So what I'm prepared to do is I'll hear first from defendants.  I can give you about 25 minutes.  You can figure out how you want to split it amongst yourselves. Then I'll hear from plaintiffs for about half an hour.  And then defendants have five minutes of reply.

So, with that, why don't I turn first to whoever is going to be arguing first on behalf of defendants.

K5SALUOOps

MR. ROSENSWEIG:  Thank you, your Honor.  That would be me, Richard Rosensweig, representing Sogou and Sohu.  Sogou, of course, is the issuer here in this case.

Although the company's name is spelled with a U, it is pronounced "so-go."  It has the additional advantage of making it easier to understand the distinction between Sogou and Sohu, which is an additional defendant.

I will address the Section 11 and Section 15 claims against Sogou and Sohu.

Starting with Sogou, the company, it was primarily formed in 2004.  Its business is, it is a search engine and web browsing platform like Google.  It makes most of its money through advertising on its search platform.  Sogou has other businesses which make up a modest part of its revenue.  One of those other businesses is a line of smart watches, so technologically enabled watches, which are known under the brand name Teemo.  Sogou conducted an IPO on November 9th, 2017, and it sold over 50 million ADSs on the New York Stock Exchange.  In January of 2019, the first of several complaints was filed in this matter alleging violations of Section 11 and Section 15 of the Securities Act.  The cases were consolidated, and the complaint was subsequently amended twice after that.  Initially it was twice amended.  And then at that point, the defendants -- that is, those who had been served: Sogou, Sohu, and the underwriters -- filed a motion to dismiss in response

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K5SALUOOps

to the second amended complaint.  The plaintiffs then amended the complaint for a third time rather than respond to the original motion to dismiss.  And the current motion seeks dismissal of the third amended complaint.

Plaintiffs have two claims.  Essentially they allege that Sogou's registration statement, filed in connection with its IPO, was misleading in two respects:  They say it was misleading because Sogou failed to disclose that its content-monitoring procedures, which are designed to remove content that is prohibited under Chinese censorship laws, were inadequate.  The second claim that the plaintiffs make is that, prior to the IPO, the company had decided to phase out older models of its Teemo smart watch, which were not with artificial-intelligence functions.  And the claim is that Sogou knew that they would do this at a later date and that when they did phase out the older-model watches, it would result in a write-off of inventory of the older models.

The defect in both of the plaintiffs' claims is that they have failed to allege any facts existing at the time of the IPO that would support either of their two claims. Instead, the basis that the plaintiffs assert for their two claims are events that occurred in June and July 2018, which was seven to eight months after the IPO of the company.  The first event in question is one that is commonly referred to as the Douyin incident.  Douyin is spelled D-o-u-y-i-n.  And

essentially, the Chinese authorities, in June of 2018 and July of 2018, investigated an advertisement that was carried on Sogou's search platform by a company called Douyin.  Douyin is a video-sharing application, your Honor.  If you're familiar perhaps with the application known as TikTok, Douyin is a Chinese version, Chinese-language version of TikTok.  It is an application that allows people to share videos among their group of friends or social set or publicly.

By the way, TikTok and Douyin are both applications that are created and marketed by the same company.

In any event, the investigation of the advertisement in question occurred because the advertisement included a satirical animated video clip of a Chinese war hero named Qiu Shaoyun.  I am sure that I'm mispronouncing that name, but in any event, it is spelled Q-i-u, first name, second name S-h-a-o-y-u-n.  This individual, this Chinese war hero, is somebody who had, according to Chinese history, set himself on fire during the Korean War as a way to protect his comrades in arms.  And the video in question was a satirical cartoon about this incident.

The Chinese authorities --

THE COURT:  Perhaps you'll educate me as to what the humor was in that, but I don't think I've been supplied with TikTok, and so I wonder where the humor was.

MR. ROSENSWEIG:  I don't know, your Honor.  I haven't

K5SALUOOps

seen the clip in question.  All I can say is because it was an animated clip, perhaps the clip was intended to poke light at this historical incident.  It is not a form of humor that necessarily strikes me as obvious.  But so be it.  Perhaps in China some found it amusing.  But clearly the Chinese authorities did not.  They determined that the content of this ad violated a Chinese statute called the Heroes and Martyrs Act.  And the Heroes and Martyrs Act is included in our materials attached to the affidavit in support of our motion to dismiss, in English and original Chinese versions.  It is a statute that was enacted after the IPO.  It was enacted on April 27, 2018, so five months after the IPO.  And it went into effect in May of 2018.  The act created a new class of prohibited contents in China.  And that class of prohibited content is insults or defamation of Chinese historical heroes and martyrs.  I am not completely familiar with what constitutes the difference between a hero and martyr, but I have learned that communist war heros and martyrs are the subject of stories that are commonly taught in schools as part of the national curriculum in China.

As a result of the airing or the inclusion of this advertisement by Douyin on Sogou's platform and the fact that it could be accessed on Sogou's platform, both companies were investigated and ultimately were both fined.  Sogou was fined the equivalent of $150,000 in Chinese currency, which is

K5SALUOOps

something over a million yuan, but it's $150,000 or so in equivalent U.S. value.

Sogou also suspended part of its search service for ten days in July of 2018, during the time that it was in discussions with the Chinese regulators about resolving this issue.

THE COURT:  Counsel, can't the complaint be understood to allege the omission or misleading statement with respect to a fact that was existing at the time of the IPO, i.e., the absence from Sogou's compliance procedures of a committee that would keep up to date on new regulations and the failure to have manual terms as part of the compliance procedures?

MR. ROSENSWEIG:  This is Richard Rosensweig, your Honor.  The plaintiffs have argued that those, the procedures in place were as you have just described.  They argue that in their opposition.  However, it's not consistent with the allegations.  The allegation is not that there was a purely manual procedure in place prior to the IPO.  The procedure in place prior to the IPO included three steps: when an ad was submitted, it was run through a content-control system, which used a keyword blacklist.  The ads were also uploaded into a database that ran through a round of autoinspection of all those ads.  And then finally, Sogou performed manual inspections of ads on a sample basis, and those allegations are set forth in the complaint, in paragraphs 65 and 88.  The

disclosures of these procedures are also contained in the registration statement -- excuse me. No. They were disclosed later on in response to the Douyin incident that these were the prior procedures in place at the time prior to the IPO.

There was no -- there is no requirement to have any specific procedures in place at the company. The requirement that the company is under is to not publish prohibited content. And there is no finding that has been made by the Chinese authorities that Sogou's procedures prior to the IPO were in breach of any statute or law or were in fact deficient at all. However, it is true that as a result of the Douyin incident, the company did implement additional procedures. And one of those additional procedures was to have a dedicated group monitor for new laws and regulations.

THE COURT: And what's your position with respect to whether the company had a duty to disclose that it did not have such a team at the time of the IPO? I understand the argument to be that the absence of such a team is a pretty material fact.

MR. ROSENSWEIG: There is no allegation that they did not have -- that they did not -- that the company did not monitor for new laws and regulations. The only allegation is that, after the Douyin incident, there was a dedicated team that was assigned monitor for new acts and regulations. But there's no allegation that nobody at the company was monitoring

K5SALUOOps

for new acts and regulations.

Also, there is no allegation in the complaint that Sogou was unaware of the new law. Prior to the IPO, when the new law didn't exist, there is no allegation that Sogou's procedures ever failed to identify prohibited content and remove it from the system. There is no allegation that the authorities ever investigated Sogou and found that it had an extensive amount of -- or any amount -- of prohibited content. The only prohibited content ever allegedly found on Sogou's platform was the ad that was uncovered in June of 2018.

So we would submit that there is no material disclosure regarding the adequacy of Sogou's procedures to monitor content that was omitted from the offering documents, and in fact there had never been a problem. So there is no requirement that Sogou have a dedicated team to monitor for new acts and statutes. Sogou, there's no allegation they didn't so monitor. And there's no allegation they were unaware of the Heroes and Martyrs Act. In fact -- I'm sorry, your Honor.

THE COURT: Counsel, you're coming up to three minutes to go until it's been 25 minutes. Do you want to touch on briefly the team watch?

MR. ROSENSWEIG: Yes, your Honor, I do, very briefly.

THE COURT: You're coming up on 20.

MR. ROSENSWEIG: Thank you, your Honor.

The Teemo Watch issue relates to the fact that, in

K5SALUOOps

July, specifically the end of July 2018, so long after the IPO, the company announced that it would discontinue the selling of older Teemo Watches that were not AI-enabled, and there was a write-down of the inventory of some of these older watches.

The company had introduced a newer Teemo Watch in July of 2017 that was AI-enabled.  That was obviously a view months before the IPO.  Then, in July of 2018, after the Teemo Watch with AI capability was in circulation for about a year, and also after Sogou had introduced two other hardware products that were AI-enabled that were successful or at least well received in the marketplace, in March, I believe it was, and May of 2018, Sogou decided that it would no longer manufacture the older Teemo Watches.  So the plaintiffs allege that they have a fact -- they allege, rather, that Sogou had decided prior to the IPO to stop selling these older-model Teemo Watches but didn't so disclose until July of 2018.  But the plaintiffs have not identified any fact, at all, that demonstrates that Sogou had made this decision prior to the IPO.  What they say is that, in July of 2018, when the announcement was made, that Sogou referred to it as an acceleration of its artificial-intelligence plans.  That's what they say in their opposition.  But what the complaint actually says is the announcement was that Sogou, at the end of July 2018, had decided to start to accelerate its AI plans and, as a result, decided that it would no longer manufacture this

K5SALUOOps

older-model watch.

So what I would leave the Court with is really that the plaintiff scenario that they're positing here, which they say is a plausible one, is that Sogou introduced an artificial-intelligent watch for the first time in July of 2017, just four months prior to the IPO, and decided, within four months, that they were going to discontinue the older-model watches, and that they were going to continue to manufacture the older-model watches for the next seven or eight months so that they could then announce that they would stop manufacturing them and take a write-down of inventory.  And essentially, from our perspective, that is not a plausible scenario.  But, moreover, there simply is no fact alleged in the complaint that would show that Sogou had made that decision, or frankly was even considering that decision prior to the date of the IPO.

THE COURT:  Thank you, Mr. Rosensweig.

I'll hear now from the counsel for the underwriters for five minutes, just anything that counsel for the underwriters wants to ad.  Mr. Rosensweig, I'll give you five minutes at the end to wrap up because it's your motion.

I should say that, at the end of this, I'm going to ask defendant to order a copy of the transcript on an expedited basis so the Court has it available.

MR. SCHACTER:  Thank you, your Honor.  This is Ken

K5SALUOOps

Schacter from Morgan Lewis for the underwriters.  I'll be brief.

We obviously agree with Mr. Rosensweig's presentation. I'd like to sort of zero in if I could on your Honor's questions about the first theory of liability relating to the company's procedures for complying with Chinese government internet content laws.

I think what needs to be understood -- Mr. Rosensweig made this point but I just want to underscore it -- is that this entire case rises or falls on a single incident, in which it is alleged that a single internet content law was violated. So there is only one internet content law that plaintiffs claim was violated.  That's the Heroes and Martyrs Act.  It wasn't enacted until late April 2018, five months after the IPO. There is only one governmental investigation at issue, and that's this investigation that began in June 2018, more than six months after the IPO.  It related to a single advertisement run, as your Honor now knows not by Sogou but by this Douyin platform.  And that advertisement was also run in June 2018, more than six months after the IPO.  And there was only one sanction ever visited on this company, and that was the fine and a ten-day cooling-off period, if you will.  And that was announced in July 2018.  So one statute, one investigation, one advertisement, one alleged violation, one single sanction.

So if I can go back to your Honor's questions about

K5SALUOOps

procedures, it seems to me that it would be quite a different story if Sogou, in its registration statement, had said, we have a dedicated team to monitor compliance with every law and every new law.  It didn't say that.  It would be quite another thing if Sogou had said in the registration statement that its procedures ensured that it would always catch a violation, even of a new law, a recently enacted law, and a violation that was committed not by Sogou but by an advertiser.  It never said anything like that.  So for plaintiffs to say that because a single ad slipped through the cracks, in light of a recently passed statute, that shows a material inadequacy in the company's controls, I don't think is right.  I don't think it's fair.  I don't think it's accurate.

And the plaintiffs again try to expand this to make it more generic, if you will, by claiming, oh, it wasn't one law; there were, I think the brief said, that this incident may have likely violated five Chinese laws.  As far as I can tell there are only two that are mentioned in the plaintiffs' brief or the complaint.  That's the advertising law and the cyber security law.  But all they say is that advertisements may not include materials that PRC, People's Republic of China, laws and regulations otherwise prohibit.  Cyber security law says the same thing.  So it's the underlying prohibition that changed.  The statutes, all they say is you can't advertise prohibited content.  It wasn't until the Heroes and Martyrs law was

K5SALUOOps

enacted that it became prohibited.

So in our view, this is really a function of a single incident and a single advertisement, and that cannot demonstrate a material inadequacy in controls of the type that your Honor inquired about or that the plaintiffs seem to be contending existed here.

As to the Teemo Watch, I think Mr. Rosensweig covered it. I don't have anything to add on that. Thank you.

THE COURT: I think I have that. Thank you.

Mr. Goldberg, let me turn to you now. And I should tell you that I have in front of me a copy of the complaint. And so it would be helpful to me, if you're referring to a specific allegations, for you to tell me where in the complaint the things are pled which you want me to pay attention to. But let me turn it over to you for a half an hour now.

MR. GOLDBERG: Your Honor, thank you very much. Jacob Goldberg on behalf of lead plaintiff.

Your Honor, very simply stated, this case is on all fours with the *Jinkosolar* case in which the Second Circuit, reversing an order of dismissal, found that, if the measures that the defendants, that the registrant, claimed to have implemented to deal with pollution were ineffective, that the IPO offering documents were themselves misleading.

Your Honor, it is propitious for lead plaintiffs that our friends on the other side have submitted to the Court the

very recent case of assay *Assay v. Pinduoduo*, because the *Meyer v. Jinkosolar* case, the *Pinduoduo* case, and this case are substantially similar.  And the problem is that Judge Castel, in the *Pinduoduo* case, asked the exact wrong question based on what the Second Circuit had instructed him to ask.  In *Meyer*, the Second Circuit said, these pollution measures are not guarantees of a hundred percent compliance, and certainly, in *Jinkosolar*, the registrant disclosed that its measures might fail and that could lead to liability.  Similarly, in the *Pinduoduo* case, they did not guarantee a hundred percent that they would avoid counterfeiting.  And in *Pinduoduo*, rather than ask the question of whether the strict -- I'm quoting now -- strict measures to prevent counterfeiting, whether those measures were as defendants described them or whether defendants' description of the measures in the offering documents were materially inaccurate, instead, Judge Castel asked the question that the Second Circuit said don't ask.  He said, did the company caution about the ongoing possibility and impact from counterfeit goods.  It did.  And he found that dispositive.

But, again, your Honor --

THE COURT:  Mr. Goldberg, let me ask, didn't the Second Circuit, subsequent to *Jinkosolar*, distinguish *Jinkosolar* as a case in which the company described its compliance measures in, quote, competent detail, and

distinguish that from a circumstance where the company made more tentative and generic statements about its compliance measures?

MR. GOLDBERG:  Yes, it did, your Honor, but it's not dispositive here.  And the reason it's not dispositive is, the question here is, as it was in *Jinkosolar*, did the measures on which the company sought its license from the Ministry of Culture, paragraph 50 of the complaint, your Honor, did the content filtration system that the company implemented work. And in *Jinkosolar*, your Honor, the Second Circuit gives this wonderful example.  It's the sort of Maginot Line of content filtration systems here.  The Second Circuit says, in a securities offering, a registrant cannot disclose a business's peculiar risk of fire, the installation of a comprehensive sprinkler system to reduce fire danger, and omit that the system has been found to be inoperable.  The question is, is the system that Sogou implemented, is that system operable?

THE COURT:  Mr. Goldberg, can you point me to a paragraph of your complaint that indicates that, prior to the IPO, there was a failure with respect to the compliance measures or, more particularly, a violation of PRC law by this company?

MR. GOLDBERG:  Your Honor, we cannot.  We did not plead any pre-IPO violation.  However, I will say that whether any such violation existed is outside of the plausibility

K5SALUOOps

inquiry that this Court should engage in under Rule 8(a). And the reason for that, your Honor, is, as a nonpublic company that is covered by Chinese media, there may have been even publicized instances of which we are unaware. The company was not public. And therefore whether there were is not even really the question, your Honor, because while defendants have focused on the ex post situation that occurred here, again, in *Jinkosolar*, the question is, are the measures themselves adequate. If they're inadequate at the time of the IPO, then things that happened after the IPO that cause problems, that bring the risk of which they disclosed -- and they did, your Honor. We do not shy away from that. As they did in *Jinkosolar*, as they did in *Pinduoduo*, they disclosed the risk of failure to comply. But it never --

THE COURT: Help me with this. Under your theory, if I accept it, what would prevent a plaintiff from bringing a securities lawsuit against any company who, after it's done an IPO or issued an SEC filing, improved its compliance measures in response to some subsequent violation? Under your theory, wouldn't a plaintiff be able to, in every one of those cases, bring a securities fraud lawsuit?

MR. GOLDBERG: If the improvement -- and we're not dealing with rules of evidence, your Honor; we're dealing with a pleading -- if the improvement renders plausible the material inadequacy at the time of the IPO, then yes is the answer to

your question.  If a company like Jinkosolar, like Pinduoduo, like Sogou, discloses that it has a system, let's call it, to prevent fire, and that system is inoperable at the time of the IPO, then if a fire strikes after the IPO, the question isn't, oh, look, the fire happened, the fire didn't happen before the IPO.  It didn't, it couldn't have, your Honor, obviously.  The question is, you told --

THE COURT:  Mr. Goldberg, then what fact do you point to in the complaint other than the Qiu Shaoyun incident, that demonstrates that the compliance measures were inadequate at the time of the IPO?

MR. GOLDBERG:  We needn't point to any other.  It only takes one to shut the company down for ten days and for it to materially impact the company's revenue.  There's only one. Your Honor, what's even --

THE COURT:  Do you dispute, Mr. Goldberg, that the law that was violated, the substantive law that was violated only came into effect after the IPO?

MR. GOLDBERG:  No, your Honor, but it proves the point.  The question here is whether the system, the measures are competent, are they operable to prevent the prohibited conduct -- I beg your pardon, your Honor -- the prohibited content.  This law proves the point.  Think about the Hong Kong situation going on that is in the news now.  If the Chinese government says, you may not publish things to internet service

providers, to search engines, to whomever, about Hong Kong, the company must be able to react immediately to that, your Honor. Think about what this does.  This isn't that the Heroes and Martyrs existed, but that the Heroes and Martyrs was implemented by the PRC government after the IPO is dispositive of this motion, because the fact that the government implemented it on April 27 and that, fully a month, almost a month and a half later, there was a violation, and that violation occurred because Sogou had not implemented a system timely to update its wonderful, wonderful AI-enhanced content filter is exactly the point.  What happened if it had happened ten times?  It happened once.  They corrected it.  But the correction implicates, in the context of the incident, the correction implicates the inadequacy of what existed at the time.

THE COURT:  Counsel, assume with me hypothetically that China never passed the Heroes and Martyrs law.  And assume therefore that the Qiu Shaoyun TikTok was perfectly lawful. And assume further, therefore, that there was never any violation by the company.  Your position still would be that the company violated Section 11?

MR. GOLDBERG:  The incident is only an uncovering of the inadequacy.  If it was never uncovered, your Honor, and we got a year beyond the offering but in no instance longer than three years after the offering, the statute of

limitation/repose respectively, it's a tree falling in the woods with no one there.

THE COURT: No, no. Stick with me for a second, Mr. Goldberg. Let's assume that you've got an insider who said, you know what, we don't have in this company the compliance measures that you allege the company later adopted. There's never been a violation. It's not just a matter of statute of limitations, a tree falling in the forest. I take it your position is, yes or no, that there would be a violation of Section 11, even if there was never a violation by this company of Chinese law?

MR. GOLDBERG: Yes, your Honor. There would absolutely be a violation. The question is, do I have the fact to prove it. What you added to your hypothetical was, I now have a witness who says, we did not have an operable system to filter content. If I have the witness and they said, we have a system, I have a violation.

THE COURT: Even if the system in place is effective to detect all of the violations of the law as they currently exist?

MR. GOLDBERG: Your Honor, the effectiveness of the system is what's key. And if it catches one but might not catch another because, let's say for instance, the PRC implements the Heroes and Martyrs Act, which everyone knew was going to be implemented since 2017, if they implement that, the

K5SALUOOps

question is, is the system still robust, or is it the Maginot Line and the Germans can just go around it by marching through Luxembourg and Belgium. I mean, the fact that the Maginot Line doesn't protect an invasion through Belgium doesn't mean that the Maginot Line doesn't exist and doesn't mean that it's not preventing an invasion across the French and German border. It doesn't mean that they didn't install the sprinkler system from the Second Circuit's example. They did. The question is, is it operable. So there are two ways in which --

THE COURT: With respect to the Maginot Line, just to stick with that analogy, assume that the French are aware that the Germans are building up their forces. They're not going to go through the way they did before. They're going to go through to the north. And France is remiss in sticking with the Maginot Line. What facts do you allege and where in the complaint do you allege it that the German threat, which was your analogy, was imminent? What would you like me to look at in terms of what the company knew at the time of the IPO that would have indicated their policies for the Maginot Line?

MR. GOLDBERG: Your Honor, the defendants need not have had actual knowledge of anything. And the French need not have had actual knowledge, when they built it well in advance of the German buildup, they need not have known that the Germans were going to amass on the Belgium border and come through the north. When they say that we have this robust

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

system of protecting ourselves, the question is, is it knowable that the Germans can, if they ever build up and ever march against France, can they come through Belgium?  Answer yes. And that's knowable.

THE COURT:  Did the company say it had a robust compliance system?

MR. GOLDBERG:  Your Honor, again, I point you to paragraph 50.  And we read all of this in context.  The company said, to get licenses, we need to submit this plan to the Ministry of Culture.  My colleagues say they didn't violate any law with respect to a committee they had.  The law didn't require them to do one thing versus another.  But they did, to get their license, submit the content filtration system that they had developed to the Ministry of Culture.  And this indicates to the market, again, same thing, it's not a hundred percent guarantee, but we have something that has enabled us to get a license.

And by the way, they didn't say that there were any violations ex ante, your Honor, before the IPO.  They said, we have a system.

THE COURT:  Are there any other statements -- I've got time for it -- where you believe that the company indicated that it had a robust compliance system or that it had language where it described its compliance measures in competent detail, besides paragraph 50?

K5SALUOOps

MR. GOLDBERG:  No, your Honor.  And in advance of the hearing I did scour the offering statements.  But that distinction is not necessarily material, because, again, the company is not promising a hundred percent -- they're not guaranteeing that they will a hundred percent filter prohibited content.  In *Jinkosolar* the company didn't guarantee.  And in *Pinduoduo* it did not guarantee.  But the question is --

THE COURT:  Mr. Goldberg, is it your position -- again let's go back to the Maginot Line -- that the German threat did not even need to exist?  Are you saying the German threat had to exist but it's irrelevant whether the French knew about it?

MR. GOLDBERG:  It's irrelevant whether it existed, your Honor.  The purpose of the Maginot Line was to prevent against a German onslaught, whether at the time they began and completed building it one was imminent, or even planned.  The point is, we have a system to prevent something from happening.  And the question the Second Circuit requires this Court and the *Pinduoduo* court, which by the way is on appeal, that case is on appeal, your Honor, the question it requires us to ask is not whether it's a hundred percent guarantee against the German onslaught, your Honor, but the question is, does the system have material problems?  Is the sprinkler system and the fire system that you installed operable?  If it is materially inoperable, if there are material problems with it, you must disclose those problems if they're knowable.  This problem was

K5SALUOOps

knowable.

THE COURT:  In what paragraph do you point to for the notion that there were material problems that were knowable?

MR. GOLDBERG:  So, your Honor, that's where, what defendants point to is this ex post existence of the Heroes and Martyrs Act, ex post IPO.  But the reason why the Heroes and Martyrs Act actually supports it is because the government imposed a content regulation and they didn't update the system.  They left the system to fend for itself.  And the system may have been as stalwart as the Maginot Line, but Belgium's here, you know, because the prohibited content that the government said, on April 27th, you may not broadcast, this company did not react.  It didn't install in it -- it didn't install the prohibited words.  And therefore, your Honor, the violation proves the point.  They were not updating the system.  It's very simple.  Garbage in, garbage out.  The AI may be spectacular.  It may be the most robust.  It doesn't matter, if you don't have the personnel who are scouring the law and scouring dictates from the People's Republic, from the Party in China, saying, you may not talk about Hong Kong in this way, you may not talk about heroes and martyrs in this way.  And this company, maybe it was the first time, maybe it wasn't, it failed.  It didn't update it for a month and a half.

THE COURT:  Mr. Goldberg, you would have me impose a duty on the company to disclose something.  I'm not sure.  I'm

still trying to understand what it is exactly.  But what do you base that on?  Is that based upon a duty that arises because of something that the company said in its offering documents, or is it a freestanding duty?  And if it's a freestanding duty, what would you have me look to for the existence of that freestanding duty?  What would you have me look to in the securities laws if it's a freestanding duty?

MR. GOLDBERG:  Your Honor, there is a duty to disclose under item 303, but we needn't get there.  Because, as the Court knows under *Rombach* and its progeny, it must take everything in context.  So the question for the Court is, with all of the disclosure about prohibited content, the risks of it slipping through the filtration, with all of the disclosure about licensing and submitting plans to the Ministry of Culture, the question becomes, for the Court, did that require them to say that our system may be materially inadequate for a failure of us to create a system by which we immediately updated the automatic system?  The automatic system is robust and it's wonderful and it may be, it may not, your Honor.  We don't know.  But what the company did change in response to its discussions with the government, ex post, after the Heroes and Martyrs implementation exposed the flaw, they told us what the flaws were.

Now, again, your Honor, either they became noncompliant after the IPO, but that's unlikely, or they were

K5SALUOOps

compliant -- they were noncompliant at the time of the -- I'm sorry. I'm using the wrong word. I said noncompliant. Either there was a material deficiency at the time of the IPO or there wasn't one. But clearly there was one because the Heroes and Martyrs Act implementation caused the company to trip, effectively requiring it to shut down and having a material impact. Right. So in effect the company -- it was knowable. Your Honor, there is no scienter requirement here. Congress has put on registrants like Sogou a strict liability so that they have shifted the risk to Sogou to disclose that there are material inadequacies. If they didn't have a committee timely to update their system, there was going to be an event, or we could have gotten a witness who said, hey, this is it, and that would have disclosed it and enabled us to say, you have a problem.

THE COURT: And where do you point to for the fact that they did not have a system in place to timely update their procedures?

MR. GOLDBERG: Your Honor, the disclosures after the class period in response to what happened with the Heroes and Martyrs Act is exactly that. After an investigation --

THE COURT: I'll take a look at those.

You might want to address the Teemo Watch argument. You guys have another five minutes left, and I want to make sure that we cover that and I give you time on that.

MR. GOLDBERG:  Absolutely, your Honor.  And I appreciate it.

Your Honor, the analysis, again, plausibility, is the same.  And *Jinkosolar* requires no different result for the Teemo Watch situation.  I refer the Court to paragraph 86, in which the company, in the context of talking about the Teemo Watch and in the context of its smart hardware strategy, the company said after end of the period, after the IPO, they said, and now I'm quoting, your Honor, again paragraph 86: "From July last year, we began to develop new hardware product that better leveraged our AI capabilities."  They said that in the context of the Teemo Watch.  So the question for the Court is, is it plausible, based on what the company admitted to after the IPO, that from July of 2017, before the November 2017 IPO, they had been developing new hardware product, does it make it plausible that they had determined in some way, that they had strategized in some way at the time of the IPO to move away from the Teemo Watch based on its development of new hardware product.  The question here is not whether we have pleaded with heightened particularity.  The question with respect to the Teemo Watches, in the context of defendants' own admission, of having begun to develop new hardware products in advance of the IPO, and then to disclose the shift in strategy after the IPO, whether a jury could find, after full discovery, whether it is plausible, whether it is more than speculative that that strategy existed

at the time of the IPO.  And I submit to the Court that --

THE COURT:  What do I do with the statement at the beginning of that next paragraph in paragraph 86 that said, "Encouraged by this development, for example, the second quarter, we accelerated an adjustment of our smart hardware strategy.  Now they're transitioning the products to better leverage our AI capability"?

MR. GOLDBERG:  Your Honor, I think that the word "accelerated" is exactly -- is supportive of the plausibility of our position.  "We had a strategy.  We have now accelerated it."  Keep in mind that paragraph 86 is post IPO.  That is, it's after the company discloses that it is shifting its strategy, after the company discloses the issue with respect to its content filtration system.  These are post disclosures. And they're talking about acceleration.

Again, your Honor, under *Rombach*, context is critical. These paragraphs appear together -- the Teemo Watch, the development of the new product, and what they themselves call acceleration of the smart hardware strategy.  That means that, at that time, July of 2018, your Honor, at that time, they were accelerating something that they had strategized prior to that time.  So the question is, is it plausible, based on paragraph 86, that at the time of the IPO, having begun to develop products that would replace the Teemo Watch, whether it's plausible that that strategy existed and whether, if it

K5SALUOOps

existed, they were required to disclose it.  And the answer is, with respect to plausibility, absolutely yes.  That is an acceleration.

THE COURT:  And the answer about the duty is item 303?

MR. GOLDBERG:  No, your Honor.  The offering statement itself talks about hardware and talks about the importance of the Teemo Watch to hardware, and effectively concedes the materiality of hardware as a growing division of the company.  So in that context, if they say Teemo Watch and they say that that the Teemo Watch relates to the growth in hardware, your Honor, and they fail to disclose a shifting of strategy, it is materially inaccurate.

THE COURT:  Their disclosures notwithstanding, isn't the smart watch also part of the hardware company?

MR. GOLDBERG:  Yes, the Teemo smart watch, your Honor.  Yes.

I'm sorry.  Did I miss your question, your Honor?

THE COURT:  Yes, you did.  Why don't you finish up, and then I'm going to give Mr. Rosensweig five minutes at the very end.

MR. GOLDBERG:  Sure.

Your Honor, I commend to the Court a careful comparison of the *Jinkosolar* case, the *Pinduoduo* case, and this case.  The Second Circuit set a standard.  Judge Castel got the question exactly wrong.  This Court should not fall prey to

K5SALUOOps

that.  We do not contend that they did not warn of a possibility of prohibited content appearing on its platform. But the question for the Court is not that but, rather, whether there were knowable material inadequacies at the time of the IPO.  Because the complaint pleads plausibly there were, the Court should deny the defendants' motion to dismiss.

Thank you.

THE COURT:  Thank you very much.

Mr. Rosensweig.

MR. ROSENSWEIG:  Thank you, your Honor.  Two points really.  First, with regard to the *Jinkosolar* case, *Meyer v. Jinkosolar*, the distinction between that case and many of the others cited by plaintiffs is a simple one.  And it is not as Mr. Goldberg described.  The distinction between the case and our case is that the problem that was disclosed later had already materialized before the IPO.  In *Jinkosolar*, the company was already extensively violating the pollution laws and polluting the environment to an extensive degree before the IPO.  It had already started investigating its pollution problem and had discovered that its pollution piping was far larger than what was allowed by the law.  It had already discovered that it had polluted a whole array of water systems in and around its plant prior to the IPO.  When the report in *Jinkosolar* was disclosed a few weeks after the IPO, it was clear from the report that the problem had materialized and

K5SALUOOps

they were known by the company before the IPO.  Here, there is no problem that is alleged to have materialized prior to the IPO, let alone that it was known or knowable.

And the second thing is, what we have to look at in this case is what happened in June, July 2018 with respect to the Douyin incident.  The authorities did not discover or say that the company's procedures were materially or systematically deficient.  What was disclosed was that the company wasn't able to catch this ad because its keyword technology had not provided for the possibility that three words would be used in the same ad.  And the three words were "Qiu Shaoyun," "fire," and "joke."  So the company simply said, if it had figured out and put in its blacklist of keywords to look for those specific three words in combination in the same place, it would have caught this ad.

And I would submit that it is -- I'm sorry, your Honor?

THE COURT:  I don't have any questions for you.

MR. ROSENSWEIG:  I would submit that it is simply impossible to catch every violation, every keyword, or every, you know, possible incident, such as the one that came to pass here, but the existence of this one infraction does not demonstrate anything like what was demonstrated in *Jinkosolar*. And I would leave it at that with respect to the Section 11 claims.  I do not purport, and you have not invited me, to

K5SALUOOps

spend more time arguing with regard to the Sohu motion to dismiss the control person claim under Section 15. I believe that's been adequately briefed.

THE COURT: I don't need argument with respect to that.

MR. ROSENSWEIG: Yes. I merely wanted to mention it so the Court wouldn't think that we had somehow withdrawn it or forgot about it, but that was really it. Thank you, your Honor.

THE COURT: OK. Thank you all.

MR. GOLDBERG: Excuse me, your Honor. May I just say one sentence, with the Court's indulgence?

THE COURT: Of course. Who is this?

MR. GOLDBERG: This is Jacob Goldberg. Apologies, your Honor.

I just would like to say one sentence. What my friend just did was, again, attempt to confuse the issue. He confuses a manifestation of a problem with the inadequacy of the system on which the Second Circuit focused in *Jinkosolar*.

Thank you, your Honor.

THE COURT: Thank you.

I was in the process of saying, and I will repeat it, that the case has been very well argued. I think all three of you have presented the issues very clearly in a way that's very helpful. So I want to thank you.

K5SALUOOps

I want to thank the court reporter obviously. Defendants will order a copy of the transcript on an expedited basis.

And everybody stay safe and healthy.  And thank you very much.

COUNSEL:  Thank you, your Honor.

(Adjourned)